RYAN ADAIR SHANNON (OR Bar No. 155537)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211
Tel: 971-717-6407
rshannon@biologicaldiversity.org

*Lead Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

### Portland Division

### Civil Action No.: 23-150

| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY** and **AUDUBON SOCIETY OF PORTLAND**, | |
| *Plaintiffs*, | |
| v. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| **DEBRA HAALAND**, in her official capacity as Secretary of the Interior, **MARTHA WILLIAMS,** in her official capacity as the Director of the U.S. Fish & Wildlife Service, and **U.S. FISH AND WILDLIFE SERVICE**, | |
| *Defendants*. | |

**INTRODUCTION**

1.      Plaintiffs Center for Biological Diversity ("Center") and Audubon Society of

Portland ("Audubon") challenge a decision by the U.S. Fish and Wildlife Service ("Service") to

again list the streaked horned lark (*Eremophila alpestris strigata*) ("Lark") as a threatened rather

than endangered species, and to issue a "special rule" pursuant to section 4(d) of the Endangered

Species Act ("ESA"), 16 U.S.C. § 1533(d), exempting activities acknowledged to be a threat to

this severely imperiled bird from liability under the ESA. Threatened Species Status for Streaked

Horned Lark With Section 4(d) Rule, 87 Fed. Reg. 21,783 (Apr. 13, 2022) ("2022 Threatened

Determination").

2.      Native to the much-diminished prairies of the Puget Lowlands and Willamette

Valley, the Lark is found nowhere else on Earth. Once abundant, the Lark has been reduced to

exceedingly small and scattered populations and is at immediate risk of extinction.

3.      The Service first listed the Lark as threatened in 2013 notwithstanding the

recommendation of Lark experts urging the Service to list the species as "endangered"—a more

protective classification under the ESA. The 2013 listing determination was subsequently

remanded back to the Service to reconsider whether the Service acted arbitrarily and capriciously

in its analysis of whether the Lark was endangered in at least a "significant portion of its range,"

("SPOIR"), which would qualify it for listing as endangered. 16 U.S.C. § 1532(6).

4.      Following remand, and despite the ongoing steep decline in the quantity, quality,

and distribution of suitable habitat, and other threats such as the synergistic effects of small

population sizes, invasive species, climate change, severe weather events, and disturbance of

nests, which are constructed on the ground, the Service again determined that the Lark is

COMPLAINT                                                                                        1

currently not in danger of extinction throughout all or a significant portion of its range, and thus did not warrant listing as an endangered species under the ESA.

5.      Instead, the Service reaffirmed its determination that the Lark is only a "threatened" species. 87 Fed. Reg. 21,783. In doing so, the Service failed to account for the Lark's population numbers that are far below accepted minimum viable population sizes and below the population sizes necessary to ensure resilient populations and to prevent inbreeding depression, failed to account for the best available science demonstrating that Lark populations face numerous imminent threats and are declining at a significant rate, and failed to determine whether the Lark is endangered in a SPOIR based on its status in one or more of the three regional populations—South Puget Lowlands, Pacific Coast and Lower Columbia River, or Willamette Valley.

6.      Listing of the Lark as a threatened rather than endangered species allowed the Service to promulgate a "4(d) Rule" for the species. *Id.* at 21,807–11 ("2022 4(d) Rule"). Such a rule may exempt otherwise harmful activities from the ESA's safeguards so long as the rule as a whole "provide[s] for the conservation of the species." 16 U.S.C. § 1533(d). The 2022 4(d) Rule exempts agricultural activities from liability under the ESA despite known and serious impacts on the Lark. The stated purpose of this exemption is to "remove the incentive" for landowners to "discontinue activities" that maintain habitat for the Lark. Proposed Rule, Threatened Species Status for Streaked Horned Lark with Section 4(d) Rule, 86 Fed. Reg. 19,186, 19,204 (Apr. 13, 2021). However, despite the 4(d) rule's existence since 2013, landowners have continued to convert lands to crops that are unsuitable for the Lark at a rapid clip. Consequently, although the 4(d) rule has allowed harmful activities to occur in Lark habitat without any restrictions (such as

limiting mowing down of active nests), it has not resulted in any demonstrable conservation

benefit to the species, in contravention of section 4(d) and the purposes of the ESA.

7.    For these and additional reasons, the Service's 2022 Threatened Determination

and 2022 4(d) Rule violate the ESA and are arbitrary and capricious.

## JURISDICTION AND VENUE

8.    This action is brought pursuant to the ESA citizen suit provision, 16 U.S.C. §

1540(g)(1), and Administrative Procedure Act ("APA"), 5 U.S.C. § 702, which waive

Defendants' sovereign immunity.

9.    This Court has jurisdiction over this action under Section 11(g) of the ESA, 16

U.S.C. § 1540(g), 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 1331 (federal question),

and 5 U.S.C. § 702 (review of agency action under the APA).

10.    Venue in this Court is proper under 28 U.S.C. § 1391(e) and 16 U.S.C. §

1540(g)(3)(A) because Defendants are officers and employees of the United States acting in their

official capacities, and a substantial part of the violations giving rise to the claim occurred in this

judicial district. Venue is proper in the Division according to Local Rule 3-2 because a

substantial part of the events giving rise to the claim occurred in this Division. The Service's

Oregon Fish and Wildlife Office in Portland, Oregon prepared the 2022 Threatened

Determination and 2022 4(d) Rule for the Lark.

11.    Plaintiffs provided Defendants with 60 days' written notice of Plaintiffs' intent to

sue on October 27, 2022, to the extent required by 16 U.S.C. § 1540(g)(2).

## PARTIES

12.    Plaintiff Center for Biological Diversity is a national, non-profit conservation

organization that works through science, law, and the media to protect imperiled species and

their habitats. The Center has more than 84,000 members, with over 7,000 members in Oregon and Washington. The Center is incorporated in California and headquartered in Tucson, Arizona, with offices throughout the United States including in Portland, Oregon. The Center brings this action on behalf of itself and its members.

13.     Plaintiff Audubon Society of Portland is a statewide non-profit conservation organization with over 17,000 members and a mission to inspire all people to love and protect birds, wildlife, and the natural environment on which all life depends. Audubon manages forest sanctuaries on the Oregon coast, Mt. Hood, and in Portland, Oregon. Protecting Oregon's native habitat and imperiled native species including the Lark has long been a priority for Audubon. Audubon's members actively recreate in and advocate for protection of the habitat that support the Lark.

14.     Plaintiffs' members and staff have aesthetic, recreational, professional, spiritual, and scientific interests in the Lark and its habitat. Plaintiffs' members spend time in the Lark's habitat and attempt to observe them in the wild. Plaintiffs' members have concrete plans to visit the Lark's habitat to try to view a Lark.

15.     For instance, Joe Liebezeit, a member of Audubon since 2013 and its current Staff Scientist and Avian Conservation Manager, has led several community science projects that included attempts to document Larks using viable nesting and foraging habitat on Sauvie Island and to restore their habitat in Oregon. During those projects, only 2 undocumented Lark sightings have occurred. He also has led several successful birding trips to sites in the Willamette Valley including areas where Larks were successfully observed. These trips have included members of the public interesting in seeing Larks as part of their birding experience. As part of his professional work, and in pursuit of his own recreational, aesthetic, and spiritual interests, Joe

COMPLAINT                                                                                                4

travels six or more times a year to Sauvie Island and National Wildlife Refuges in the Willamette

Valley to go birding, hiking, and wildlife viewing including in habitats where Larks are known

to reside. Joe plans on maintaining this practice on a regular basis for the foreseeable future and

Audubon will continue to offer birding trips to the public that will have some focus on observing

Larks.

16.      Similarly, Noah Greenwald, a member of the Center for over 25 years and its

current Endangered Species Program Director, has professional, aesthetic, recreational, and

spiritual interests in the Lark's survival and recovery in the wild. Noah is a resident of the

Willamette Valley and frequently observes and visits habitats formerly and currently occupied by

the Lark. He first saw a pair of Larks on August 26, 2015, just outside of Basket Slough National

Wildlife Refuge, and again saw Larks at Broughton Beach in Portland on July 2 and 5, 2020.

Noah continues to look for them there on a regular basis, but his understanding is that 2022 was

the first year in many that Larks did not breed in the Broughton Beach area, reflecting their

declining and imperiled status. Noah plans to visit Lark habitat this spring and summer in the

hope of seeing more Larks, including at the Broughton Beach area, the Basket Slough National

Wildlife Refuge, and the South Puget Sound, where he went to college and still has friends that

share his interest in the Lark.

17.      Plaintiffs' members' aesthetic, recreational, commercial, scientific, and spiritual

interests in the Lark have been and will continue to be irreparably harmed by Defendants'

actions unless the relief sought in this Complaint is granted. Because of Defendants' refusal to

list the Lark as an endangered species and their issuance of a 4(d) rule that authorizes highly

destructive activities to continue unabated, the Lark is highly likely to continue to decline to the

detriment of Plaintiffs' members' concrete interests in the survival and conservation of the species.

18.     Defendant Debra Haaland is the Secretary of the Interior ("Secretary"). As Secretary, she has the ultimate responsibility to administer and implement the provisions of the ESA regarding the Lark, and to comply with all other federal laws applicable to the U.S. Department of the Interior. Plaintiffs sue Defendant Haaland in her official capacity.

19.     Defendant Martha Williams is the Director of the Fish and Wildlife Service. Plaintiffs sue Defendant Williams in her official capacity.

20.     Defendant U.S. Fish and Wildlife Service is a federal agency within the Department of the Interior. The Secretary has delegated to the Service the authority to administer the ESA for non-marine species such as the Lark. 50 C.F.R. § 402.01(b).

## STATUTORY AND REGULATORY BACKGROUND

### Endangered Species Act

21.     The Supreme Court has stated that the ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). Its purpose is to provide "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved," and "a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

22.     The ESA directs the Service to add species it determines are endangered or threatened to a list of endangered and threatened species, a process known as "listing." *Id*. § 1533(a); 50 C.F.R. § 17.11 (lists of endangered and threatened wildlife).

23.     A species is "endangered" when it "is in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A species is "threatened" when it is "likely to become an endangered species within the foreseeable future throughout all *or* a significant portion of its range." *Id.* § 1532(20) (emphasis added). The question as to whether a species is endangered or threatened in "all" of its range is distinct from whether it is endangered or threatened in a "significant portion" of its range.

24.     In making listing determinations, the Service must assess five statutory categories of threats, also known as "listing factors," which are: "(A) the present or threatened destruction, modification, or curtailment of [the species'] habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence." *Id.* § 1533(a)(1).

25.     The Service must list the species if it meets the definition of "endangered" or "threatened" because of "any one or a combination of" the five listing factors. 50 C.F.R. § 424.11(c); *see* 16 U.S.C. § 1533(a)(1).

26.     The Service must make listing determinations "solely on the basis of the best scientific and commercial data available," 16 U.S.C. § 1533(b)(1)(A), and may not allow for "economic considerations" when making "determinations regarding the status of species." H.R. Rep. No. 97-835, at 20 (1982).

27.     A species does not receive any protections under the ESA until it is listed as endangered or threatened. Without these protections, endangered and threatened species continue to decline toward extinction and become harder to conserve as their situations become more dire.

COMPLAINT                                                                                          7

28.     Once listed, species are afforded numerous protections. For example, ESA Section 4 requires the Service to designate areas that are "essential to the conservation of the species" as "critical habitat," and to develop and implement recovery plans. *Id.* § 1533(a)(3), (f); 1532(5). Section 7(a)(2) requires all federal agencies to consult with the Service to ensure their actions are not "likely to jeopardize the continued existence" of listed species or "result in the destruction or adverse modification" of their critical habitat. *Id.* § 1536(a)(2). Thus, listing is the crucial first step in the ESA's system of species conservation and recovery.

29.     The ESA provides more stringent and far-reaching protections for species that are listed as "endangered" rather than "threatened." For example, endangered species generally receive higher priority for the preparation and implementation of recovery plans. The listing of a species as endangered under the ESA also automatically triggers prohibitions under Section 9 of the ESA, *id.* § 1538, including the prohibition on the "take" of species, which is defined to include "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19); 50 C.F.R. § 17.3 (harm "means an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering").

30.     The ESA's take provisions do not automatically apply to species that are listed as threatened. 16 U.S.C. § 1538(a)(1). Instead, Section 4(d) of the Act provides that the Service is authorized to extend the prohibitions in Section 9 of the Act to threatened species. *Id.* § 1533(d). Section 4(d) further specifies that the Service "shall issue such regulations as [it] deems necessary and advisable to provide for the conservation" of threatened species. *Id.*

COMPLAINT                                                                                          8

31.     The ESA defines conservation as "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary. Such methods and procedures include, but are not limited to, all activities associated with scientific resources management such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation, and, in the extraordinary case where population pressures within a given ecosystem cannot be otherwise relieved, may include regulated taking." *Id.* § 1532(3).

## Administrative Procedure Act

32.     Under the APA, a reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The APA supplies the standard of review for the Service's 2022 Threatened Determination and 2022 4(d) Rule at issue here.

## FACTUAL BACKGROUND

### The Lark

33.     The Lark is a subspecies of horned lark that is endemic to the Pacific Northwest west of the Cascades, i.e., it exists nowhere else on Earth. 87 Fed. Reg. at 21,789.

34.     Extirpated from the northern and southern portions of its range, the Lark has been reduced to three regions: (1) the South Puget Lowlands in Washington, (2) the Pacific Coast and Lower Columbia River in Washington and Oregon, and (3) the Willamette Valley in Oregon. *Id.* at 21,790.

COMPLAINT                                                                                                    9

35.    Horned larks are small, ground-dwelling birds. Generally pale brown with yellow washes in the male's face, adults "have a black bib, black whisker marks, black 'horns' (feather tufts that can be raised or lowered), and black tail feathers with white margins." *Id*. at 21,789.



36.    Larks form pairs in the spring and the nesting season begins in mid-April and ends in late August. *Id*. Following an initial nesting attempt in April, Larks often attempt to re-nest in late June or early July. *Id*.

37.    Historically, Larks thrived in relatively flat, open areas that were maintained by flooding, fire, and sediment transport dynamics. *Id*. However, the historic conditions that maintained these habitats have been interrupted by flood control, dams, and fire suppression. *Id*.

38.    Lacking the conditions that previously created and maintained their habitat, Larks are now often found on large, open areas created by anthropogenic disturbance, such as areas within or adjacent to grass seed fields, pastures, or fallow fields, recently planted conifer farms,

COMPLAINT                                                                                          10

wetland mudflats, islands created by dredged materials, and coastal areas free from encroaching seagrass. *Id.*

39.     "The most recent rangewide population estimate for streaked horned larks," based on surveys from 2013, estimated that only 1,170 to 1,610 Larks remain.  *Id.* at 21,790.

40.     In 2019, only 121 Lark pairs were observed in the South Puget Lowlands and only 97 Lark pairs were observed on the Pacific Coast and Columbia River combined.

41.     Estimates for the Willamette Valley population are tenuous because a portion of the population occurs on inaccessible sites on private lands which have not been surveyed, but 165 Lark pairs were counted in 2019.

**The Lark's Listing History**

42.     The Service first determined the Lark warranted protection as an endangered or threatened species in 2001, but rather than provide such protection the agency placed the Lark on a list of species that were candidates for listing but whose listing was precluded by species the agency deemed higher priorities. 66 Fed. Reg. 54,808, 54,810 (Oct. 30, 2001).

43.     In 2002, the Center submitted a formal listing petition. Among other threats, the Center stressed that an estimated 99% of the native grassland in the Willamette Valley had been lost to agriculture and other human impacts, and that in order for the Lark to persist on the agricultural lands that have displaced the birds' natural habitat, efforts had to be made to lessen adverse effects on the species during the active breeding season.

44.     Following the petition's submittal, the Service repeatedly determined that the Lark faced "imminent threats of a high magnitude" due to the "continued loss of suitable lark habitat, risks to the wintering populations, and plans for development," and other activities that are "imminent threats to the species." *See, e.g.*, 71 Fed. Reg. 53,756, 53,761 (Sept. 12, 2006).

COMPLAINT                                                                                          11

Although the Service assigned the Lark the highest possible "listing priority," *id.*, the agency took no action to list the Lark until it was sued by the Center for failing to make an ESA listing decision in a timely manner. *See In re Endangered Species Act Section 4 Deadline Litigation*, Misc. Action No. 10-377 (EGS), MDL Docket No. 2185 (D.D.C.).

45.     In October 2012, the Service finally proposed listing the Lark under the ESA. *See* 77 Fed. Reg. 61,938 (Oct. 11, 2012). Despite painting a bleak picture of the Lark's then current status—finding that fewer than 1,600 Larks remained—and the myriad threats to its continued existence—such as the loss of habitat due to agricultural conversion and the encroachment of unsuitable habitat, the loss of natural disturbance regimes, predation, stochastic severe weather events, lack of protective regulatory mechanisms, and the loss of genetic diversity—the Service proposed to list the Lark as threatened rather than endangered. *Id.* at 61,968–97.

46.     Subsequently, notwithstanding peer reviewers and commenters expressing concern over the Service's proposal to list the Lark as threatened rather than endangered, in October 2013 the Service published a final regulation listing the Lark as threatened. 78 Fed. Reg. 61,452 (Oct. 3, 2013). The Service concurrently published a 4(d) rule that omitted protections urged by peer reviews and other commenters, and instead exempted all routine agricultural activities in the Willamette Valley, where most Larks occur, from the ESA's prohibition on killing or otherwise taking Larks, including during the breeding season. *Id.* at 61,500–502.

47.     The Center challenged the 2013 Final Listing Determination and 4(d) Rule in the District of Oregon. *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, No. 3:18-cv-359-MO (D. Or. 2018). The Center argued that the Service's refusal to list the Lark as endangered and the 4(d) Rule were contrary to the ESA and arbitrary and capricious. Following summary judgment briefing and oral argument, the court held that the Service had failed to support a

finding that the Lark is only threatened, and not endangered, in a significant portion of its range, and remanded the 2013 Final Listing Determination and 4(d) Rule back to the Service for further consideration. *Ctr. for Biological Diversity*, No. 3:18-cv-359-MO, ECF 42. The court left the 2013 Final Listing Determination and 4(d) Rule in place during remand. *Id.*

### The 2022 Threatened Determination and 4(d) Rule

48.    On April 13, 2021, after conducting a new Species Status Assessment ("SSA"), a report that is intended to provide the science informing its listing determination, the Service proposed re-affirming its prior threatened determination and expanding the 2013 4(d) Rule's applicability. 86 Fed. Reg. 19,186.

49.    Peer reviewers and commenters again objected to the Service's decision to not list the Lark as an endangered species and to the 4(d) Rule's sweeping exceptions. For instance, Bob Altman, a leading expert on the Lark who the Service asked to provide his opinion on the SSA, objected that the Service had over-counted and misrepresented Lark population numbers in the Willamette Valley and that the agency's counts provided an overly optimistic view of the species' status by focusing on airports and conservation lands in the Willamette Valley—areas which do not face the negative impacts of agricultural operations, urbanization, and habitat loss. Altman also criticized the Service for failing to conduct any statistical analysis justifying its conclusion that Lark numbers were increasing. He additionally critiqued the Service's assumption that the 4(d) Rule would incentivize voluntary conservation actions due to his personal experience over the course of the original 4(d) Rule's implementation that voluntary efforts empirically have not worked to incentivize Lark conservation in the Willamette Valley.

50.    Nevertheless, following the proposed rule and comments, the Service updated the SSA ("SSA V2") and on April 13, 2022, reaffirmed its prior determination that the Lark is a

threatened species and did not warrant listing as an endangered species throughout all or a significant portion of its range. 2022 Threatened Determination, 87 Fed. Reg. 21,783. In addition, the Service's 2022 4(d) Rule expanded the 2013 4(d) Rule's exemption for agricultural practice to include Lark populations in Washington even though grass seed farming, the one type of agriculture that provides habitat for Larks, does not occur in the state. *Id.* at 21,807–09.

51.     In finding the Lark threatened rather than endangered, the 2022 Threatened Determination failed to explain how the Lark is not currently on the brink of extinction due to its low population numbers; numbers far below those necessary for the species' continued survival.

52.     In its final determination, the Service found that the estimated minimum viable population for passerines, which include the Lark, is 6,415 individuals. 87 Fed. Reg. 21,789.

53.     The most recent Lark survey efforts estimated that 1,170–1,610 Larks remain rangewide. This estimate leaves the Lark at a quarter of the abundance needed for survival rangewide.

54.     The regional Lark populations fare no better and are a fraction of what the Service itself has found to be minimally viable. At last count prior to the SSA's completion, roughly 121 Larks pairs remained in the South Puget Sound population, 10 in the Pacific Coast population, and 87 in the Columbia River population. SSA V2 at 13–14. Even in the Willamette Valley, the current core of the species range, only 165 pairs were counted. *Id.* at 16.

55.     The 2022 Threatened Determination attempts to downplay the Lark's extremely low population numbers by asserting that the species has been stable since it was first listed in 2013 and that populations may even be increasing.

56.     However, annual surveys conducted by the U.S. Geological Survey known as the "Breeding Bird Survey" ("BBS") "provide[] the only range-wide breeding population trend for

the [Lark]." SSA V2 at 40, and have found the population to be sharply declining with a "6.52 percent decline for the subspecies between 2005 and 2015[,]" revealing a consistent pattern of decline. *Id.* The Service fails to explain how this pattern of decline, coupled with the Lark's low numbers, does not place the Lark in danger of extinction.

57.     The Service also found that the Lark is not currently in danger of extinction because there are allegedly "multiple populations in high or moderate condition across all representative regions." 87 Fed. Reg. at 21,805.

58.     The Service asserted that a population was in high or moderate condition if it had a stable or increasing population trend, there is movement between local populations/regions, favorable habitat conditions, and if regular surveys detected at least 7 to 25 breeding pairs, depending on the regional population. *Id.* at 21,799. This assertion has no grounding in the best available science, which instead indicates that between 100 and 1,000 individuals are needed in the short-term to maintain a population's evolutionary potential and to avoid threats related to small population size, including demographic stochasticity and inbreeding depression.

59.     Contrary to the best available science, the Service considered Lark populations with as few as 15 pairs to be in high condition. *Id.* The Service does not provide any citations to support such small populations being considered resilient.

60.     Small population effects are a particular concern for populations of Larks in the South Puget Sound Lowlands, which suffer from low reproductive success and a loss of genetic diversity exacerbated by continued small population size resulting in the regional population's continued decline. Lark populations on the Pacific Coast and Lower Columbia River fare little better due to the impacts from climate change, including from sea-level rise, severe weather events, and increased coastal erosion.

COMPLAINT                                                                                                    15

61.     The Service's conclusion that the Lark is stable in the Willamette Valley ignores the continuing loss of habitat on private lands in the Willamette Valley from human population growth and agricultural conversion by relying on surveys conducted primarily on airports and dedicated conservation sites—i.e., sites that provide favorable habitat and conditions for the Lark.

62.     In contrast to airports and conservation lands, there are no conservation measures protecting the Lark on private lands in the Willamette Valley. Absent such measures, the Lark will continue to lose habitat within the Willamette Valley, of which 96% is privately owned and which is the fastest growing and most densely populated area in Oregon. Population growth, in turn, will lead to further loss of habitat as a result of increased construction and road development.

63.     On top of population growth, grass seed production in the Willamette Valley has declined due to market forces. Grass seed fields provide both breeding and wintering habitat for the Lark, but their total acreage is expected to continue to decline as it is converted to other agricultural commodities whose fields do not provide the low-statured vegetation and bare ground preferred by the Lark.

64.     By minimizing the significant threats the Lark faces on private lands within the Willamette Valley and by relying on surveys of populations that are not threatened by the same forces of habitat loss and fragmentation on private lands, the Service failed to adequately consider whether the Lark is endangered in the core of its range.

65.      The Service also failed to adequately analyze the threats posed by stochastic, i.e., random, weather events. In the winter, Larks largely congregate in the Willamette Valley and on islands in the lower Columbia River. When the regional populations are congregated, the Lark's

COMPLAINT                                                                                16

ongoing viability is threatened by "potentially disastrous stochastic events, such as ice storms or flooding, which could kill individuals, destroy limited habitat and food availability, or skew sex ratios." SSA V2 at 35.

66.     The Service dismissed the impact of these extreme events due to their "infrequency." *Id.* But stochastic events are, by their very nature, infrequent, and as the Service otherwise recognizes, "[c]limate change may increase the frequency and severity of stochastic weather events[.]" *Id.*

67.     By effectively ignoring the Lark's low population numbers, the BBS data showing a declining trend, the continuing loss of habitat in the Willamette Valley, the precarious status of the South Puget Lowlands, Pacific Coast, and Lower Columbia River regional populations, and the potential impact of stochastic severe weather events, the Service acted arbitrarily, capriciously, and contrary to the best available science in finding the Lark is not endangered throughout all of its range.

68.     In addition to reaching an insupportable conclusion that the Lark is not endangered throughout all of its range, the Service also failed to support a finding that the Lark is not endangered in a SPOIR.

69.     To determine whether the Lark is endangered in a SPOIR, the Service asked whether threats to the Lark are "geographically concentrated in any portion of the species' range such that the threats presently affect enough individuals in an area to influence the resiliency of a population." 87 Fed. Reg. at 21,805. Answering the question in the negative, the Service concluded that "there is no portion of the range where there is currently a concentration of threats relative to other areas in the range." *Id.* at 21,805–06. As a result, the Service did not even

COMPLAINT                                                                                              17

analyze whether any particular populations where threats exist constitute a "significant portion" of the species' range.

70.    The cursory conclusion that there are no areas where threats are concentrated contradicts the record and the best available science.

71.    There are specific and concentrated threats to regional populations that place them at immediate risk of extinction. For example, small population size presents a particular threat to the South Puget Lowlands and Pacific Coast and Lower Columbia River populations. *See, e.g.*, SSA V2 at 66, 71 ("Coastal populations in the Pacific Coast and Lower Columbia River region and local populations in the northern portion of the South Puget Lowlands region are at greatest risk due to their small size and instability.").

72.    The South Puget Lowlands population is specifically in danger of extinction due to low fecundity and nest success, low genetic variability, small and rapidly declining local populations, high breeding site fidelity, and no observed migration into the South Puget Lowlands' population. All of these impacts combined leave the population currently in danger of extinction.

73.    Further, climate change, leading to sea-level rise and increased severe weather events, and small population size threaten the Lark's Pacific Coast populations. These threats are also likely to compound the negative effects of beach grass invasion.

74.    The Service asserted that these unique threats on the Pacific Coast do not currently threaten the Lark with extinction because the Lark's population there has "been low for many years[,]" and because there is "no apparent declining trend[.]" 87 Fed. Reg. at 21,806.

75.    The threats facing the Pacific Coast population, however, are increasing. By relying on past population numbers to dismiss the current and future threat of increasing loss of

habitat due to climate change, sea level rise, and invasive beach grasses, the Service ignored an important aspect of the problem and the best available science.

76.    The Service likewise ignored unique and concentrated threats to the Willamette Valley regional population.

77.    With the decline of its native habitat, the Lark is now found primarily on grass seed fields in the Willamette Valley. However, grass seed farming is in rapid decline in the Willamette Valley as growers have switched to crops such as wheat, grapes, and hazelnuts that do not provide habitat for the Lark.

78.    Overall, between 2007 and 2017, the quantity of grass and other seed farms in the Willamette Valley decreased by 26 percent. This decline is likely to continue because "the variable economics of agricultural markets will likely result in a continued conversion from grass seed field to other agricultural types, and fewer acres of suitable habitat for streaked horned larks." *Id.* at 21,795.

79.    In addition to agricultural conversion, the Lark's Willamette Valley population faces further habitat loss and fragmentation due to urban development. Approximately "96 percent of the Willamette Valley is privately owned, and it is both the fastest growing area in Oregon and the most densely populate[,]" SSA V2 at 25, with the Willamette Valley's population predicted to double in the next 50 years. The impacts from this explosive population growth will put unsustainable pressure on the Lark's already imperiled Willamette Valley population, pushing it to the brink of extinction.

80.    The Service thus failed to address the specific and unique concentration of threats facing the Lark in the South Puget Lowlands, Pacific Coast and Lower Columbia River, and Willamette Valley.

COMPLAINT                                                                                      19

81.     In addition to reaffirming its determination that the Lark is threatened rather than endangered, the Service issued the 2022 4(d) Rule broadly exempting harmful activities from any ESA safeguards. 87 Fed. Reg. at 21,807–11.

82.     4(d) rules must "provide for the conservation" of the threatened species, 16 U.S.C. § 1533(d), but the 2022 4(d) Rule exempts activities that threaten the Lark's survival and recovery from ESA take liability while providing no demonstrable conservation benefit for the Lark.

83.     The 2022 4(d) Rule is substantively the same as the 2013 4(d) Rule except that it expanded the exception for incidental take for certain agricultural activities on non-Federal lands from the Willamette Valley to the entirety of the Lark's range. This exempts "normal farming practices" from take liability under the ESA, including the conversion of grass seed farms to other forms of agriculture that provide no benefit to Larks and plowing, mowing and other land disturbing activities during the early spring and summer when Larks are nesting on the ground. The 2022 4(d) Rule also added an additional exception for incidental take associated with alleged habitat restoration activities. *Id.* at 21,807.

84.     Instead of benefiting the Lark's conservation, the record is replete with admissions that the activities permitted by the 2022 4(d) Rule are harmful to the species. See, e.g., *id.* at 21,808 (admitting that "agricultural activities can harm or kill individual [Larks] or destroy their nests in some localized fields"). Additionally, the record highlights the harm of the lack of timing restrictions on activities permitted by the 2022 4(d) rule—such as when mowing is allowed on agricultural fields— and acknowledges that the activities allowed by the 2022 4(d) Rule "have the potential to result in destruction of nests, crushing of eggs or nestlings, or

COMPLAINT                                                                                          20

flushing of fledglings or adults when conducted during the active breeding season[.]" *Id.* at 21,810.

85.     To justify the 2022 4(d) Rule, the Service asserts that the "revised 4(d) rule will promote the conservation of the [Lark] by encouraging management of the landscape in ways that meet the conservation needs of the subspecies." *Id.* at 21,807. Specifically, the Service's primary justification for the 2022 4(d) Rule is the agency's assertion that absent such an exemption, owners of grass seed farms will be incentivized to convert their farms to crops that do not provide Lark habitat in order to avoid potential ESA liability. *Id.* at 21,808–09.

86.     The record, however, shows that market forces are driving the conversion of farms away from grass seed, and that there is no evidence that the 2013 4(d) Rule—which largely mirrors the 2022 4(d) Rule—slowed the speed of that conversion. The 2022 4(d) Rule cites to no empirical evidence that the 2013 4(d) rule stemmed the decline of Lark habitat that would otherwise have occurred.

87.     The Service itself predicts that this loss of habitat will continue, with or without the 2022 4(d) Rule, "due to the variable economics of agricultural markets [which] will likely result in a continued conversion from grass seed fields to other agricultural types, and fewer acres of suitable habitat for [Larks]." *Id.* Although the record reflects that it is market conditions, and not any fear of ESA liability, that is causing the decline of suitable habitat, the Service has nonetheless promulgated a 4(d) Rule that exempts all agricultural activities from take—even those that are directly contributing to the killing of Larks, destruction of Lark nests, and ongoing loss of Lark habitat.

88.     Lacking any demonstrable benefit, and in the face of these acknowledged harms to the Lark, the 2022 4(d) Rule does not provide for the conservation of the species and there is

no evidence that it is bringing, or will bring, the Lark any closer "to the point at which the measures provided by the Act are no longer necessary." 16 U.S.C. § 1532(3). To the contrary, by maintaining an admittedly unacceptable status quo, the 2022 4(d) Rule directly impedes Lark recovery, thereby contravening the "conservation" standard in the ESA.

## PLAINTIFFS' CLAIMS FOR RELIEF

### First Claim for Relief

**The Service's Determination to List the Lark as Threatened Rather Than Endangered Ignored the Best Available Science and Was Arbitrary and Capricious**

89.     Plaintiffs re-allege and incorporate by reference the allegations set forth in the preceding paragraphs.

90.     The Service "shall . . . determine whether any species is an endangered species or a threatened species" because of any one or combination of five listing factors. 16 U.S.C. § 1533(a)(1). When doing so, the Service must rely "solely on the best scientific and commercial data available." *Id.* § 1533(b)(1)(A).

91.     The Lark warrants listing as an endangered species because the best available scientific data demonstrates that the species is in danger of extinction throughout all of its range and in significant portions of its range due to the ongoing loss and conversion of suitable habitat for the Lark, small population sizes, invasive species, climate change, and other factors.

92.     The Service failed to rely on the best available scientific data available when it found that the Lark does not warrant listing as an endangered species throughout all of or in a significant portion of its range.

93.     The Service failed to provide a rational connection between the facts before the agency and its determination not to list the Lark as an endangered species based on its status throughout all or in a significant portion of its range.

COMPLAINT                                                                                          22

94.     Accordingly, the Service's 2022 Threatened Determination is contrary to the best available science, dismisses threats that warrant protection, violates the ESA, and is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law. 16 U.S.C. § 1533; 5 U.S.C. § 706(2)(A).

## Second Claim for Relief

### The Service's 4(d) Rule Does Not Provide for the Conservation of the Lark, and is Arbitrary, Capricious, and in Violation of the ESA

95.     Plaintiffs re-allege and incorporate by reference the allegations set forth in the preceding paragraphs.

96.     "Whenever any species is listed as a threatened species…, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species." 16 U.S.C. § 1533(d).

97.     The Secretary's discretion when crafting and issuing rules pursuant to Section 4(d) is limited by the requirement that the regulations issued must provide for the conservation of threatened species.

98.     "'[C]onservation' mean to use and the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary." *Id.* § 1532(3).

99.     The 2022 4(d) Rule fails to provide for, and in fact impedes, the conservation of the Lark because it does not contribute to or provide for the survival or recovery of the Lark.

100.    Accordingly, the Service's 2022 4(d) Rule violates the ESA, and is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law. *Id.* § 1533(d); 5 U.S.C. § 706(2)(A).

COMPLAINT                                                                                           23

**REQUEST FOR RELIEF**

THEREFORE, Plaintiffs respectfully request that this Court:

(1)    Declare unlawful Defendants' 2022 Threatened Determination and 2022 4(d) Rule;

(2)    Remand the 2022 Threatened Determination and 2022 4(d) Rule to Defendants to conduct a new 12-month finding and final listing determination for the Lark consistent with the law and this Court's order within 12 months of this Court's order;

(3)    Exercise its equitable authority to keep the 2022 Threatened Determination and any regulations contributing to the conservation of the Lark in place during remand;

(4)    Award Plaintiffs reasonable attorneys' fees, costs, and expenses; and

(5)    Grant Plaintiffs such further and additional relief as the Court may deem just and proper.

Dated: January 31, 2023                    Respectfully submitted,

*/s/ Ryan Adair Shannon*
RYAN ADAIR SHANNON (OR Bar No. 155537)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211
Tel: 971-717-6407
rshannon@biologicaldiversity.org

*Lead Counsel for Plaintiffs*

COMPLAINT                                                                              24