TODD KIM
Assistant Attorney General
S. JAY GOVINDAN, Section Chief
NICOLE M. SMITH, Assistant Section Chief
MAGGIE BAKER SMITH (WA Bar No. 45628), Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
7600 Sand Point Way, NE
Seattle, Washington 98155
Tel: 202-598-3088/ Fax: 202-305-0275
maggie.smith@usdoj.gov

*Attorneys for Defendants*


UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION


| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and AUDUBON SOCIETY OF PORTLAND, | Case No.: 3:23-cv-00150-AN |
| Plaintiffs, | **DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT/IN RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| DEBRA HAALAND, in her official capacity as Secretary of the U.S. Department of the Interior, et al., | Request for Oral Argument |
| Defendants. | |

## MOTION FOR SUMMARY JUDGMENT

Under Federal Rule of Civil Procedure 56(a) and Rule 56-1 of the Local Rules of Civil Procedure, Federal Defendants hereby move this Court for summary judgment on claims brought by the Center for Biological Diversity and Audubon Society of Portland ("Plaintiffs") challenging the U.S. Fish and Wildlife Service's ("the Service") listing of the streaked horned lark as threatened under the Endangered Species Act ("ESA") and the Service's rule under Section 4(d) of the ESA extending prohibitions and protective measures to the streaked horned lark. The parties conferred, as required by Local Rule 7-1(a), but were not able to resolve the need for this cross-motion.

Federal Defendants respectfully request that this Court grant summary judgment in their favor and deny Plaintiffs' motion for summary judgment (ECF No. 17) on each of Plaintiffs' two Claims for Relief. Plaintiff has failed to demonstrate that the Service's listing decision and 4(d) rule were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). This cross-motion is supported by the following Memorandum of Points and Authorities and the Administrative Records lodged with the Court (ECF No. 19).

Dated: December 15, 2023   TODD KIM
            Assistant Attorney General
            U.S. Department of Justice
            Environment & Natural Resources Division
            S. JAY GOVINDAN, Section Chief
            Wildlife & Marine Resources Section
            NICOLE SMITH, Assistant Section Chief

LYDIA T. GRIMM      */s/ Maggie Baker Smith*
Attorney Advisor      MAGGIE BAKER SMITH, Trial Attorney
Department of the Interior   (WA Bar No. 42658)

*Fed. Defs.' Cross-Mot. for Summ. J. & Mem.*

Office of the Solicitor
Pacific NW Region

Wildlife & Marine Resources Section
7600 Sand Point Way, NE
Seattle, Washington 98155
Tel: 202-598-3088/ Fax: 202-305-0275
Email: Maggie.Smith@usdoj.gov

*Attorneys for Federal Defendants*

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ................................................................................................ i

GLOSSARY OF ACRONYMS AND ABBREVIATIONS.............................................. iv

INTRODUCTION ............................................................................................................1

BACKGROUND ...............................................................................................................2

    A.  Legal Framework: The Endangered Species Act..............................................2

        1.  "Listing" a species ...............................................................................2

        2.  Consultations and prohibitions–Sections 4(d), 7, and 9 .....................4

    B.  Factual Background ..........................................................................................5

        1.  The Streaked Horned Lark.....................................................................5

        2.  2013 Listing ...........................................................................................7

        3.  Remand Period......................................................................................8

        4.  Listing Decision...................................................................................11

        5.  4(d) Rule .............................................................................................12

STANDARD OF REVIEW ..............................................................................................13

ARGUMENT....................................................................................................................15

    I.     The Service's Listing Determination is Rational, Consistent with the Mandates of the ESA, and Supported by the Best Available Scientific Data. ....................................................................15

        A.  The Service had a Rational Basis for its Listing Determination Based on the Best Scientific and Commercial Data Available. ............................16

            1.  Threats...................................................................................17

            2.  Rangewide and Regional Population Trends.......................18

            3.  "3Rs" Framework Analysis ................................................19

            4.  Future Condition ................................................................20

        B.  The Service Considered the Effects of Small Population Size. ............................22

        C.  The Service Reasonably Assessed the Streaked Horned Lark's Resiliency....................................................................25

            1.    The Service reasonably assessed abundance.............................26

2. The Service reasonably assessed local population trends. ..........................29

3. The Service reasonably assessed connectivity.  ........................................30

4. The Service reasonably assessed habitat.  .................................................31

II. The Service Reasonably Determined that the Streaked Horned
Lark Was Not Endangered in a Significant Portion of Its Range. .............................32

A. The Service Reasonably Determined that the Streaked Horned
Lark was Threatened in the Willamette Valley.  ...................................34

B. The Service Reasonably Determined that the Streaked Horned Lark
was Threatened in the Other Regions.  .................................................36

III. The Service's 4(d) Rule is Critical to the Conservation of the Lark,
Consistent with the ESA, and Should be Upheld.  ....................................38

IV. Remedy .........................................................................................................43

CONCLUSION .................................................................................................................44

# TABLE OF AUTHORITIES

**Case**                                                                                               **Page**

*Alaska Dept. of Environmental Conservation v. EPA*,
   540 U.S. 461 (2004).......................................................................................................... 29

*Alaska Oil & Gas Ass'n v. Pritzker*,
   840 F.3d 671 (9th Cir. 2016) ..................................................................................... 22, 25

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv., Bureau of Land Mgmt.*,
   273 F.3d 1229 (9th Cir. 2001) ................................................................................... 14, 15

*Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*,
   419 U.S. 281 (1974)........................................................................................................... 35

*Citizens to Pres. Overton Park v. Volpe*,
   401 U.S. 402 (1971).......................................................................................................... 14

*City of Sausalito v. O'Neill*,
   386 F.3d 1186 (9th Cir. 2004) ........................................................................................ 14

*Ctr. for Biological Diversity v. Everson*,
   435 F. Supp. 3d 69 (D.D.C. 2020) ................................................................................. 32

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
   No. CV 21-791 (TJK), 2023 WL 6388936 (D.D.C. Sept. 30, 2023)............................... passim

*Ctr. for Biological Diversity v. Zinke*,
   900 F.3d 1053 (9th Cir. 2018) ........................................................................................ 36

*Greenpeace Action v. Franklin*,
   14 F.3d 1324 (9th Cir. 1992) .......................................................................................... 30

*Herguan Univ. v. Immigr. & Customs Enf't*,
   258 F. Supp. 3d 1050 (N.D. Cal. 2017) ........................................................................ 13

*In re Endangered Species Act Section 4 Deadline Litig.-MDL No.*,
   2165, 704 F.3d 972 (D.C. Cir. 2013) ............................................................................... 7

*In re Polar Bear Case Endangered Species Act Listing & Section 4(d) Rule Ltig.*,
   709 F.3d 1 (D.C. Cir. 2013) ...................................................................................... 16, 25

*In re Polar Bear Endangered Species Act Listing & 4(d) Rule Litig.*,
   748 F. Supp. 2d 19 (D.D.C. 2010) ................................................................................. 15

i

*Fed. Defs.' Cross-Mot. for Summ. J. & Mem.*

*In re Polar Bear Endangered Species Act Listing & 4(d) Rule Litig.*,
  794 F. Supp. 2d 65 (D.D.C. 2011) ............................................................. 16

*In re Polar Bear Endangered Species Act Listing & 4(d) Rule Litig. Polar Bear III*,
  818 F. Supp. 2d 214  (D.D.C. 2011) ......................................................... 39

*Karuk Tribe of Cal. v. U.S. Forest Serv.*,
  681 F.3d 1006 (9th Cir. 2012) .................................................................... 13

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ...................................................................................... 2

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989) ...................................................................... 14, 15, 26

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
  184 F. Supp. 3d 861 (D. Or. 2016) ........................................................... 16

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*,
  475 F.3d 1136 (9th Cir. 2007) .................................................................... 22

*Occidental Eng'g Co. v. Immigration & Naturalization Serv.*,
  753 F.2d 766 (9th Cir. 1985) ...................................................................... 13

*River Runners for Wilderness v. Martin*,
  593 F.3d 1064 (9th Cir. 2010) .................................................................... 35

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
  747 F.3d 581 (9th Cir. 2014) .............................................................. passim

*Selkirk Conservation All. v. Forsgren*,
  336 F.3d 944 (9th Cir. 2003) ...................................................................... 14

*Sierra Club v. U.S. EPA*,
  346 F.3d 955 (9th Cir. 2003) ...................................................................... 14

*Sweet Home Chapter of Cmtys. for a Great Or. v. Babbitt*,
  1 F.3d 1 (D.C. Cir. 1993) ............................................................................ 39

*Trout Unlimited v. Lohn*,
  559 F.3d 946 (9th Cir. 2009) ...................................................................... 38

*WildEarth Guardians v. Salazar*,
  741 F. Supp. 2d 89 (D.D.C. 2010) ............................................................ 39

**Statutes**

5 U.S.C. § 706(2)(A) ........................................................................................................ 14

5 U.S.C. § 706(2)(E) ........................................................................................................ 14

16 U.S.C. § 1531 .............................................................................................................. 2

16 U.S.C. § 1531(b) ......................................................................................................... 2

16 U.S.C. § 1532(6) ........................................................................................................ 2, 16

16 U.S.C. § 1532(16) ....................................................................................................... 3

16 U.S.C. § 1532(19) ....................................................................................................... 4

16 U.S.C. § 1532(20) ....................................................................................................... 2, 16, 17

16 U.S.C. § 1533(a) ......................................................................................................... 2, 3

16 U.S.C. § 1533(a)(1) ..................................................................................................... 17

16 U.S.C. § 1533(a)(1)(A)-(E) ........................................................................................ 3

16 U.S.C. § 1533(a)(2) ..................................................................................................... 2

16 U.S.C. § 1533(a)(3) ..................................................................................................... 4

16 U.S.C. § 1533(b)(1)(A) ............................................................................................... 3, 17

16 U.S.C. § 1533(b)(3)(A) ............................................................................................... 3

16 U.S.C. § 1533(b)(3)(B) ............................................................................................... 7

16 U.S.C. § 1533(b)(3)(B)(ii) .......................................................................................... 3

16 U.S.C. § 1533(b)(6)(A) ............................................................................................... 3

16 U.S.C. § 1533(b)(6)(B)(i) ........................................................................................... 3

16 U.S.C. § 1533(c) ......................................................................................................... 2

16 U.S.C. § 1533(d) ......................................................................................................... 4, 38, 39

16 U.S.C. § 1533(f) .......................................................................................................... 4

16 U.S.C. § 1533(f)(2) ..................................................................................................... 9

iii

16 U.S.C. § 1536(a)(2) ..................................................................................... 4

16 U.S.C. § 1538(a) ......................................................................................... 2

16 U.S.C. § 1538(a)(1) ..................................................................................... 4

16 U.S.C. § 1538(a)(1)(B) ............................................................................... 38

16 U.S.C. § 1539 ............................................................................................ 38

16 U.S.C. § 1540 ............................................................................................ 13


## Rules

Federal Rule of Civil Procedure 56(a) ............................................................. i


## Regulations

50 C.F.R. § 17.31(a) ........................................................................................ 4

50 C.F.R. § 17.31(c) ........................................................................................ 4

## Federal Register

66 Fed. Reg. 54,808 (Oct. 30, 2001) ............................................................... 7

79 Fed. Reg. 37,578 (July 1, 2014) ................................................................. 32

iv

*Fed. Defs.' Cross-Mot. for Summ. J. & Mem.*

**GLOSSARY OF ACRONYMS AND ABBREVIATIONS**

| | |
|---|---|
| APA | Administrative Procedure Act |
| BBS | North American Breeding Bird Survey |
| ESA | Endangered Species Act |
| Lark | Streaked Horned Lark (*Eremophila alpestris strigata*) |
| Mot. | Plaintiffs' Motion for Summary Judgment (ECF No. 23) |
| The Service | United States Fish & Wildlife Service |
| SPR Policy | Significant Portion of the Range Policy |
| SSA | Species Status Assessment |

## INTRODUCTION

The streaked horned lark (or "lark") is a small, ground-nesting bird that requires wide open spaces to successfully reproduce.  The natural processes that used to create these types of habitats no longer exist.  Instead, for the most part, the only way these habitats are created and maintained is by human activity like mowing, plowing, and dumping dredged material.  As a result, critical streaked horned lark habitat is now found at airports, along the sides of roads, on dumping grounds for dredged materials, and on agricultural fields.  And maintenance of those habitats depends on people continuing those activities; without this human-caused disturbance, the areas would quickly become unusable for larks.

The limited amount of appropriate breeding habitat has reduced the streaked horned lark's population size, and the threat of continued land use changes mean that even greater challenges are in the lark's future.  Although the species has retained multiple, well-distributed populations that show the lark is not currently at risk for extinction, the United States Fish and Wildlife Service ("the Service") determined that the streaked horned lark is likely to become endangered—which means facing imminent danger of extinction—within the foreseeable future.  As a result, the Service listed the Species as threatened under the Endangered Species Act ("ESA").  The Service also issued a species-specific rule that prohibits most forms of "take" of streaked horned lark.  At the same time, to encourage people to continue the land management activities the larks depend on, that species-specific rule did not extend the take prohibition to routine agricultural practices, airport maintenance activities, or noxious weed removal.  This aspect of the species-specific rule is vital to the lark's survival and recovery because it encourages these necessary actions by private landowners.

The listing decision was a reaffirmation of the Service's decision to list the lark as threatened in 2013. That 2013 rule was remanded to the Service to better explain its decision. On remand, the Service has done just that, issuing a new rule that fully explains why the lark is a threatened species. The Service's decisions were rational, supported by the record, and within the Service's area of special expertise. The Plaintiffs make numerous arguments in an attempt to overcome this, but their arguments only amount to a disagreement with the Service's interpretation of the available evidence. Under the applicable law, the Service's determinations are entitled to deference and should be upheld. Therefore, Plaintiffs' motion for summary judgment (Pls.' Mot. for Summary Judgment ("Mot."), ECF No. 23)[1] should be denied and summary judgment should be granted in favor of the Service.

**BACKGROUND**

**A. Legal Framework: The Endangered Species Act**

**1. "Listing" a species**

The ESA, 16 U.S.C. § 1531 *et seq*., contains substantive and procedural requirements designed to conserve endangered and threatened species and the ecosystems on which they depend. 16 U.S.C. § 1531(b); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 558 (1992). Section 4 of the ESA directs the Secretary[2] to determine whether certain species are "endangered" or "threatened," and to publish lists of such species. 16 U.S.C. § 1533(a), (c). A species is considered "endangered" if it is "in danger of extinction throughout all or a significant portion of its range," while a "threatened species" is one "likely to become an endangered species within

---

[1] All citations to Plaintiffs' motion use the pagination imprinted by the Court's ECF system.
[2] The ESA divides this responsibility between the Secretary of the Interior (mostly for terrestrial species) and the Secretary of Commerce (for marine species). *See* 16 U.S.C. § 1533(a)(2). As relevant here, "Secretary" refers to the Secretary of the Interior.

the foreseeable future throughout all or a significant portion of its range." *Id*. § 1532(6), (20). The term "species" includes species, subspecies, and "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." *Id*. § 1532(16).

A species may be "listed" as endangered or threatened either on the initiative of the Secretary or as a result of a petition submitted by an "interested person." *Id*. § 1533(b)(3)(A). In making a determination whether to list a species, the Service must evaluate whether a species is endangered or threatened "because of any of the following factors: (A) the present or threatened destruction, modification, or curtailment of its habitat; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory mechanisms; or (E) other natural or manmade factors affecting its continued existence." *Id*. § 1533(a)(1)(A)-(E). The ESA further provides that a determination whether to list a species must be made "solely on the basis of the best scientific and commercial data available to [the Secretary] after conducting a review of the status of the species and after taking into account those efforts, if any, . . . to protect such species." *Id*. § 1533(b)(1)(A).

If the Service determines that listing is warranted, it must publish a notice in the Federal Register that includes the complete text of a proposed rule to implement the action. *Id*. § 1533(b)(3)(B)(ii). The Service must act on a proposed rule within one year of the date of its publication. *Id*. § 1533(b)(6)(A). At that point, the Service must promulgate a final rule, withdraw the proposed rule, or extend the one-year period for consideration by not more than six months if the agency finds that there is "substantial disagreement regarding the sufficiency or accuracy of the available data relevant to the determination or revision concerned." *Id*. § 1533(b)(6)(B)(i). Following listing, the Service develops a recovery plan for the species to guide efforts for the conservation of the species, including objective, measurable criteria which, when

met, would provide for the delisting of the species. *Id*. § 1533(f). The Service also designates "critical habitat" for each threatened and endangered species. *Id*. § 1533(a)(3).

### 2.  Consultations and prohibitions–Sections 4(d), 7, and 9

A species listed as endangered or threatened is afforded certain legal protections under ESA Sections 7 and 9. *Id*. § 1536(a)(2) (federal agency must ensure its action is not likely to jeopardize listed species); *id*. § 1538(a)(1) (identifying prohibited acts with respect to any endangered species of fish or wildlife). Section 7 protections apply to both threatened and endangered species. Under Section 7, if a federal agency determines that an action may affect a listed species, it must consult with the Service. The Service then analyzes the proposed action in a biological opinion, which determines whether the action is likely to jeopardize the continued existence of the listed species.

Section 9 of the ESA prohibits the "take"[3] of any endangered species of fish or wildlife without prior authorization. *Id*. § 1538(a). Section 9 does not automatically prohibit take of threatened species. Rather, Section 4(d) of the ESA authorizes the Service to extend Section 9 prohibitions, and other protective measures, to any threatened species as the Secretary deems "necessary and advisable to provide for the conservation of such species." *Id*. § 1533(d). To meet the requirements of Section 4(d), the Service may thus issue a "species-specific rule" (also known as a "4(d) Rule") containing "all the applicable prohibitions and exceptions" for that species. 50 C.F.R. § 17.31(a) & (c).

---

[3] The statute defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id*. § 1532(19).

## B. Factual Background

### 1. The Streaked Horned Lark

The streaked horned lark (*Eremophila alpestris strigata*) is a subspecies of horned larks, which are endemic to the Pacific Northwest. AR_228; AR_315. Streaked horned larks, like other horned larks, are small, ground-dwelling birds that create nests in shallow depressions in the ground. AR_232. Streaked horned larks only live at lower elevations on the west side of the Cascade Mountains, in Washington and Oregon. AR_231. Horned larks need wide-open spaces, relying on this type of habitat for both nesting and foraging. AR_233-34. For streaked horned larks this means nesting in flat, open areas in grasslands, estuaries, and sandy beaches in British Columbia; in dune habitats along the coast of Washington and Oregon; in prairies of western Washington and western Oregon; and on the sandy beaches and islands along the Columbia and Willamette Rivers. AR_233. In addition, Larks have a strong affinity for recently disturbed habitats. AR_94. In the past, these types of habitats were created by dynamic processes: flooding, fire, coastal sediment transport dynamics, and Native American prairie creation. AR_233. Today, human efforts to minimize flooding, suppress fire, and otherwise limit environmental changes have eliminated many of these habitats. *Id*.

Without the natural processes that used to create lark habitat, this species relies on other types of disturbances—primarily human-created disturbances—to create the necessary conditions for successful hatching and rearing of young. AR_234. Streaked horned larks rely on areas such as prairies, coastal dunes, fallow and active agricultural fields, wetland mudflats, sparsely vegetated edges of grass fields, recently planted Christmas tree farms with extensive bare ground, fields denuded by overwintering Canada geese, gravel roads or gravel shoulders of lightly traveled roads, airports, and dredge material placement sites along the Columbia River.

*Id.* All these sites contain a key attribute for the streaked horned lark—open landscape free from visual obstructions. *Id.*; AR_315. And many of these habitats would not exist without regular human intervention, such as plowing, dumping of dredged material, and mowing. *Id.* The streaked horned lark's habitat needs mean that larks now depend on landscapes that are heavily altered by disturbance from human activities. Without regular large-scale, manmade disturbance (e.g., burning, mowing, herbicide application, crop rotation, and placement of dredged materials), the quantity of suitable habitat available to larks would decrease rapidly. AR_235; AR_321.

At one time, streaked horned larks were found from the Oregon-California border, all the way into British Columbia. AR_237. Today, they are present in three general regions: the South Puget Sound Lowlands, the Pacific Coast and Lower Columbia River, and the Willamette Valley. *Id.*; AR_238. Larks are sometimes present on public lands, for example on the Pacific Coast or on islands and other sites next to the Columbia River. *See* AR_242. Other important sites for streaked horned larks are found on airports (south Puget Sound and Willamette Valley) and on privately-owned agricultural land—landscapes where regular disturbance creates the conditions larks require. AR_239; AR_242-44. Larks have been observed in many locations on private agricultural lands in the Willamette Valley, particularly on grass fields; these lands may contain much of the regional population in Oregon. AR_245. Larks in the Willamette Valley have not been surveyed as regularly or intensively as local populations in other regions of the species' range because of the lack of access to private lands. AR_243.

### 2.  2013 Listing

The streaked horned larked was listed as a threatened species in October 2013.[4]  AR_1.

At the same time, the Service also designated critical habitat for the species at four sites on the

outer coast of Washington, nine islands in the lower Columbia River, and on three units of the

Service's Willamette Valley National Wildlife Refuge Complex.  AR_8.  In addition, the Service

determined it was necessary and advisable to extend to the threatened lark many of the

prohibitions afforded an "endangered" species under the Act, and so the Service also

promulgated a species-specific rule under Section 4(d) of the ESA.  AR_13.  To help preserve

the species' remaining populations, slow their rate of decline, and allow for the maintenance of

suitable habitat, the Service's 2013 4(d) rule applied most of the section 9 prohibitions, including

prohibiting "take" of the lark generally.  AR_23.  The Service did not extend the take prohibition

to certain activities, including:  1) management activities at non-Federal airports to minimize

hazardous wildlife; 2) routine agricultural and ranching activities consistent with State laws on

---

[4] Plaintiffs spend considerable effort trying to paint the Service as willfully failing to take any action regarding listing the streaked horned lark.  Mot. at 15-16.  In fact, the Service acknowledged that listing of the Lark was "warranted" in 2001. 66 Fed. Reg. 54,808 (Oct. 30, 2001).  But listing the streaked horned lark could not move forward because the Service was precluded from doing so by higher-priority listing actions.  *Id.*  The ESA contemplates situations in which the listing of a species may be warranted, but "the immediate proposal and timely promulgation of a final regulation implementing the petitioned action ... is precluded by pending proposals to determine whether any species is an endangered species or a threatened species." 16 U.S.C. § 1533(b)(3)(B).  The Service could not move forward with listing the Lark until the Center and its co-plaintiff in a series of "deadline" lawsuits agreed to limit the quantity of deadline litigation to allow the Service to concentrate its efforts on the listing petitions.  *In re Endangered Species Act Section 4 Deadline Litig.*-MDL No. 2165, 704 F.3d 972, 975 (D.C. Cir. 2013).  The parties to the multi-district litigation ultimately reached a settlement agreement that provided a schedule for the Service to complete its pending listing actions, in exchange for an agreement by the Center and its co-plaintiff to limit the quantity of deadline litigation to allow the Service to concentrate its efforts on completing the listing process.  *Id.*

non-Federal lands in the Willamette Valley; and 3) routine removal or management of noxious

weeds on non-Federal lands.  AR_50-52.

The Center sued the Service on February 28, 2018, challenging both the listing decision

and the 4(d) Rule.  AR_88.  The Court explained from the bench that it found the agency's

explanation for how it reached its decision "murky" and "unclear on this record" and therefore

not supportable.  ECF No. 23-1 at 45.  The Court therefore remanded for "further analysis" on

"an analysis of the significance of the portion of the range" and "a clearer explanation of what

the agency is relying on in determining that the species is only threatened."  *Id*. at 45-46.  As for

the 4(d) Rule, the Court agreed "fundamentally with the agency's argument that this is really an

unusual situation in which industrial and agriculture activity create an inadvertent habitat for the

species, and really almost turning on its head in some ways what would be the typical analysis

here."  *Id*. at 46.  The Court then explained that "it's sensible enough as an overall proposition,

and the situation is unusual enough—that is, that we require this agricultural activity to keep

going in order to create the habitat, that I'm going to not vacate the 4(d) rule . . . ."  *Id*.  In short,

the Court concluded that the Service had not adequately explained its listing decision.  The

listing and the 4(d) Rule were therefore remanded without vacatur to the agency for further

consideration.  The Service agreed to submit a new proposed listing rule by March 31, 2021.

AR_88.

### 3.  Remand Period

During the remand period, the Service undertook several analyses that formed the basis

of its updated decision to list the lark as threatened.  First, the Service completed a "Species

Biological Report for the Streaked Horned Lark" in 2018 and updated it in 2019.  AR_6991;

AR_2707.  In the reports, the Service reviewed the lark's biology and stressors and evaluated its current status and viability.  AR_6995.

Next, the Service completed a draft Recovery Plan, which was published for public comment on October 30, 2019.  AR_54; AR_88.  The draft Recovery Plan for the streaked horned lark stated specific recovery goals and objectives that when met signal that ESA protections are no longer necessary.  AR_55.  In developing these plans, the ESA authorizes the Service to obtain assistance from knowledgeable institutions, government agencies, and individuals.  16 U.S.C. § 1533(f)(2).  For the streaked horned lark, the Service convened a group of species experts (the Streaked Horned Lark Recovery Team Species Specialist Group), which consisted of six individuals assembled specifically to help the Service ensure the use of the best available science in developing the draft Recovery Plan for the streaked horned lark.  AR_58.  The Service set lark recovery objectives in terms of a "minimum viable population," which estimates the number of individuals sufficient to have a 99 percent probability of persisting over 40 generations.  AR_65; AR_106.  The Service estimates that the appropriate minimum viable population for streaked horned larks is 5,725 individuals.  AR_66; AR_70.  This level represents a fully recovered population that would allow for the streaked horned larks to be removed from the list of threatened and endangered species entirely.  AR_66.

The Service also completed a Species Status Assessment ("SSA") in February 2021.  AR_80.  Under The SSA framework, the Service begins with a compilation of the best available information on the species (taxonomy, life history, and habitat) and its ecological needs at the individual, population, and species levels based on how environmental factors are understood to act on the species and its habitat.  AR_6533.  Next, an SSA describes the current condition of the species' habitat and demographics, and the probable explanations for past and ongoing changes

in abundance and distribution within the species' ecological settings (i.e., areas representative of geographic, genetic, or life history variation across the range of the species). *Id*. Lastly, an SSA forecasts the species' response to probable future scenarios of environmental conditions and conservation efforts. *Id*. Overall, an SSA uses the conservation biology principles of resiliency, redundancy, and representation (collectively known as the "3Rs") as a lens to evaluate the current and future condition of the species.[5] As a result, the SSA characterizes a species' ability to sustain populations in the wild over time based on the best scientific understanding of current and future abundance and distribution within the species' ecological settings. *Id*.

The SSA for the lark represents a comprehensive review of the best scientific and commercial data regarding the status of the species and provides the scientific basis for the regulatory decisions made by the Service. AR_170. Although the Service is the author of the SSA, it solicited review from a range of individuals and institutions. AR_81; AR_166. The Service sought the expert opinions of five appropriate specialists for peer review and sent the report to six partners, including scientists with expertise in ornithology and streaked horned lark biology and habitat, for review. *Id*. The SSA evaluated the lark's life-history needs, its historical and current distribution and status, the factors influencing the lark's viability, its current condition, and made predictions for its future conditions. *See* AR_87.

Finally, the Service published a proposed rule in the Federal Register. AR_166. The Service proposed affirming the streaked horned lark's 2013 listing as threatened and revising the 4(d) Rule. AR_182. In the proposed rule, the Service outlined its rationale for the proposed

---

[5] The 3Rs are further described in the SSA framework at AR_6535, and specific to the Lark at AR_230.

decisions and solicited comments from "other concerned governmental agencies, Native American Tribes, the scientific community, industry, or any other interested parties." AR_166.

### 4. Listing Decision

On April 13, 2022, the Service issued a final rule that affirmed the threatened listing of the streaked horned lark and revised the 4(d) Rule. AR_309. The Service found that the main factors influencing the future viability of the streaked horned lark include ongoing and sustained habitat loss, continued land management activities and related effects, recreation, and the synergistic effects of climate change and small population size. AR_309; AR_330. Despite the ongoing influence of these stressors, the Service determined the lark is not currently in danger of extinction, because the species retains multiple populations in high and moderate condition across all representative regions, those populations occur in a variety of habitat types, and no threat could plausibly change this under current conditions. AR_331. In addition, survey data of known populations shows relative stability for the last seven years (since the 2013 listing). *Id*. Looking to the foreseeable future, however, the Service recognized the potential for decline as habitat loss continues and the species experiences the amplification of negative effects related to small population size and climate change. *Id*.

In reaching its decision to list the lark as threatened, the Service carefully evaluated the species' status throughout its range, and also considered whether the species had a different status in a significant portion of its range. AR_331. The Service evaluated the condition of the streaked horned lark across its range and concluded that there are no portions of the species' range where the species has a different status from its rangewide status and that no portion of the species' range provides a basis for determining that the species is in danger of extinction in a significant portion of its range. *Id*. The Service determined that the streaked horned lark is not

in danger of extinction now in any portion of its range, but that it is likely to become in danger of extinction within the foreseeable future throughout all of its range. *Id.*

### 5. 4(d) Rule

In the same final rule, the Service revised the 4(d) Rule to promote conservation of the streaked horned lark by encouraging management of the landscape in ways that meet the needs of the species. AR_333. The 4(d) Rule prohibits all take of streaked horned lark unless incidental to wildlife hazard management at airports and accidental strikes by aircraft, normal agricultural practices in Oregon and Washington, noxious weed control on non-Federal lands, and habitat-restoration activities beneficial to streaked horned larks. AR_334.

The exemption of incidental take for agricultural activities is particularly important to the continued survival and recovery of the streaked horned lark. AR_334. The agricultural land base in the Willamette Valley is one of the largest areas of potential habitat for the lark. *Id.* The agricultural practices themselves create and maintain habitat, mimicking the lark's historical habitat. *Id.* The continued farming of these private agricultural lands—primarily grass seed farms—in the Willamette Valley is crucial to maintaining the overall population of streaked horned larks in the Valley and aiding in the recovery of the subspecies in Oregon. *Id.* This is despite the fact that these practices can, on occasion, harm or kill individual larks. *Id.*

Despite some risks from agricultural activities to individual larks, the Service concluded that not extending the take prohibition to these agricultural practices under the 4(d) rule would benefit the lark by creating an incentive to continue the practices that create habitat for the species. Evidence before the Service demonstrated that, in general, private landowners may alter land management practices or restrict conservation activities to discourage attracting listed species to their lands. AR_335. These changes in land management practices arise out of

private citizens' concern about being subjected to regulation associated with the ESA.[6]  *Id*.  In the case of the streaked horned lark, given the importance of human-created habitat through ordinary agricultural activities, this risk aversion would harm the conservation of the species.  *Id*. The revised 4(d) rule both removes the negative incentive for private landowners to discontinue activities resulting in suitable habitat for larks and provides positive incentives for landowners to voluntarily report and conserve the species on their property.  *Id*.  The Service concluded that supporting landowners' ongoing activities that create or maintain lark habitat, while also encouraging the voluntary conservation of the species on these private lands, is likely to result in more net positive conservation outcomes at the population level when compared to an approach that would subject these activities to penalties under Section 9.  AR_336.

## STANDARD OF REVIEW

"An agency's compliance with the ESA is reviewed under the Administrative Procedure Act ('APA')."  *Karuk Tribe of Cal. v. U.S. Forest Serv*., 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc).  In APA cases, "the district court is reviewing a decision of an administrative agency which is itself the finder of fact," *Occidental Engineering Co. v. Immigration and Naturalization Service*, 753 F.2d 766, 770 (9th Cir. 1985), and the "district judge sits as an appellate tribunal." *Herguan Univ. v. Immigr. & Customs Enf't*, 258 F. Supp. 3d 1050, 1063 (N.D. Cal. 2017) (quotation omitted); *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv*., No. CV 21-791 (TJK), 2023 WL 6388936, at *8 (D.D.C. Sept. 30, 2023) ("Although both parties move for summary judgment, the ordinary summary-judgment standard does not apply.  Plaintiff seeks

---

[6] Without a permit, or applicable exemption from the take prohibition, individuals are subject to civil and criminal liability for unlawful taking of a listed species, including enforcement by citizen suits.  16 U.S.C. § 1540.

review of agency action under the APA, so the Court sits as an appellate tribunal." (quotations omitted)).

The standard of review in these cases is a "narrow one." *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971). The APA provides that the Court may set aside an administrative agency's decision only if that decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, . . . or unsupported by substantial evidence." 5 U.S.C. § 706(2)(A), (E). Thus, courts "must uphold agency decisions so long as the agencies have considered the relevant factors and articulated a rational connection between the factors found and the choices made.'" *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1206 (9th Cir. 2004).

A reviewing court must be at its most deferential when, as in this case, it is reviewing scientific judgments and technical analyses within the agency's special expertise. "Disputes involving 'primarily issues of fact' must be resolved in favor of the expert agency so long as the agency's decision is based on a reasoned evaluation of the relevant factors." *Selkirk Conservation All. v. Forsgren*, 336 F.3d 944, 954 (9th Cir. 2003). The Ninth Circuit has consistently held that when "a court reviews an agency action involving primarily issues of fact, and where analysis of the relevant documents requires a high level of technical expertise, we must defer to the informed discretion of the responsible federal agencies." *Sierra Club v. U.S. EPA*, 346 F.3d 955, 961 (9th Cir. 2003), amended by 352 F.3d 1186 (9th Cir. 2003) (internal quotations and citation omitted); *see also Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv., Bureau of Land Mgmt.*, 273 F.3d 1229, 1236 (9th Cir. 2001) ("We are deferential to the agency's expertise in situations ... where 'resolution of this dispute involves primarily issues of fact.'") (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377–78 (1989)); *Selkirk*, 336 F.3d at 954 ("Disputes involving 'primarily issues of fact' must be resolved in favor of the expert

agency so long as the agency's decision is based on a reasoned evaluation of the relevant

factors." (quoting *Marsh*, 490 U.S. at 377–78)). "Deference is particularly important 'when the

agency is making predictions, within its area of special expertise, at the frontiers of science,'"

and in such cases, "the reviewing court may set aside only those conclusions that do not have a

basis in fact, not those with which it disagrees." *Ariz. Cattle Growers*, 273 F.3d at 1236.

<strong>ARGUMENT</strong>

At their core, Plaintiffs' claims are simply a disagreement with the Service's reasoned

weighing of the available evidence. Plaintiffs cannot point to any evidence superior to that

considered by the Service; rather they review the very same evidence the Service considered and

ask this Court to substitute Plaintiffs' weighing of the evidence for that of the Service. While

Plaintiffs clearly would have preferred a different outcome, it is the Service, as the expert agency

responsible for making listing decisions under the ESA, that Congress has charged with

weighing the available evidence and making reasonable predictions based on that evidence. A

reviewing court is not empowered to substitute a plaintiff's preferred conclusion for that reached

by the Service. Because Plaintiffs have failed to show that the Service's determinations lack a

rational basis, the Service is entitled to summary judgment on all claims.

**I.**   **The Service's Listing Determination is Rational, Consistent with the Mandates of the ESA, and Supported by the Best Available Scientific Data.**

The Service reasonably applied the ESA terms "threatened species" and "endangered

species" in the Final Rule. The distinction between an "endangered" species and a "threatened"

one is temporal. *Ctr. for Biological Diversity*, 2023 WL 6388936, at *15; *In re Polar Bear

Endangered Species Act Listing & 4(d) Rule Litig.*, 748 F. Supp. 2d 19, 26 (D.D.C. 2010)

("*Polar Bear I*"). The ESA defines a "threatened species" as "any species which is likely to

become an endangered species *within the foreseeable future* throughout all or a significant

portion of its range." 16 U.S.C. § 1532(20) (emphasis added). In contrast, an "endangered species" is "any species which is *in danger of extinction* throughout all or a significant portion of its range." *Id.* § 1532(6) (emphasis added). One court in this district previously explained that "endangered species are at the brink of extinction now and threatened species are likely to be at the brink in the near future." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 184 F. Supp. 3d 861, 869 (D. Or. 2016) (quotation omitted); *see also In re Polar Bear Endangered Species Act Listing & 4(d) Rule Litig.*, 794 F. Supp. 2d 65, 89 (D.D.C. 2011) ("*Polar Bear II*"), *aff'd, In re Polar Bear Case Endangered Species Act Listing & Section 4(d) Rule Litig.*, 709 F.3d 1 (D.C. Cir. 2013). The statute does not define "in danger of extinction," and "the ESA leaves to the Service some discretion to determine what constitutes a danger of extinction in a given case." *Ctr. for Biological Diversity*, 2023 WL 6388936, at *17.

### A. The Service had a Rational Basis for its Listing Determination Based on the Best Scientific and Commercial Data Available.

Using the best available scientific and commercial data, the Service reasonably determined that the streaked horned lark should be listed as threatened because it is likely to become in danger of extinction in the foreseeable future. The lark is not currently in danger of extinction, because the species retains multiple populations in high and moderate condition across all representative regions, those populations occur in a variety of habitat types, and no threat could plausibly change this under current conditions. AR_331. The lark's future viability, however, is influenced by ongoing and sustained habitat loss, continued land management activities and related effects, recreation, and the synergistic effects of climate change and small population size. AR_309; AR_330. The Service found a potential for decline across the lark's range in the future and concluded that the species is likely to become in danger of extinction in the foreseeable future. Therefore, the Service's determination that the Lark should be listed as

threatened comports with the statutory definition of a "threatened species." 16 U.S.C. §

1532(20).

      As explained above, in deciding whether to list a species as threatened or endangered

under the ESA, the Service is required to consider five factors, any one of which could

independently, or combined with other factors, support the determination. *See id.* § 1533(a)(1).

The ESA also requires the Service to make its listing determinations "solely on the basis of the

best scientific and commercial data available." *Id.* § 1533(b)(1)(A). "The best *available* data

requirement merely prohibits an agency from disregarding available scientific evidence that is in

some way better than the evidence it relies on." *San Luis & Delta-Mendota Water Auth. v.

Jewell*, 747 F.3d 581, 602 (9th Cir. 2014) (quotations and alterations omitted). The record

demonstrates that the Service met these requirements.

### 1. *Threats*

      The Service analyzed the threats facing the lark both at present and in the future.

AR_250-59; AR_319-25. First among these is the ongoing loss and conversion of appropriate

habitat—i.e., large, open spaces with bare ground and sparse or short vegetation. AR_250;

AR_320. This loss includes the natural succession to woody vegetation, the spread of invasive

beach grasses, development, and agricultural conversion (*i.e.*, away from grass seed farming).

AR_250-53; AR_320. The Service also considered the effects of land management activities,

such as routine agricultural activities, on the lark. AR_253; AR_321. Because the lark evolved

a life-history strategy that relies on disturbance to create suitable habitat, these human-caused

disturbances are critical to maintaining habitat for the species in a landscape where natural

disturbance has been curtailed. AR_254. At the same time, the Service also considered that if

activities such as mowing and disposal of dredged materials occur at the wrong times, they can

harm larks.  AR_254-57.  Other important threats to the lark include aircraft strikes, recreation, climate change, and small population size.  AR_321-25.  The Service evaluated these factors for each of the regional populations.  AR_265; AR_325.

### 2. *Rangewide and Regional Population Trends*

The Service relied on several sources of data to estimate recent abundance and population trends for the lark.[7]  This included the most recent rangewide population estimate for streaked horned larks from 2011, which estimated a total of 1,170 to 1,610 individuals, based on multiple survey efforts, anecdotal observations, and extrapolation.  AR_316.  The Service also considered the results from the North American Breeding Bird Survey ("BBS") to provide trend information.  AR_267.  The BBS analyzes short-term trends in ten-year increments.  The most-recent short-term trend assessment covered 2005 to 2015, which means that data set was collected largely before the 2013 threatened listing.  *Id*.  The U.S. Geological Survey, which manages the BBS, rated the data for larks as "yellow," which means it has deficiencies, but has moderate precision and confidence.  *Id.*  The BBS estimated a 6.52% decrease in the lark population during this period.  *Id*.

More recent data have been collected through surveys and monitoring of the known nesting sites of the streaked horned lark.  AR_246-47; AR_278.  While this is recent data and provides valuable information, the Service explained that it has some limitations.  First, monitoring efforts increased after the 2013 listing, which could mean that the increased numbers

---

[7] The term "population" is generally accepted to mean a group of potentially interbreeding individuals within a defined area.  AR_230.  Streaked horned larks tend to congregate (and thereby interact) in the Willamette Valley in winter, and then disperse to various breeding grounds in the spring.  *Id*.  The Service discusses the Lark population in three ways: (1) "rangewide population," which is all individual Larks, (2) "regional population," which is all individual Larks that breed in one of the regions within the species' range, and (3) "local populations," which refer to specific breeding aggregations within those regions.  AR_230-31.

identified resulted from increased observations. AR_278. In addition, there is variability in survey type and effort across locations and time. AR_317. Accordingly, the Service determined that the survey data could not be used to make conclusive rangewide population estimates or be relied on to conclude that the rangewide population is increasing. AR_318.

With those caveats, however, the Service was able to draw important information from the survey data collected at occupied sites. The number of breeding pairs at regularly monitored sites increased from 198 to 383 between 2013 (when the lark was first listed as threatened) and 2019. AR_293. Recent evidence suggest that larks may be colonizing previously unoccupied areas in some regions. AR_281. While the number and distribution of some local populations have increased since 2013, these increases are not evenly distributed and some local populations may be decreasing. AR_318. The available data are enough to conclude that there has not been a recent precipitous decline across any of the regions or the range as a whole, but not sufficient to make a determination regarding whether the rangewide population has increased. *Id.* Based on this information, the Service concluded that the rangewide population status for streaked horned larks has remained relatively unchanged since the 2013 listing. AR_268.

### 3. *"3Rs" Framework Analysis*

To analyze the lark's current condition, the Service used the "3Rs" framework set forth in the Service's Species Status Assessment Framework. AR_6530. Under this framework, a species' biological condition should be evaluated relative to its degree of resiliency, redundancy, and representation. AR_6539. Resiliency describes the ability of the species to withstand stochastic disturbance events; redundancy describes the ability of the species to withstand catastrophic events; and representation describes the ability of the species to adapt over time to long-term changes in the environment. *Id*.

The Service created a matrix to evaluate the resiliency of local populations of streaked horned larks. AR_268-270; AR_6535. The matrix included abundance, population trends, connectivity, habitat, and the presence of a beneficial disturbance regime. AR_271. Using this matrix, the Service then evaluated the resiliency of the local populations within each regional population. AR_272-76. The Service also evaluated the species' redundancy and representation, both of which are evaluated at the rangewide level. AR_276-77; AR_6540. Based on these analyses, the Service concluded that the streaked horned lark has numerous, but mostly small (fewer than 10 breeding pairs) populations that are well-distributed throughout the South Puget Lowlands, Pacific Coast/Columbia River, and Willamette Valley. AR_278. There are positive trends in population, primarily associated with sites operated by the U.S. Department of Defense, which is managing its properties to benefit larks as a result of the 2013 listing and associated Section 7 consultations. *Id*. This includes conservation measures implemented as result of Section 7 consultations by the Service with the Department of Defense on Joint Base Lewis McChord lands, and by the Army Corps of Engineers in management of its deposits of dredged river material. AR_322. Other areas show stable or decreasing population trends. *Id*. And while colonization of some new sites has occurred, particularly along the Columbia River, other areas of suitable habitat have not seen recolonization. AR_280. In all, the rangewide distribution of 42 local populations confers some measure of protection against catastrophic events. AR_281.

### 4. *Future Condition*

The Service also analyzed the future condition of the streaked horned lark. AR_328. In the future, the lark will face the same threats, with ongoing trends of habitat loss continuing to reduce the quality and quantity of appropriate habitat. AR_282; AR_328. In particular,

agricultural trends in the Willamette Valley suggest that grass seed farms will continue to be converted to other uses and other types of agriculture.  AR_282.  The Service analyzed the expected condition of the lark on a thirty-year timeframe under three scenarios:  status quo, improved conditions, and degraded conditions.  AR_283; AR_329.  This analysis demonstrated that the lark requires improved conditions to increase the number of populations with high or moderate status.  AR_291; AR_329-30.  In sum, the species has shown relative stability for the last seven years based on survey data of known populations, negative influence factors have not fluctuated much for the last twenty years, and survey data suggest that some local populations may even be increasing.  AR_293-94; AR_331.  Despite this, in the foreseeable future there is a potential for a decline in resiliency across the lark's range because of habitat loss and changes to management regimes.  AR_294; AR_331.  There are synergistic negative effects from these factors that will likely be amplified by climate change and the lark's small population size.  *Id.*

After completing this rigorous and exhaustive examination of the science and evidence, the Service found that the lark is a threatened species and should receive protection under the ESA as a listed species.  AR_330-31.  The Service concluded that the streaked horned lark is not currently in danger of extinction because the species retains multiple populations in high and moderate condition across all representative regions, in a variety of habitat types, and there is no threat that could plausibly change this conclusion right now.  AR_331.  That said, looking to the foreseeable future, the Service found there is a potential for a decline in resiliency of local populations across the lark's range, primarily because of a continued loss of habitat and changes to beneficial agricultural practices, but also because of synergistic effects related to small population size and the increased effects of climate change.  *Id.*

The Service's conclusion considered all available information, was reasonable, and is entitled to deference. As the Ninth Circuit has held, courts "must defer to the agency's interpretation of complex scientific data so long as the agency provides a reasonable explanation for adopting its approach and discloses the limitations of that approach." *Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 679 (9th Cir. 2016) (quotations omitted). The expert agency's well-reasoned judgment should be affirmed.

**B. The Service Considered the Effects of Small Population Size.**

In an attempt to cast doubt on the thoroughness of the Service's determinations, Plaintiffs target one particular aspect of the listing decision, arguing that the Service "ignored" the problems associated with small populations. Mot. at 24. Although Plaintiffs disagree with the Service's scientific conclusions, the record reflects that the Service considered at length whether the lark's small population size put it at risk for extinction now or in the foreseeable future. As the Ninth Circuit has made clear, disagreement regarding scientific conclusions is not enough to overcome the reasoned judgment of the expert agency charged with implementing the ESA. *See Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1150 (9th Cir. 2007) ("Whether the Service was correct to focus on the alleles is beside the point; interpretation of complex genetic data falls within the domain of the Service's scientific discretion, to which we must defer so long as the Service has articulated a rational basis for its conclusion.").

The Service's consideration of the lark's population size is well documented in the record. First, the Service addressed this issue in the SSA and the associated peer-review process. In Section 4.5 of the SAA, titled "Small Population Effects," the Service discussed how natural population fluctuations can have large impacts on populations that are small, isolated, or impacted by genetic effects from small populations. AR_263. The Service explained that while

small population effects influence the population structure and reproductive success of the

streaked horned lark, it was not anticipated to be a driver of the species' viability (unlike habitat

loss, for example). *Id*. That said, as the Service acknowledged, some populations do show signs

of a loss of genetic diversity and associated breeding failures. *Id*. The Service discussed the

potential implications of this phenomenon for populations with small numbers and the potential

for extirpation of some populations if conditions do not improve. *Id*.

Small population size was also considered by the Service throughout the SSA, alongside

the other threats facing the lark. Population size is part of the analysis for each of the "3Rs."

Resiliency describes the ability of the species to withstand stochastic disturbance events, which

is associated with population size, growth rate, and habitat quality. AR_6535. To capture this,

the Service included "abundance" (the number of breeding pairs) as part of the matrix used for

assessing the resiliency of local populations. AR_271. Population size is also a factor in

determining "redundancy," i.e., the ability to withstand catastrophic events, and is related to the

number and distribution of local populations. AR_276; AR_6550. It is also a key aspect of

assessing representation, which is a measure of sufficient genetic diversity at a rangewide level.

AR_277; AR_6550. In synthesizing the factors influencing the streaked horned lark and looking

to the future, the Service considered "the synergistic effects" of small population size

compounded with the other stressors. AR_294. The Service found that "the synergistic effects

of climate change and small population size" was a "main factor[] influencing the future viability

of streaked horned larks." AR_281; AR_291. Put plainly, the Service recognized that small

population size would exacerbate other threats to the species and that in the foreseeable future

this dynamic would lead to a risk of extirpation of some local populations. AR_292.

Small population size was also considered in the Final Rule and was a component of the Service's listing determination. There, the Service analyzed listing "Factor E," which requires the Service to consider "other natural or manmade factors affecting [the species'] continued existence." *Id*. § 1533(a)(1)(E). In evaluating Factor E, the Service concluded that other factors, "combined with the synergistic effects of small population size and climate change[,]" made the lark likely "to become an endangered species within the foreseeable future." AR_309. On top of being a part of the rationale for the Service's listing decision, the effects of small population size and the way small population size exacerbates other challenges were considered throughout the Final Rule, including in a section of the Rule titled "Small Population Size." AR_325; AR_329-32. In short, contrary to Plaintiffs' assertions, the Service considered the effects of the lark's small population size throughout its analyses, and that consideration was part of its decision to ultimately list the lark as threatened.

In arguing to the contrary, Plaintiffs primarily rely on the Service's own scientific documents that explicitly considered the effects of small population sizes on the Larks. Mot. at 25 (citing to the Final Rule & SSA). Plaintiffs inexplicably assert that these assessments are "outside of [the Service's] assessment of the lark's current status," when the entire point and focus of the cited documents are to assess the lark's current status. *Id*. Plaintiffs also focus on comments from one of the reviewers of the SSA, who believed that small population size should have been listed as a "primary stressor" for streaked horned larks. *Id*. The Service solicited and seriously considered these comments from the reviewer. AR_8057-58. In response to the reviewer, the Service explained that it "carefully considered small population size as a potential stressor affecting the resiliency of streaked horned lark populations." *Id*. The Service "consider[s] small population size to be a byproduct of other stressors influencing the population

and a synergistic factor influencing the condition and resiliency of many local populations of streaked horned larks." *Id*. The Service then explained that it "recognize[s] the troubling effects that various factors such as habitat loss or recreation have on large, stable populations versus the amplified influence these factors have on small populations like the streaked horned lark." *Id*. This is precisely the type of scientific judgment within the agency's special area of expertise that deserves deference. *See Alaska Oil & Gas Ass'n*, 840 F.3d at 679.

Plaintiffs claim that the Service failed to "connect the dots," but it is unclear what else the Service could have done here. Mot. at 26. The agency analyzed the problem of small population size, it examined how small population size is currently influencing populations, and it analyzed how the effects of small populations combined with other factors would affect the lark's risk of extinction in the future. The record simply does not support Plaintiffs' accusation that this problem was ignored. It is not that the Service failed to "connect the dots;" rather, Plaintiffs would have preferred that the dots lead to a different conclusion. The Service has provided thoroughness and care in its explanation of its decision, and Plaintiffs' argument is simply a competing view about policy and science. *In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig.--MDL No. 1993*, 709 F.3d at 3. Plaintiffs' judgment should not be substituted for the judgment of the Service and the Service's decision should be upheld. *See San Luis & Delta-Mendota Water Auth.*, 747 F.3d at 601.

### C. The Service Reasonably Assessed the Streaked Horned Lark's Resiliency.

Besides disagreeing with the Service about the conclusions it drew from the assessment of the lark's small population size, Plaintiffs' also attack the Service's consideration of the lark's resiliency in an attempt to have the Court adopt the Plaintiffs' preferred analysis of the available information. AR_268-276. Resiliency is assessed at the local population level, which for the

streaked horned lark meant that the Service was evaluating the condition of individual breeding sites.[8]  AR_231.  To accomplish this, the Service created a matrix, which assigned a point value for each parameter (abundance, population trends, connectivity, habitat, and the presence of a beneficial disturbance regime) that varied based on whether the site met certain criteria. AR_271.  Using this matrix, the Service assessed each breeding site's resiliency.  *See, e.g.*, AR_273.  The Service's conclusions for each breeding site were based on the best available scientific data, were supported by rational explanations for its conclusion using its special expertise, and are entitled to the Court's deference.  *See Marsh*, 490 U.S. at 375–77.

### 1.  *The Service reasonably assessed abundance.*

Plaintiffs primarily focus on abundance (the number of breeding pairs at a site) to attack the Service's reasonable consideration of the Lark's resiliency.  Mot. at 27.  Yet abundance is just one aspect of resiliency.  For example, a population that has a low number of individuals, but shows an increasing population trend, is connected to other populations, and resides in high-quality habitat has a resiliency that is markedly different from a population that may be the same number of individuals, but lacks positive direction for the other indicators.  *See* AR_274. Determining whether a population is resilient involves more than a simple measure of abundance and Plaintiffs' arguments fail to capture the scope of the Service's analysis.

---

[8] Resiliency "describes the ability of a species to withstand stochastic disturbance. Resiliency is positively related to population size and growth rate and may be influenced by connectivity among populations." AR_6541; *see also* AR_230 ("Resiliency means having sufficiently large populations for the species to withstand stochastic events (arising from random factors)[footnote omitted]. We can measure resiliency based on metrics of population health—for example, population size and recruitment. Resilient populations are better able to withstand disturbances such as random fluctuations in birth rates and recruitment (demographic stochasticity), variations in rainfall or extreme weather events (environmental stochasticity), or the effects of human activities.")

The Service reasonably assessed the abundance parameter by assessing the number of breeding pairs present at each observed site. The Service described the number of breeding pairs associated with a high, moderate, or low condition for each region. AR_271. Plaintiffs assert that the numbers the Service selected to represent a "high condition" are "arbitrary" and "lack any support in the record." Mot. at 27. They also assert that there is no explanation for why the number of breeding pairs representing a "high condition" differs between regions. Mot. at 27-28. But the Service explained exactly where these numbers came from: the draft Recovery Plan. AR_270 ("Abundance and population trend information were assessed using survey data and changes in number of breeding pairs between 2013 and 2019 and ranked according to abundance criteria in the draft Recovery Plan for each regional population."). And it explained that it selected those population targets in response to comments received during the peer review process. AR_8057 ("[O]ur revisions to the draft SSA incorporates recovery criteria from the draft Recovery Plan into the analysis of the current condition."); AR_311 ("[I]n response to peer review on the SSA, we revised our demographic metrics for current condition to be more in line with population targets in the draft recovery plan."). The draft Recovery Plan explains that there are different targets for numbers of individual birds per region, and that the "preceding columns indicate how these targets may be distributed among sites, recovery zones, and management designations." AR_70. Importantly, these are targets associated with *recovery* of the species, not those needed to avoid imminent extinction.

The Plaintiffs argue that the level of 25 breeding pairs set for the Willamette Valley is too low because the draft Recovery Plan sets a goal of 50 breeding pairs at some sites. Mot. at 28. Plaintiffs' argument misses the mark because it conflates the purpose of a recovery plan, which is to set a *recovery* goal for the species, with the Service's assessment of resiliency in a listing

determination. In this case the recovery goal for the Willamette Valley is 50 pairs at six sites, 25 pairs at twelve sites, and 15 pairs at three sites. AR_70. There is no requirement that a resilient population meet every benchmark in a recovery plan and it was not arbitrary and capricious for the Service to use the recovery midpoint of 25 pairs as a representation of a "high condition" population in the Willamette Valley.

Plaintiffs' critique of the Baskett Slough National Wildlife Refuge populations also disregards the Service's stated reasons for determining that this population has high resiliency. Mot. at 28. The Service's decision was not just based on the current number of breeding pairs, but also on the other prongs of the resiliency analysis. In particular, the population is experiencing strong population growth, increasing from 15 breeding pairs in 2015 to 35 pairs in 2019. AR_244. This population growth is driven by good habitat conditions, because of a programmatic Section 7 consultation with the Refuge for its farming and pesticide-use program. AR_260; AR_276. By narrowly focusing on only abundance as a measure of resiliency, Plaintiffs misrepresent the record and the full breadth of the Service's findings. There is no "unexplained inconsistency" as Plaintiffs allege. Mot. at 28. Instead, the record offers a reasoned explanation for the Service's decision that the Baskett Slough National Wildlife Refuge population is highly resilient based on abundance, recent population growth, and good habitat conditions.

Finally, Plaintiffs misrepresent the record when they argue that "the best available science in the record" states that the effective population size is "more than 100 animals."[9] Mot. at 28-29. Plaintiffs cite AR_543, but the cited document is itself only a literature review prepared to assist the Streaked Horned Lark Recovery Team Species Specialist Group in

---

[9] The Service uses breeding pairs, not individuals, in assessing resiliency.

developing recovery objectives for use in the draft Recovery Plan. AR_540. The quoted

passage is not "the best available science in the record," or even a representation of Ms.

Anderson's views, but simply a summary of a 2014 research paper (which is not specifically

about birds, let alone streaked horned larks) that recommended a doubling in the numbers

considered a genetically effective population size when extrapolating to a census population size.

AR_543.

      In sum, the Service reasonably assessed the abundance of local populations, which is just

one component of resiliency, when analyzing whether each local population was of low,

medium, or high resiliency. The agency's path in making this determination may reasonably be

discerned and its decision should therefore be upheld. *Alaska Dept. of Environmental*

*Conservation v. EPA*, 540 U.S. 461, 497 (2004) (citation and internal quotation marks omitted).

      2. *The Service reasonably assessed local population trends.*

      Plaintiffs also accuse the Service of ignoring the BBS data to "present a rosier picture

than reality" when assessing the "population growth/trend" component of resiliency. Mot. at 30

(citing AR_271). The question before the Service, however, was not whether the *rangewide*

population had experienced large drops in numbers in the past (the record reflects it had).[10]

Instead, resiliency is assessed at the *local population* level, and the Service was assessing

---

[10] To be clear, the Service has determined that the streaked horned lark is threatened—it is likely
to become endangered in the foreseeable future. The record is replete with the Service's
assessment and acknowledgment of the lark's status, which includes significant drops in
populations since the late 1960s. AR_267-68 (concluding that the data "reveal a consistent
pattern of decline in the number of individuals detected over the last five decades"). The Service
has acknowledged and considered the most recent period analyzed for trend in the BBS (2005-
2015), which estimated a population decline of 6.52%. AR_267. Contrary to Plaintiffs'
argument, these population trends are well known to the Service and rather than being ignored,
were part of the basis for determining the species is threatened and should be listed under the
ESA. AR_315-16; *supra* Section I. A. 2.

whether individual local populations (specific breeding sites) had experienced increasing population, stable population, or declining population. AR_271. Local populations with insufficient information were treated as if they were declining. *Id*. It was entirely appropriate for the Service to rely on the survey data and the observed changes in the number of breeding pairs between 2013 and 2019 to assess this component of resiliency. AR_270. The BBS is a rangewide population estimate that only captured a particular snapshot in time (2005-2015) and therefore could not be used to assess recent changes in local populations. AR_268. The Service's decision to rely on the survey data from occupied sites was supported by the record, was reasonable, and deserves deference. *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1333 (9th Cir. 1992) ("To set aside the Service's determination in this case would require us to decide that the views of Greenpeace's experts have more merit than those of the Service's experts, a position we are unqualified to take.").

### 3. *The Service reasonably assessed connectivity.*

Plaintiffs' claim that the Service "generally assume[d]" movement between local and regional populations is unsupported by the record and should be rejected. Mot. at 31. In support of the contention that the Service made this "general[] assum[ption]," Plaintiffs cite only to the matrix showing that "connectivity" was one aspect of resiliency considered by the Service. *Id*. (citing AR_325). This matrix assigned one point if the population had "[m]ovement between local populations/regions" and no points if there was no such movement. AR_325. Rather than "generally assume" such connectivity, the record shows that the Service evaluated whether it existed for each local population based on evidence. *See*, *e.g.*, AR_274. The Service recognized that larks have a "low incidence of movement between local populations, and fewer incidences of movement between regions[,]" AR_328, and found connectivity only when "information was

available from survey data[.]" AR_270. Plaintiffs point to no actual error with the Service's analysis; the Service's determination that the survey data were the best scientific data available regarding connectivity should get deference.

### 4.   *The Service reasonably assessed habitat.*

Finally, Plaintiffs assert that the Service should not have evaluated the available habitat quality as an aspect of a local population's resiliency because habitat loss is the primary driver of the lark's status. Mot. at 32. Plainly, the opposite is true. Because habitat loss is the main driver of the lark's status, it makes sense for the Service to carefully evaluate the quality of habitat available to local populations when evaluating their risk of extirpation. It is hard to understand how the Service could make an informed listing decision *without* doing so. To the extent Plaintiffs' argument is that the Service determined that the species as a whole had "resiliency due to sufficient suitable habitat," (Mot. at 32) that is squarely contradicted by the portions of the record cited by Plaintiffs (AR_325-26). As previously explained, resiliency is assessed at the local population level, and the Service's analysis looked at the habitat quality at these individual breeding sites. AR_325-26.

Nor was it inappropriate for the Service to consider the available survey data for local populations in the Willamette Valley. *Cf.* Mot. at 32. Plaintiffs imply that the Service should ignore this relevant data because it is not representative of the entire Valley. Mot. at 33. But the ESA does not require the Service to ignore imperfect data. *San Luis & Delta-Mendota Water Auth.*, 747 F.3d at 602. The Service was aware that "most of the larks in the Willamette Valley region occur on private agricultural lands and have not been monitored due to lack of access." AR_275. When evaluating the regional population in the Willamette Valley (as opposed to individual breeding sites) the Service explained that "[t]he Willamette Valley regional

population appears to be well distributed and stable, but the limited surveys of accessible sites may not accurately reflect the trend in the whole region."[11]  AR_318.  Plaintiffs imply that by considering the data available for known breeding sites, the Service somehow "effectively ignore[d]" the rest of the Willamette Valley (Mot. at 33), but this is not the case.  It was reasonable and appropriate for the Service to consider the available survey data, while also taking into account the limitations of that data.  *See San Luis & Delta-Mendota Water Auth.*, 747 F.3d at 602.

## II.    The Service Reasonably Determined that the Streaked Horned Lark Was Not Endangered in a Significant Portion of Its Range.

Under its policy for determining significant portion of the range ("SPR Policy"), the Service considers whether there is "substantial information indicating that (1) the portions may be significant and (2) the species may be in danger of extinction in those portions or likely to become so within the foreseeable future."  79 Fed. Reg. 37,578, 37,586 (July 1, 2014).[12]  If the answer to both questions is yes, the Service conducts a more-detailed analysis.  *Id*.  The Service can address either the "significant" or the "status" question first, and if the answer to either is "no," then the other question need not be evaluated.  *Id*.

In the listing decision, the Service first looked at the status of the streaked horned lark throughout all of its range.  AR_330.  It evaluated the threats facing the lark based on the ESA's Section 4(a)(1) factors.  It found that despite the ongoing influence of factors threatening the

---

[11] Plaintiffs quote this passage from the Final Rule and portions of the SSA for the proposition that the Service did not consider the limitations of the survey data.  Mot. at 27 (quoting the SSA & Final Rule).  As Plaintiffs' own citation makes clear, the survey data from the individual breeding sites was considered in context with the information available about the region as a whole.

[12] The court in *Ctr. for Biological Diversity v. Everson*, 435 F. Supp. 3d 69, 93 (D.D.C. 2020), vacated a portion of the Service's 2014 SPR policy.  The Final Rule for the Lark applied the 2014 SPR policy, as modified by the remand order in *Everson*.  AR_331.

lark, "the subspecies is not currently in danger of extinction, because the species retains multiple

populations in high and moderate condition across all representative regions[.]" AR_331. Each

region has at least eight redundant local populations, there are some signs of increase in specific

local populations, and surveys have shown relative stability for those populations that can be

monitored. *Id*. The threats to the streaked horned lark have been present and consistent for

many years, have not fluctuated much over time, and are not of a scope or magnitude, either

currently or imminently, such that the lark is currently in danger of extinction. *Id*. Looking to

the foreseeable future, however, the continued loss of preferred habitat and changes in

management regimes could lead to a decline in the resiliency of local populations. *Id*. This

would be exacerbated by the synergistic effects of climate change and low population size. *Id*.

Accordingly, the streaked horned lark is likely to become endangered in the foreseeable future.

*Id*.

　　　　Turning to the question of whether the lark's status was different throughout a significant

portion of its range, the Service chose to address the question of status first. The Service

therefore considered whether the threats to streaked horned larks are concentrated in any portion

of the species' range such that the threats currently affect enough individuals in an area to

influence the resiliency of a population. AR_331. Here, the Service found that that there was no

portion of the lark's range where the species was currently in danger of extinction, but that in all

portions it was likely to become endangered in the foreseeable future. *Id*. The Service found

that while the influence of factors threatening the lark varied somewhat across the range, there is

no portion of the range where there is currently a concentration of threats relative to other areas

in the range such that those populations could be considered *currently* in danger of extinction.

AR_332. That is, all regions populated by the streaked horned lark are experiencing factors that

are likely to lead to the lark being endangered in the foreseeable future, but none are experiencing these factors in a manner that would create a current danger of extinction now. AR_331. This analysis necessarily built on the Service's preceding analysis, which examined the risk of extinction of the species as a whole by analyzing its condition in the regions it occupies. *See*, *e.g.*, AR_315-30.

Plaintiffs raise several arguments as to why this analysis was arbitrary and capricious. Mot. at 28-33. For the most part, these arguments focus on how the threats facing the lark differ between regions. But, as explained below, the question is not whether the lark faces different threats in different portions of its range, but whether there are any significant portions of the species' range where the species is in danger of extinction now. AR_331.

### A. The Service Reasonably Determined that the Streaked Horned Lark was Threatened in the Willamette Valley.

Plaintiffs first argue that the Service's decision about the status of the lark in the Willamette Valley was wrong because grass seed fields in the Willamette Valley are in "rapid decline" and the region faces increasing urbanization. Mot. at 35-36. The Service explained that it considered, among other things, "conversion of suitable habitat into unsuitable habitat through changes in land use" and "changes in agricultural practices from crops that mimic preferred habitats to crops that diminish habitat suitability[.]" AR_331-32. The Final Rule explicitly discussed the conversion of grass seed fields to other types of agriculture. AR_321. The Service found that continued habitat loss in the Willamette Valley is a driver of the threatened listing because it is likely to put the lark at risk of extinction in the foreseeable future. AR_331. However, there is no evidence that the larks of the Willamette Valley are at a higher risk of extinction than the species as a whole, and it was not arbitrary and capricious for the Service to reach that conclusion. *See Ctr. for Biological Diversity*, 2023 WL 6388936, at *20.

Plaintiffs argue that the Service reached a "cursory conclusion" that is "contradicted by the record." Mot. at 35. But the "record" Plaintiffs rely on to support this contention is the Final Rule itself, which supported the Service's conclusions regarding the significant portion of the range. Mot. at 35-36 (citing Final Rule). It appears that Plaintiffs' argument is that because that analysis did not appear under the heading "Status Throughout a Significant Portion of Its Range" (AR_331), the extensive threats analysis contained in the Final Rule somehow does not count. But the Service need not repeat its analysis *ad nauseum* when it had previously explained precisely these issues. "[T]he absence of such a specific discussion does not necessarily require the agency's action to be overturned," because a court "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1078 (9th Cir. 2010) (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc*., 419 U.S. 281, 285 (1974)).

The Service did consider the conversion of suitable habitat into unsuitable habitat when undertaking its "significant portion of the range" analysis. AR_330-31. Habitat loss is the primary driver of the lark's threatened status. AR_320. And the continued loss of habitat "from plant succession and encroachment of woody vegetation, invasion of beach grasses, changes in land use, and changes in beneficial agricultural practices" was an important aspect of the Service's determination that the lark is likely to become in danger of extinction within the foreseeable future. AR_331. But habitat loss is a threat that faces the species throughout its range, not just in the Willamette Valley. While the *causes* of this habitat loss may differ across the range (for example, loss of grass seed farms in the Willamette Valley, invasive beach grass and sea level rise on the Pacific coast), the differences do not change the risk of extinction.

**B. The Service Reasonably Determined that the Streaked Horned Lark was Threatened in the Other Regions.**

Plaintiffs argue that small population size in the South Puget Lowlands, Pacific Coast, and the Lower Columbia River was not considered and warrants a different status determination. Mot. at 37. Plaintiffs' failure to identify one particular region, and instead argue that all of the regions are endangered, proves the Service's point: There is no portion of the species' range where the species has a different status from its rangewide status. Plaintiffs simply disagree with the Service regarding what that status should be. But, "[w]here evidence is susceptible of more than one rational interpretation, [a court] uphold[s] the agency's finding if a reasonable mind might accept it as adequate to support a conclusion." *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1068 (9th Cir. 2018) (quotation and alteration omitted).

Plaintiffs argue the Service did not consider small population size as a particular threat in the South Puget Lowlands, the Pacific Coast, and the Lower Columbia River. Mot. at 37. As explained above, small population size was discussed extensively in the record and the Final Rule itself. *Supra* Section I. B. As for the South Puget Lowlands, the Plaintiffs quote the SSA, which stated "[t]he combination of low genetic variability, small and rapidly declining local populations, high breeding site fidelity, and no observed migration into the South Puget Lowlands regional population suggests that *in the future*, if influences remain the same, the South Puget Lowlands regional population could *eventually* become extirpated." Mot. at 37 (emphasis added) (citing AR_264). But this is precisely why the Service concluded that the species was threatened—it was likely to become endangered in the foreseeable future—and exactly why the South Puget Lowlands population is representative of the status of the species as a whole. *See* AR_332 (expressing "concerns that the synergistic effects of climate change and

small populations size will also influence the *future* resiliency of local populations in the Columbia River and South Puget Lowlands." (emphasis added)).

Plaintiffs also quote from the 2013 final rule (promulgated ten years ago), which concluded that factors "suggest[] that the South Puget Sound population could become extirpated in the near future[.]" Mot. at 37-38 (brackets in original) (citing AR_39). The Service addressed this issue in the SSA, explaining that "[w]hen the lark was listed as threatened in 2013, an analysis predicted a rapid decline in the Washington regional populations, including breeding sites on the South Puget Lowlands, and Pacific Coast and Lower Columbia River regions[.]" AR_268. This rapid decline has not materialized. Instead, some local populations have stabilized or increased, while the South Puget Lowlands population as a whole is perhaps declining. AR_239-40, AR_245. A potentially declining population however, does not mean the regional population is in immediate risk of extinction rather than likely to become so in the foreseeable future. For the Pacific Coast, the Service acknowledged that the size of the coastal sites is relatively small compared to other local populations, but noted that "we see no apparent declining trend in this regional population based on survey data between 2013 and 2019[,]" and therefore concluded that these populations were not currently at risk of extirpation. AR_332. In short, for each of these regions, the Service looked at the evidence and concluded that small population size could contribute to extinction risk in the foreseeable future and therefore supported the conclusion that the species is threatened. Because none of these regions is facing a concentration of this threat in a manner that changes this conclusion, the Service's conclusion was not arbitrary and capricious.

The Service has provided a reasoned explanation, supported by the record, for its determination that the status of the lark was the same throughout its range. The Service noted

that "the influence of these factors varies somewhat across the range, [but] there is no portion of the range where there is currently a concentration of threats relative to other areas in the range." AR_332.  Plaintiffs' objections to the Service's conclusion primarily amount to a disagreement with the Service regarding the timeframe over which the threats facing the lark are likely to result in a risk of extinction—is it now or is it in the foreseeable future?  But this type of predictive judgment is exactly the type of decision "entitled to particularly deferential review." *Trout Unlimited v. Lohn*, 559 F.3d 946, 959 (9th Cir. 2009).  The agency explained its rationale, that rationale is supported by the record, and its decision should be upheld.

### III.    The Service's 4(d) Rule is Critical to the Conservation of the Lark, Consistent with the ESA, and Should be Upheld.

Having found that the Lark meets the definition of a "threatened species," the Service developed and promulgated a 4(d) Rule that provides for the conservation of the streaked horned lark.  The Service's task when a species is listed as threatened is to issue regulations "necessary and advisable to provide for the conservation of such species."  16 U.S.C. § 1533(d).  In the Service's expert judgment, the 4(d) Rule, and in particular the determination not to extend the Section 9 take prohibitions to routine agricultural activities, are critical to the species' conservation.  This is because the streaked horned lark relies on land management activities and human-caused disturbance regimes to create and maintain the wide-open spaces the species needs.  AR_334.  Thus, to encourage the continued land disturbance on which the Lark relies, the Service's 4(d) Rule does not extend Section 9 take prohibitions to normal agricultural practices and similar ground disturbing activities.  AR_334.

Section 9 of the ESA makes it unlawful for any person to "take" an endangered species, without authorization.  16 U.S.C. §§ 1538(a)(1)(B), 1539.  Threatened species, however, are not automatically subject to the Section 9 prohibitions.  For threatened species, the ESA does not

assume that take should be prohibited, instead providing that "the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species," and those regulations "may" prohibit any act included in Section 9. *Id*. § 1533(d). "[T]he combination of the two sentences of section 4(d) provides the Secretary with a wide latitude of discretion to select and promulgate appropriate regulations tailored to the specific conservation needs of a threatened species." AR_333; H.R. Rep. No. 412, 93rd Cong., 1st Sess. 1973 ("[O]nce an animal is on the threatened list, the Secretary has an almost infinite number of options available to [her] with regard to the permitted activities for those species. [She] may, for example, permit taking, but not importation of such species, or [she] may choose to forbid both taking and importation but allow the transportation of such species"). While the Service is not required to issue a rule pursuant to Section 4(d) under the auspices of it being "necessary and advisable," it has the discretion to do so. *See Sweet Home Chapter of Cmtys. for a Great Or. v. Babbitt*, 1 F.3d 1, 8 (D.C. Cir. 1993), *modified on other grounds on reh'g*, 17 F.3d 1463 (D.C. Cir. 1994), *rev'd on other grounds*, 515 U.S. 687 (1995).

"Congress has generally delegated to the Secretary of the Interior the responsibility of determining what measures are necessary for the conservation of threatened species." *In re Polar Bear Endangered Species Act Listing & 4(d) Rule Litig.,Polar Bear III*, 818 F. Supp. 2d 214 230 (D.D.C. 2011) ("Polar Bear III"*); see WildEarth Guardians v. Salazar*, 741 F. Supp. 2d 89, 105 (D.D.C. 2010) ("Congress delegated to the Secretary the authority to determine the extent to which the ESA protects threatened species."). The Service's decision to tailor protections for larks is well within its discretion under ESA Section 4(d), statutory language that another district court recently reasoned "delegates to the Service the responsibility of determining what measures to enact" and presents an "uphill climb" for Plaintiffs to claim that the Service "exceeded its

authority or abused its discretion in issuing the [Section 4(d) Rule]." *Ctr. for Biological Diversity*, 2023 WL 6388936 at 26 (internal citations and quotations omitted).

The 4(d) Rule for streaked horned larks is tailored to allow and encourage the activities the lark relies on for its habitat. The streaked horned lark relies on land management activities and human-caused disturbance regimes to create and maintain the wide-open spaces the species needs. AR_334. To accomplish this, the Service's 4(d) Rule extends the Section 9 take prohibition to all activities, except those otherwise authorized or permitted, or incidental to wildlife hazard management at airports and accidental strikes by aircraft, normal agricultural practices in Oregon and Washington, noxious weed control on non-Federal lands, and habitat restoration activities beneficial to streaked horned lark. *Id*. The Service reasonably concluded that encouraging the continuation of these activities provides for the conservation of the lark. *Id*.

Plaintiffs argue that the Service's decision not to extend the Section 9 take prohibitions to routine agricultural practices was unlawful. Mot. at 40. But the record shows that the Service's decision was not only rational—it represented a critical element of providing for the conservation of the lark. The agricultural land base in the Willamette Valley is one of the largest areas of potential habitat for the streaked horned lark and therefore crucial to its survival and recovery. AR_334. Most of these lands are privately held. *Id*. To be suitable habitat, these lands require specific characteristics that only occur with regular human intervention and maintenance. *Id*. Conservation of larks on this landscape is a significant challenge—land management activities can harm or kill individual larks, but those same activities are necessary to create and maintain the habitat characteristics that larks require. *Id*.

As the Service explained, and as documented in the scientific literature, "[a]chieving net conservation of listed species on privately-owned working lands (i.e., farmland, rangeland, tree

farms, etc.) is one of the most difficult challenges in implementation of the Act." AR_334-35.

Under certain circumstances, the prohibitions of Section 9 can work against the best interest of

the species by discouraging landowners from engaging in activities that are beneficial to the

species and by creating a perception that the species' presence creates a legal or economic

liability. AR_335. For a species like the lark that is dependent on these private lands, this type

of disincentive can be devastating. *Id*. To be clear, if a landowner does not want larks on their

land, all they need to do is stop maintaining that land in a way that benefits the lark. *Id*. Not

mowing an area, for example, would allow the encroachment of plants that are incompatible with

lark nesting habitat. *Id*. Landowners would be free to do this—there is no Section 9 requirement

to *continue* beneficial activities. And the phenomenon of landowners altering land management

practices to discourage attracting listed species to their lands is well documented. *Id*. It was

entirely rational, therefore, for the Service to use its discretion to minimize these negative

incentives for landowners and put in place a rule that encourages the continuation of land

management practices which are beneficial for the Lark.

Plaintiffs argue that the Service's 4(d) Rule is incompatible with the ESA's requirement

that the Secretary promulgate a rule which provides for the conservation of a threatened species

because the Service cannot show how the 4(d) Rule will actually "conserve" the Lark, namely

because:1) agricultural activities can harm larks and 2) the Service cannot prove that the 4(d)

rule in place since the 2013 listing achieved its intended effect of stopping the conversion of

suitable lark habitat. Mot. at 40-43. Neither of these arguments withstand scrutiny. First, the

Service fully and repeatedly acknowledged that land management activities can harm individual

larks and destroy nests. It discussed this explicitly in the response to comments and explained

that harvest of grass seed usually commences in late June, after the typical first nest attempt.

AR_312.  But larks can have second and third breeding attempts that may extend into August.  *Id*.  The question is not, however, whether these activities can harm larks (they can), but whether extending the Section 9 take prohibition to make grass seed harvest in late June a potential violation of the ESA would benefit the conservation of the species.  The Service rationally concluded that exposing landowners to Section 9 liability for harvesting grass seed would disincentivize grass seed farming and create an incentive to discourage the presence of larks.  Plaintiffs' argument amounts to a difference of opinion with the Service over the best way to incentivize private landowners to maintain the habitats larks need and provide for conservation of the species.  In such a situation, the Service's judgment is entitled to deference.

Next, Plaintiffs create a strawman, arguing that the Service was required to extend Section 9 take prohibitions to routine agricultural activities unless it could *prove* that the 2013 4(d) Rule prevented the conversion of lark-suitable cropland.  Mot. at 42.  Plaintiffs have not identified any available information relevant to this issue that the Service did not consider and this failure is fatal to their argument.  *San Luis & Delta-Mendota Water Auth*., 747 F.3d at 602 ("[W]here the information is not readily available, we cannot insist on perfection: The best scientific data available, does not mean the best scientific data possible." (cleaned up)).  There are many incentives for landowners to convert grass seed farms to habitat less hospitable to larks.[13]  For example, the availability of higher value crops and a drop in demand for grass seed has led to a decrease in the overall acreage such farms.  AR_321.  The purpose of the 4(d) Rule

---

[13] To the extent that Plaintiffs are arguing that the Service was legally required to narrowly tailor the 4(d) Rule to extend the Section 9 prohibitions to all agricultural activities except grass seed farming, the argument lacks merit.  Mot. at 42.  Grass seed farming is an important activity in providing Lark habitat, but it is not the only type of agriculture that can be beneficial to Larks.  *See* AR_315.  The Service had discretion to capture the full suite of potentially beneficial agricultural activities and exercised that discretion appropriately.

was to conserve the lark by avoiding adding an additional incentive for the conversion of habitat favorable to the lark—exposure to Section 9 liability. Whether adding Section 9 liability would have accelerated the trend of conversion is not empirically knowable, but the Service's conclusion that such liability would play a role was explained in the record and supported by the agency's experience and the scientific literature. It was not arbitrary and capricious and should be upheld.

Plaintiffs' arguments about the 4(d) Rule all fail to demonstrate that the Service was arbitrary and capricious in issuing it. The record before the Court shows that the Service carefully considered the threats facing the streaked horned lark and tailored the rule's protections in a manner that would contribute to the conservation of the species. Plaintiffs' attempt to show that the Section 4(d) rule will not conserve the lark rests on their own contrary interpretations of evidence the Service considered. As another court examining a Service section 4(d) rule recently found "[b]ecause Plaintiff identifies only evidence that is thoroughly addressed in the [record], the Court concludes that the Service's findings have a substantial basis in fact. Thus, the Court cannot find that the Service erred in finding the Section 4(d) rule necessary and advisable to provide for the conservation of the beetle. *Ctr. for Biological Diversity*, 2023 WL 6388936 at 27 (quotation omitted). Accordingly, the Court should grant summary judgment for Defendants on Plaintiffs' 4(d) Rule claim and deny Plaintiffs' motion for summary judgment.

## IV.    **Remedy**

The Service agrees that if Plaintiffs prevailed, the Court should remand the Final Rule for reconsideration without vacatur, Mot. at 45, but the Court should not order a specific remand period. If the Court were contemplating a specific remand period, the Service would seek supplemental briefing as the Service would need time to assess the work required based on the Court's findings considered in the context of its current priorities and capacity relative to species

proposed for listing but not yet determined by the Service.  Particularly if the Service determined that promulgation of new rule is needed, one year would likely be too short, as the Service would need to update the scientific information for the lark, propose and publish the rule in the Federal Register for public comment, assess the public comments, and submit a final rule for publication. This proposed rule alone generally takes one year to produce.

In addition, the 4(d) Rule should also be remanded without vacatur.  Plaintiffs are incorrect when they assert that a partial vacatur of the 4(d) Rule would result in the application of the Section 9 take prohibition and this assertion reflects a fundamental misunderstanding of Section 4(d).  Mot. at 46.  The take prohibitions do not apply to threatened species unless the Service extends them through the promulgation of a special rule.  Here, the Service partially extended those prohibitions, but did not include certain activities.  Plaintiffs repeatedly assert that the 4(d) Rule "exempts" take associated with routine agricultural activities, but this is not the case.  Instead, the Rule does not extend the prohibition.  This means that, rather than vacatur, to apply those prohibitions to routine agricultural activities would require an affirmative injunction. Plaintiffs have not requested such an injunction and are not entitled to one.

## CONCLUSION

For the foregoing reasons, the Plaintiffs' motion for summary judgment should be denied and Defendants' motion for summary judgment should be granted.

Dated: December 15, 2023          TODD KIM
                                  Assistant Attorney General
                                  U.S. Department of Justice
                                  Environment & Natural Resources Division
                                  S. JAY GOVINDAN, Section Chief
                                  Wildlife & Marine Resources Section
                                  NICOLE M. SMITH, Assistant Section Chief

LYDIA T. GRIMM                    /s/  Maggie Baker Smith
Attorney Advisor                  MAGGIE BAKER SMITH, Trial Attorney
Department of the Interior        (WA Bar No. 42658)
Office of the Solicitor           Wildlife & Marine Resources Section
Pacific NW Region                 7600 Sand Point Way, NE
                                  Seattle, Washington 98155
                                  Tel: 202-598-3088/ Fax: 202-305-0275
                                  Email: Maggie.Smith@usdoj.gov

                                  *Attorneys for Federal Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon counsel of record using the CM/ECF system on December 15, 2023.

/s/     *Maggie Baker Smith*