TODD KIM
Assistant Attorney General
S. JAY GOVINDAN, Section Chief
NICOLE M. SMITH, Assistant Section Chief
MAGGIE BAKER SMITH (WA Bar No. 45628), Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
7600 Sand Point Way, NE
Seattle, Washington 98115
Tel: 202-598-3088/ Fax: 202-305-0275
maggie.smith@usdoj.gov

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and AUDUBON SOCIETY OF PORTLAND, | Case No.: 3:23-cv-00150-AN |
| Plaintiffs, | |
| v. | **DEFENDANTS' REPLY IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT** |
| DEBRA HAALAND, in her official capacity as Secretary of the U.S. Department of the Interior, et al., | Request for Oral Argument |
| Defendants. | |

## <u>TABLE OF CONTENTS</u>

**Page(s)**

ARGUMENT ......................................................................................................... 1

A.  Plaintiffs misrepresent the role of peer reviewers and the
Service's consideration of comments on the draft SSA ...................................... 1

B.  The Service set reasonable abundance criteria when assessing
the lark's resiliency. ........................................................................................ 4

C.  The Service appropriately considered factors other than abundance .................................. 6

D.  The Service considered the Breeding Bird Survey. ............................................... 8

E.  The Service did not ignore evidence about private lands in the
Willamette Valley. ........................................................................................ 10

F.  The Service expressly considered small population size in determining
whether to list the lark as threatened or endangered. ........................................ 11

G.  The Service reasonably determined that the streaked horned lark
was not endangered in a significant portion of its range. ................................. 13

H.  The Service's 4(d) rule is critical to the conservation of the lark. ..................... 17

I.  Remedy ......................................................................................................... 19

CONCLUSION ..................................................................................................... 20

## **TABLE OF AUTHORITIES**

**Cases**                                                                          **Page(s)**

*Alaska Oil & Gas Ass'n v. Pritzker*,
  840 F.3d 671 (9th Cir. 2016) .......................................................... 10

*Center for Biological Diversity v. U.S. Fish & Wildlife Service*,
  488 F. Supp. 3d 1219 (S.D. Fla. 2020) ........................................... 14, 15

*Center for Biological Diversity v. Zinke*,
  900 F.3d 1053 (9th Cir. 2018) .......................................................... 9

*Conservation Cong. v. Finley*,
  774 F.3d 611 (9th Cir. 2014) ............................................................ 13

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.*,
  833 F.3d 1136 (9th Cir. 2016) .......................................................... 13, 16

*Ctr. for Biological Diversity v. Haaland*,
  58 F.4th 412 (9th Cir. 2023) ............................................................ 12

*Fed. Power Comm'n v. Transcontinental Gas Pipe Line Corp.*,
  423 U.S. 326 (1976) ........................................................................ 19

*Friends of Del Norte v. Cal. Dep't of Transp.*,
  No. 18-CV-00129-JD, 2023 WL 2351649 (N.D. Cal. Mar. 3, 2023) ..... 13

*In re Clean Water Act Rulemaking*,
  60 F.4th 583 (9th Cir. 2023) ............................................................ 20

*Lands Council v. Powell*,
  395 F.3d 1019 (9th Cir. 2005) .......................................................... 5

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989) ........................................................................ 3

*Nat'l Wildlife Fed'n v. Espy*,
  45 F.3d 1337 (9th Cir. 1995) ............................................................ 20

*Nat'l Wildlife Fed'n v. NMFS*,
  839 F. Supp. 2d 1117 (D. Or. 2011) ................................................. 19

*Pac. Bell v. Pac. W. Telecomm.*,
  325 F.3d 1114 (9th Cir. 2003) .......................................................... 19

*Pac. Dawn, LLC v. Pritzker*,
   No. C13-1419 TEH, 2013 WL 6354421 (N.D. Cal. Dec. 5, 2013)                9

*Pub. Citizen v. FAA*,
   988 F.2d 186 (D.C. Cir. 1993)                                            14

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
   747 F.3d 581 (9th Cir. 2014)                                             17

*Trout Unlimited v. Lohn*,
   559 F.3d 946 (9th Cir. 2009)                                              1

**Statutes**

16 U.S.C. § 1533(a)(1)......................................................................................... 11
16 U.S.C. § 1533(d) ................................................................................... 17, 18, 20

**Regulations**

50 C.F.R. § 424.11(c)........................................................................................... 12

The United States Fish and Wildlife Service ("Service") determined that the streaked horned lark ("lark") is a threatened species and should be listed under the Endangered Species Act ("ESA") because it is likely to become endangered in the foreseeable future. Contrary to the representations made by Plaintiffs, the Service has not disregarded the plight of the lark. The Service's assessment is clear—the lark is in danger of extinction within the foreseeable future. As for the Service's listing decision, Plaintiffs and the Service differ on only a very narrow question: How imminent is the risk of extinction? But Congress has entrusted these types of predictions, within the agency's area of special expertise, to the Service, and the Service has provided a reasoned explanation for its determination, supported by the record. *See Trout Unlimited v. Lohn*, 559 F.3d 946, 959 (9th Cir. 2009) (determining whether a species is in danger of extinction required a great deal of predictive judgment, which is entitled to deference). As for the 4(d) rule, once again, the area of disagreement is a narrow one: Is the lark better served by imposing Section 9 liability on farming activities, or by supporting those habitat creating activities by removing a regulatory disincentive to undertake them? Like the Service's listing determination, this is fundamentally a judgment call that Congress has entrusted to the Service. And the Service reasonably determined that the extension of Section 9 liability to private activities such as farming would harm the conservation of lark habitat. Plaintiffs' preferences should not be substituted for the Service's well-reasoned and well-supported expert determinations. The Court should deny Plaintiffs' motion for summary judgment and grant the Service's cross-motion for summary judgment.

## ARGUMENT

**A.    <u>Plaintiffs misrepresent the role of peer reviewers and the Service's consideration of comments on the draft SSA.</u>**

At the outset, clarifying the role of peer and partner review of the pre-publication draft

Species Status Assessment ("SSA") is necessary. In 2020, the Service sent a pre-publication draft of the SSA to 11 external reviewers. AR_166. Six of those reviewers provided comments on that draft, including Mr. Altman and Mr. Joe Liebezeit, an employee of Plaintiff Portland Audubon. AR_81. Both Mr. Altman and Mr. Liebezeit provided feedback on the Service's abundance criteria for the resiliency analysis in the draft SSA. AR_8047; AR_8037. Both reviewers commented that the abundance criteria were too low and that the Service should have used the goals set in the draft Recovery Plan as the abundance criteria in the SSA. *Id*. As explained by Mr. Liebezeit, "the decisions of the streaked lark Species Specialist Group reflected a certain degree of confidence that populations of a certain size could be sustainable (or "resilient in the terms of the SSA) . . .." AR_8034. Likewise, Mr. Altman put forth "my proposition for using the [draft Recovery Plan] to establish population abundance criteria for resiliency" and argued that the size of resilient populations should vary among regions, as they do in the draft Recovery Plan. AR_8047.

The Service listened to this feedback, and adjusted the abundance criteria in the SSA analysis, informed by the recovery goals set forth in the draft Recovery Plan. The pre-publication draft SSA reviewed by Mr. Altman and Mr. Liebezeit set high condition sites at more than ten breeding pairs, moderate condition sites at 5-10 breeding pairs, and low condition sites at fewer than five pairs for all regions. AR_8037. The Service increased these numbers in response to the comments: The draft SSA published with the proposed rule and the final SSA published with the Final Rule varied the criteria between regions, with high condition sites ranging from 15 to 25 breeding pairs. AR_128; AR_271. In the Final Rule the Service explained that "[f]or the streaked horned lark SSA, we incorporated information from the draft recovery plan into our analysis when appropriate and consistent with the SSA framework and, in response to peer review on the

SSA, we revised our demographic metrics for current condition to be more in line with population targets in the draft recovery plan." AR_311. Although Mr. Altman commented on the proposed rule, after the Service adjusted the abundance criteria in the SSA, Mr. Altman did not renew his criticism of that parameter. AR_190-205. Plaintiffs fail to acknowledge that the Service incorporated these reviewers' comments into the final SSA, even though this was explained in the Service's cross-motion for summary judgment. Defendants' Cross Motion for Summary Judgement ECF No. 26 at 37 ("Cross Mot.").[1]

Along with attempting to pass off Mr. Altman and Mr. Liebezeit's comments on the pre-publication draft SSA as if they are critiques of the final SSA, *see* Plaintiffs' Motion for Summary Judgment ("Mot."), ECF No. 23, at 27; Plaintiffs' Reply and Response to Cross Motion for Summary Judgment ("Reply"), ECF No. 26 at 12, Plaintiffs misrepresent the facts when they refer to Mr. Altman as "the Service's Lark expert." Reply at 6, 7, 10 & 12. Mr. Altman is not employed by the Service but is instead one of 11 external parties the Service asked to review the pre-publication draft SSA. AR_81; AR_166; Mot. at 20. As explained above, the Service sought review of the SAA from various individuals and institutions and incorporated feedback received where appropriate.[2] The request for feedback does not transform these reviewers into the "Service's experts" nor are their views entitled to deference from the Court, particularly in determining whether a species is threatened or endangered. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989).

---

[1] All citations to briefs filed by Plaintiffs and Defendants use the pagination imprinted by the Court's ECF system.

[2] The Service considered Mr. Altman's input, responded to his comments, and explained its reasoning. AR_8057 (responding to Mr. Altman's feedback on the pre-publication draft SSA); AR_311-315 (responding to comments provided on the proposed rule). Nothing more is required.

**B.**     **The Service set reasonable abundance criteria when assessing the lark's resiliency.**

As demonstrated above, the Service used the criteria in the draft Recovery Plan to set the abundance criteria for assessing the lark's resiliency, as recommended by Mr. Altman and Mr. Liebezeit. Plaintiffs now criticize the Service's use of the population targets set forth in the draft Recovery Plan, because, they claim, those are actually regional goals and there is "no basis" for using them to assess individual populations' resiliency. Reply at 13-14. This is illustrative of the shifting goal posts that Plaintiffs have constructed during this litigation. *See also* Reply at 14 (quoting Mr. Liebezeit's recommendation to use the draft Recovery Plan criteria, which the Service subsequently did); AR_8044 (Mr. Altman urging the Service to use the population targets set forth in the draft Recovery Plan, which the Service subsequently did).

In any event, Plaintiffs' new argument is also incorrect. The draft Recovery Plan sets minimum numbers of pairs for "core sites," which are sites "managed specifically to advance the recovery of the streaked horned lark"—*i.e.*, the highest-quality lark habitat.[3] AR_71. The draft Recovery Plan acknowledged that other areas ("Matrix lands") are also necessary but would not have specific goals in terms of breeding pairs. AR_70. Thus, the goals for breeding pairs at core sites represented the recovery goals for the best sites, managed for lark conservation. *Id*. Plaintiffs' assertion that those targets were used only to establish regional population goals is flatly contradicted by the record. AR_70 (setting regional population goals by summing target populations at core sites *and* Matrix lands). The Service was neither arbitrary or capricious to use these recovery goals (as Mr. Altman and Mr. Liebezeit urged) to help evaluate abundance.

Plaintiffs now assert that resilient sites must have 100 to 1,000 animals (a number never

---

[3] Defendants have addressed the Service's rationale for choosing 25 breeding pairs as the metric for a highly resilient population in the Willamette Valley. Mot. 37-38.

suggested by Mr. Altman or Mr. Liebezeit in their comments on the SAA). Reply at 14. In their motion for summary judgment, Plaintiffs claimed this number was appropriate because it was the recommendation of Ms. Anderson, who supposedly "analyzed what would constitute an [minimum viable population] of Larks for the Service." Mot. at 28. When Federal Defendants pointed out that Plaintiffs were quoting from a summary of a 2014 paper, not Ms. Anderson's own analysis (Cross Mot. at 29)—Plaintiffs pivoted. They now assert that "the Service must explain why it did not rely on [the study summarized by Ms. Anderson] in the listing decision itself" because it is purportedly "the *only* study in the record positing an effective population size." Reply at 15.

Contrary to Plaintiffs' assertion, this study is not in the administrative record. The administrative record contains only a summary of the study and there is no way to assess what the study actually says and whether it applies to the analysis of discrete breeding populations, or whether the analysis actually applies to *overall* rangewide population levels, as the summary seems to suggest. AR_543. Plaintiffs had multiple opportunities to request that it be added or to argue that it should be admitted under an exception to record review. *See Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005) (explaining the exceptions to record review in APA cases). They did not. The document that *is* in the record is a summary of literature prepared for the Service in support of its development of a minimum viable population size for recovery planning ("[h]ere, we briefly discuss whether a population size recovery objective should be included in a recovery plan. . ."), not to determine the correct number of breeding pairs at particular nesting sites. AR_539. The team that prepared the draft Recovery Plan—which did consider this study—concluded that local populations as low as ten breeding pairs, depending on the region, constituted a core site that met recovery criteria. AR_8047; AR_70. Based on the

goals set in the draft Recovery Plan, the lark would fully meet the recovery criteria with only six core sites having more than 50 breeding pairs, and 32 core sites having significantly fewer. *Id.* Plaintiffs' attempts to misrepresent the record should be rejected.

Finally, Plaintiffs point to an ice storm at Corvallis Airport as evidence that only local populations with more than 50 breeding pairs can be considered resilient. Reply at 13. The Service considered the population drop at Corvallis Airport, which could have resulted from extreme weather. AR_243. But the insights to be gained from this very anecdotal event are limited. Experts from Oregon State University surveyed the site and analyzed the potential causes of the decline, ultimately concluding that "the information at hand is so spotty that speculation is of very limited use." AR_2128. It is precisely because of these types of events, however, that the Service determines species status based on the 3Rs, not on resiliency of individual nesting sites alone. And the team that drafted the draft Recovery Plan knew about this event and did not agree with Plaintiffs that the event showed that all local populations must be above 100 individuals.

C.    **The Service appropriately considered factors other than abundance.**

By focusing on the Service's consideration of small-population size, Plaintiffs attempt to convince this Court that the determination of whether a species is threatened or endangered rest solely on a species' abundance. Reply at 11-13. But abundance is not the only consideration for the Service when making a listing determination. The Service's analysis of the species' current condition in support of listing decisions uses the conservation biology principles of resiliency, redundancy, and representation, collectively known as the "3Rs." *See* Cross Mot. at 29-30. Although the concept of resiliency incorporates abundance, which in this case would include the number of birds at specific nesting sites, the Service also considered population trends, connectivity, habitat, and the presence of a beneficial disturbance regime (which is necessary to

maintain suitable habitat). AR_230 (explaining that resiliency is measured based on metrics of population health); AR_6541 (explaining that resiliency is "positively related to population size and growth rate," and may also include measures connectivity and habitat quantity and quality).

Accordingly, the Service assessed abundance in concert with known quantity and quality of available habitat. Because of the streaked horned lark's specific and unique habitat requirements, sites that are managed for larks offer significant advantages.[4] Sandy Island is an example of this because it is the subject of a Habitat Conservation Plan ("HCP") and associated permit issued under Section 10 of the ESA. AR_259. Under the HCP, the Port of Portland must manage this site to benefit larks. AR_3127-3246. In considering the resiliency of the site, the Service noted the low scores for abundance and population trends, but the site rated very highly for connectivity, habitat quality, and disturbance regime. AR_274. Considering all the information, it was not arbitrary and capricious for the Service to determine that the site was highly resilient.

The Plaintiffs say that Sandy Island has "limited connectivity," but it is unclear what they base this conclusion on. Reply at 12. The page they cite from the administrative record (AR_274) does not say that. The Service explained how it assessed connectivity "based on seasonal and intra-annual observations of larks moving between sites (within a breeding season, based on color-banded or tagged birds, and observations of birds returning to alternate breeding sites relative to where they were banded)." AR_312. In their reply Plaintiffs repeat their assertion that the Service's determinations of connectivity lack record support, but they supply no evidence of this. AR_17-18. Their only support is a statement from the Final Rule about

---

[4] The draft Recovery Plan also specified that areas managed to benefit larks (called "Core sites") have special utility for lark conservation. AR_67.

recolonization of unoccupied sites—an entirely different matter than connectivity between occupied sites. Reply 12 at (quoting AR_331).

D.    **The Service considered the Breeding Bird Survey.**

Plaintiffs claim the Service "dismiss[ed] survey data showing that the Lark is declining across its range." Reply at 15. As evidence of this supposed omission, they point to trend analysis based on Breeding Bird Survey ("BBS") data that captures survey counts for all horned lark subspecies. *Id*. The Service has never disputed that the BBS trend analysis represents a reliable estimate of changes to the rangewide populations between 2005 and 2015. AR_318. When assessing rangewide population, however, the Service was examining how the lark subspecies was *currently* changing (*i.e.*, between 2013 and 2019) and whether a significant drop in population had occurred since 2013 as some studies had predicted. AR_268. In answering these questions, the Service was reconciling the BBS data, which showed a decline, with survey data from multiple sources, including nesting sites and roadside point count surveys that showed moderate increases in some populations and small decreases in others. *Id.* The Service understood the data were inconclusive and explained, in the Final Rule, that the increases it was observing at nesting sites could not be extrapolated to conclude that the rangewide population was increasing. AR_318. This does not, however, undermine the Service's conclusion, based on the recent survey data that since 2013 there "is no evidence to support that there are precipitous declines across any of the regions or across the range as a whole." *Id.* This conclusion was fully supported by the record and hardly amounts to ignoring the BBS trend analysis.[5]

---

[5] Plaintiffs imply that, because the Service reached the same substantive decision (a threatened listing) after the remand, it therefore "skew[ed]" "the available data to reach a desired result." Reply at 17. No evidence supports the claim that the agency did not act in good faith, and Plaintiffs' implications to the contrary should be summarily rejected. Nothing in the District Court's decision remanding the 2013 Rule suggested that the Service's decision was

Plaintiffs claim that "the available evidence suggests that the number of [l]arks has declined dramatically" and point to the mean number of pairs detected in the Willamette Valley (48 in 2013 and 18.3 in 2019) as evidence of this, but this is not an accurate representation of the administrative record. Reply at 17. In 2013, only *two* sites were surveyed (the Corvallis Airport and Independence State Airport). AR_243. There were a total of 96 breeding pairs at these two sites, resulting in a mean of 48. *Id*. In 2019, *nine* sites were surveyed, some of which were much smaller than the two airport sites. *Id*. This meant the mean was lower, but the actual number of breeding pairs observed *increased*. *Id*. In particular, the number of breeding pairs at the two airport sites surveyed in 2013 increased by three pairs. *Id*. Rather than evidence of a decline, the data collected by the Service and presented in Table 3, shows variability and no clear signs of either increased or decreases in population. *Id*.

Plaintiffs seek to draw parallels with *Center for Biological Diversity v. Zinke*, 900 F.3d 1053 (9th Cir. 2018), but that case is entirely distinguishable. First, it involved the Ninth Circuit's review of a "not warranted" decision determining that a species should not be listed under the ESA at all, not a decision to list a species as threatened. Second, in that case the Court found that the agency "omitted" certain data from its determination and did not explain why it had done so. *Id*. at 1068. This is not the case here, where the Service included, considered, and expressly discussed the BBS data along with other available data to draw conclusions about long-term trends. AR_268; AR_318.

Plaintiffs are unhappy with the inferences the Service has drawn based on its expert

---

substantively incorrect, only that the Service was required to provide a clearer explanation for its decision. ECF No. 23-1 at 45. It is not unusual, in such instances, for an agency to reach the same substantive decision and for a district court to affirm that decision based on the new record. *See, e.g.*, *Pac. Dawn, LLC v. Pritzker*, No. C13-1419 TEH, 2013 WL 6354421, at *4 (N.D. Cal. Dec. 5, 2013), *aff'd*, 831 F.3d 1166 (9th Cir. 2016).

judgment. Plaintiffs would like the Service to extend the trend line from the BBS (with a data set that ended in 2015) through to the present day. The Service, however, reasonably considered more recent survey data—along with the trend information from the BBS—when making its conclusions (*i.e.*, that there was no evidence of a precipitous decline since 2013). Its consideration of these data does not make the listing decision arbitrary and capricious. "The ESA does not require [the Service] to base its decision on ironclad evidence when it determines that a species is likely to become endangered in the foreseeable future; it simply requires the agency to consider the best and most reliable scientific and commercial data and to identify the limits of that data when making a listing determination." *Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 681 (9th Cir. 2016). The Service has done so here.

E.    **The Service did not ignore evidence about private lands in the Willamette Valley.**

Plaintiffs repeat their argument that the available "survey data ignores the [l]ark's status on private lands in the Willamette Valley" and therefore the Service "effectively ignore[ed]" the lark population on those private lands. Reply at 18. Once again, Plaintiffs do not identify any data sources the Service overlooked. The Service acknowledged that survey data on private lands are limited and thus may not be representative. Cross Mot. at 41-42. Plaintiffs acknowledge both the limits of the available data and that the Service should not have ignored the available data. Reply at 19. Yet Plaintiffs still maintain—without support—that "there is no basis for presuming that these sites are representative." *Id.* But the Service never made such a presumption. In fact, it did the opposite. To assess local populations, it analyzed the available survey data with the express caveat that, because of the lack of surveys "there is no data to suggest any other local populations are resilient." AR_275. In other words, it made the conservative (protective for the species) assumption that unsurveyed local populations were *not* resilient. Plaintiffs arguments on

this point lack any support.

**F.**    **The Service expressly considered small population size in determining whether to list the lark as threatened or endangered.**

The Service's thorough consideration of small population size is set forth in Defendants' previous filing and supported with multiple citations to the record. Cross Mot. at 32-35. Plaintiffs make various attempts to undermine the Service's consideration of this issue by arguing, incorrectly, that it is "nowhere in the agency's decision document," maintaining that describing small population size in the supporting SSA is insufficient, and otherwise nitpicking the Service's consideration of the issue (e.g., complaining that the Service discussed the issue under the wrong topic heading in the Final Rule or that it wasn't included in certain charts). Reply at 8-9. None of this stands up to scrutiny.

The ESA directs the Secretary to determine whether a species should be listed as an endangered species or threatened species because of any one of the five listing factors. 16 U.S.C. § 1533(a)(1). In the Final Rule, the Service determined that the listing of the lark was warranted due to "ongoing loss and degradation of suitable habitat (Factor A), as well as land management activities and related effects, and recreation (Factor E), combined with the synergistic effects of *small population size* and climate change (Factor E), such that it is likely to become an endangered species within the foreseeable future." AR_309 (emphasis added); Cross Mot. 34. The Service also explicitly addressed this issue in the response to commenters who argued that the lark "should be listed as endangered in all or a significant portion of the range due to small population sizes, ongoing loss of habitat, and lack of protection across most of its range." AR_311. The Service explained that "[d]espite the ongoing influence of stressors, the subspecies is not currently in danger of extinction, because the species retains multiple populations in high and moderate condition across all representative regions and those populations occur in a variety

of habitat types. . . . Negative influence factors on the subspecies have not fluctuated much for the last 20 years and are not of a scope or magnitude such that the subspecies is currently in danger of extinction." *Id.* This is an assessment of the role of small population size on the current condition of the lark, an explanation for why the Service does not believe small population size warrants an endangered listing, and it is found in the Final Rule. Plaintiffs may disagree with this conclusion, but the Service did not ignore the threat of small population size. Likewise, this reasoning from the Final Rule demonstrates that, contrary to Plaintiffs' assertions (Reply at 9), the Service analyzed the effect of small population size when considering the factors currently influencing species viability. AR_263-64.

Plaintiffs discount the Service's analysis of small population size as insufficient because the Service also considered it a "synergistic" factor —i.e., a factor that "amplifies the effect of other stressors but is difficult to evaluate by itself." AR_261. The Service, consistent with its regulations providing for consideration of any one "or a combination of" the statutory factors (*see* 50 C.F.R. § 424.11(c)), viewed small population size as a factor exacerbating all of the other stressors facing the lark, rather than a "primary" independent factor. As earlier explained, the primary driver of the status of the lark is the availability of the very specialized habitat required by the species.[6] AR_320. The effect of habitat loss is well-documented and the species' small

---

[6] Plaintiffs say the Service's position "changed" on this issue from the draft Recovery Plan. Reply at 10. Recovery plans are developed under the requirements of Section 4(f) of the ESA and are to identify metrics that describe what recovery of the species may look like. AR_311. In contrast, the SSA is used to analyze the current status of the species and project future conditions under a suite of plausible scenarios to support management decisions. *Id.* Goals and objectives of recovery plans do not dictate listing decisions made under sections 4(a) of the Act. *See Ctr. for Biological Diversity v. Haaland*, 58 F.4th 412, 418 (9th Cir. 2023). In this case, the draft Recovery Plan was appropriately focused on increasing the population of the lark, which everyone agrees is an important element of the species' recovery, as well as on improving habitat quality and quantity. AR_65.

population size is in large part driven by that loss of habitat. AR_250. Thus, it was rational for the Service to consider small population in tandem with other stressors.

The record reflects that the lark's population was small and that the population size was a consideration that influenced the decision to list the species as threatened. The core of Plaintiffs' argument is that they disagree with this conclusion. "[D]ifferences in opinion, however, are not sufficient grounds for rejecting the analysis of agency experts." *Ctr. for Biological Diversity v. Bureau of Land Mgmt.*, 833 F.3d 1136, 1148 (9th Cir. 2016); *Conservation Cong. v. Finley*, 774 F.3d 611, 620 (9th Cir. 2014) ("Under our deferential standard of review, we are not permitted to substitute our judgment for the agency's in determining which scientific data to credit, so long as the conclusion is supported by adequate and reliable data."). Plaintiffs have not shown that the Service ignored any relevant information or disregarded better available science and for this reason their argument fails. *See Friends of Del Norte v. Cal. Dep't of Transp.*, No. 18-CV-00129-JD, 2023 WL 2351649, at *10 (N.D. Cal. Mar. 3, 2023).

**G.    The Service reasonably determined that the streaked horned lark was not endangered in a significant portion of its range.**

Plaintiffs argue that "the threats facing the species vary from region to region in both type and intensity, and that there are concentrated threats that imperil the [l]ark's continued existence in each region." Reply at 20. The Service evaluated the available information and concluded otherwise. The Service considered "information pertaining to the geographic distribution of both the species and the threats that the species faces to identify any portions of the range where the species is endangered." AR_331. The Service considered whether there were threats geographically concentrated currently affecting enough individuals to influence the resiliency of a population. *Id.* The record demonstrates that the Service reasonably concluded that threats— while they varied between regions—were not concentrated in a way that any population could be

considered currently in danger of extinction. *Id.*

Plaintiffs accuse the Service of "conflat[ing]" the analysis of a rangewide listing determination with the analysis of whether the species' status is different in a significant portion of its range ("SPR"). Reply at 20. But these were separate analyses conducted by the Service and Plaintiffs' argument misunderstands the contents of the Final Rule and how the Service conducted its status review. First, much of the content of the Rule is background information summarizing the information the Service relied on to make its listing decision, including its SPR analysis, and its 4(d) rule, which are shorter sections synthesizing and applying the preceding information. AR_330-32. That the Service used the background section of the Rule (*see* Mot. at 35) to describe conversion of grass-seed farms to other crops does not mean that information did not inform the Service's subsequent SPR analysis. Putting information in the "background" section is different from "conflat[ing]" the analyses of the subspecies' status at the rangewide and SPR scales, which were clearly separately considered.

In the Final Rule, the Service assessed, region by region, the status of each lark population in detail. *See, e.g.*, AR_324. Plaintiffs ignore this detailed consideration because it does not appear under the heading "Status Throughout a Significant Portion of Its Range." But the Service referred to the preceding analyses of the threats facing the larks in each region (which again, were spelled out in detail in the Final Rule) and concluded that there are "no portions of the species' range where the species has a different status from its rangewide status." AR_332. "Courts will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned" and the Service's conclusion easily meets this standard. *Pub. Citizen v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) (quotation omitted).

Plaintiffs rely on *Center for Biological Diversity v. U.S. Fish & Wildlife Serv*ice, 488 F.

Supp. 3d 1219, 1232 (S.D. Fla. 2020), for the proposition that the SPR analysis here is inadequate, but that case is entirely distinguishable. There, the Service had a uniform threat (sea-level rise) that was proceeding at different rates across the species' range. *Id*. The Service ultimately determined the species did not warrant listing at all (unlike here, where the Service concluded a threatened listing was warranted). The district court narrowly remanded the agency's not-warranted decision with an order to explain why the different rates of sea level rise did not constitute a concentrated threat. *Id*. In this case, the Service evaluated the many threats to the lark, and explained why none of those threats were concentrated in a way that would suggest a different status (endangered instead of threatened—a different temporal risk of extinction) in a portion of the lark's range. Absent any difference in status, there was no need to assess whether the portion of the range was "significant" (which would be required to support a determination of endangered based on SPR analysis). AR_331.

Plaintiffs' attempts to show that the Service missed important information is once again flatly contradicted by the record. Plaintiffs cite a study by Keren and Pearson for the proposition that the Service did not assess the issue of a declining female population in the South Puget Lowlands population. Reply at 22. But the Final Rule specifically relied on the Keren and Pearson study when discussing these declining trends at the Olympia and Shelton Airports. AR_318. And, as the Service discussed, five other local populations in the region, located within Joint Base Lewis McChord ("JBLM"), have increased in size since 2013. *Id*. Plaintiffs omit that Keren and Pearson agreed that "the [JBLM] sites appear to have relatively stable female populations and growing male populations, which may reflect a population response to ongoing management of lark habitat and human activities in nesting locations." AR_1817. Likewise, Plaintiffs pluck a sentence fragment from the SSA, which discusses the potential for lark

extirpation in the South Puget Sound region but omit that the conclusion applies "in the future, if influences remain the same" and is therefore fully consistent with the Service's threatened determination. AR_264

Finally, turning to the Pacific Coast population, the Service knew that the Pacific Coast population had the lowest number of breeding pairs and no highly resilient sites. AR_318. Because of the small size of this population, the Service recognized this raised a particular question about a potentially different status for its SPR analysis, and so it carefully considered the available information. *Id.* That information indicates that larks never occurred in this area in large numbers, and "the number, distribution, and size of local breeding populations along the Pacific Coast appears to have remained relatively constant." *Id*. The Service concluded that "[t]he size of those coastal sites is relatively small compared to other local populations and therefore naturally limits the number of breeding pairs, and we see no apparent declining trend in this regional population based on survey data between 2013 and 2019." AR_332. Plaintiffs claim that the Service found the region was "currently considered unstable" (Reply at 23), but that description was applied only to one site, Leadbetter Point, and referred to population fluctuations for this site and a lack of a clear trend line in either direction. AR_274. Plaintiffs also claim that the Service did not address the effects of invasive beach grass, but the Service detailed the restoration work completed at Leadbetter Point (part of a National Wildlife Refuge managed by the Service), which has successfully reduced the cover of encroaching beachgrasses into lark habitat. AR_320. Plaintiffs even concede that "the situation is not getting any worse," they just disagree with the conclusion the Service has drawn from this state of affairs. Reply at 23. A difference of opinion is not sufficient where, as here, the Service's conclusion is based on substantial evidence. *Ctr. for Biological Diversity*, 833 F.3d at 1148.

**H.    The Service's 4(d) rule is critical to the conservation of the lark.**

The Service's 4(d) Rule meets the ESA's mandate that such rules be "necessary and advisable to provide for the conservation of such species," 16 U.S.C. § 1533(d), because it generally prohibits take while supporting the continuation of activities that lead to necessary habitat features. The Service was not required to issue a 4(d) Rule (Cross Mot. at 49), but the agency reasonably concluded that it was in the best interest of the lark to generally extend the Section 9 take prohibitions to all but a few carefully considered activities that lead to habitat maintenance and development. *Id.* at 49-50. Plaintiffs' arguments in reply demonstrate their lack of understanding of the legal requirements of Section 4(d) and the rationale of the rule.

First, Plaintiffs mispresent the law when they insist that the Service was required to gather evidence showing that the 4(d) Rule in place between 2013 and 2022 prevented the conversion of lark-suitable cropland. Reply at 25-26. The ESA requires the Service to use the best available scientific data but does not require the agency to gather new information. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014). Plaintiffs provide no legal support for their argument to the contrary. Reply at 25-26.

Second, Plaintiffs argue that any reduction in grass-seed acreage is proof that the 4(d) Rule is ineffective. *Id*. This is not the measure of success, nor could it be. There are multiple reasons for continued decline of the grass seed industry in the Willamette Valley beyond the Service's control, including reduced consumer demand for grass seed. AR_321. The purpose of the 4(d) Rule was (1) to avoid providing landowners an additional incentive to convert their cropland; and (2) to avoid creating a situation in which landowners were actively discouraging larks from using their property. AR_334-35. Plaintiffs accuse the Service of pointing to "generic statements" regarding these incentives without any acknowledgment that those conclusions were based on the Service's long experience in administering the ESA, as well as scientific literature

and documented instances in which private landowners "alter land management practices or restrict conservation activities to discourage attracting listed species to their lands." AR_335. Plaintiffs fail to acknowledge that larks rely on consistent disturbance to create habitat and there is nothing to stop private landowners from simply choosing to do nothing (e.g., stop mowing) in an effort to discourage larks from using their land. Such inaction is not prohibited under Section 9 but would harm the lark because of the species' dependence on human-made habitat. Cross Mot. at 51. Moreover, to extend the take prohibition to routine farming activities, the Service would need to demonstrate that such an extension is necessary and advisable to provide for the conservation of the species. 16 U.S.C. § 1533(d). There is nothing in the record (and Plaintiffs offer no argument) as to why such an extension would meet this standard.

Finally, Plaintiffs argue that the Service erred by describing the limitations on the extension of the take prohibition by activity rather than crop type. Reply at 26. But the Service addressed this in the 4(d) Rule and offered a reasonable explanation. It explained that various farming activities, not just grass seed farming, can create habitat beneficial to larks. AR_315. Larks use bare areas in pastures and fallow fields and washed-out areas in any row crop field. *Id.*; AR_234. While grass seed fields are particularly beneficial, other types of farming also benefit the lark, and cannot always be predicted based on crop type. *Id*. Therefore, the Service reasonably limited the extension of the Section 9 prohibitions by describing *the activity* that creates that habitat, such has planting, mowing, and burning (AR_338), rather than by listing specific crop types.

Achieving net conservation of listed species on privately-owned, working lands is one of the most difficult challenges in implementation of the ESA because of private landowners' aversion to being regulated by the Act. AR_334-35. The Service's view, informed by decades of

experience administering the ESA and supported by the scientific literature, is that in this situation, "given the importance of human-created habitat through ordinary agricultural management activities, this risk aversion would be detrimental to the conservation of the species." *Id*. This conclusion is reasonable and supported by the record.

## I.    <u>Remedy</u>

The Court should uphold the Service's determinations as reasoned, well-supported in the record, and in accordance with the ESA. But should the Court rule for the Plaintiffs on the merits, the appropriate remedy would be to remand the final rule to the agency without vacatur. *See*, *e.g.*, *Pac. Bell v. Pac. W. Telecomm.*, 325 F.3d 1114, 1123 (9th Cir. 2003) (allowing agency actions to remain in place pending completion of remand, even where the actions were found to be arbitrary and capricious). Even if the Court retains jurisdiction, the timeline requested by the Plaintiffs is not reasonable or realistic. This is particularly so given that, "[i]n the absence of 'substantial justification,' . . . a court should not dictate to an administrative agency 'the methods, procedures, and time dimension' of the remand." *Nat'l Wildlife Fed'n v. NMFS*, 839 F. Supp. 2d 1117, 1129 (D. Or. 2011) (citing *Fed. Power Comm'n v. Transcontinental Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976)). If the Court is considering setting a remand period, the Service respectfully requests the opportunity to address the appropriate timeframe for remand through additional briefing. Supplemental briefing would be necessary because the amount of time necessary to complete any remand would turn on the reasons the Court would find the Service's determination arbitrary and capricious.

Although Plaintiffs agree that the listing rule should be remanded without vacatur, Plaintiffs request a "partial vacatur" of the Service's 4(d) Rule to extend the Section 9 prohibitions to farming activites. Reply at 27. Such a remedy is inappropriate for several reasons. First, there is nothing to partially vacate. The Service did not extend all of Section 9's take

prohibitions and then separately carve out exceptions to those prohibited acts. Rather, the text of the 4(d) rule is clear—the Service expressly declined to extend Section 9's prohibitions to certain activities described in paragraph (a)(2) of the 4(d) Rule in the first instance. AR_338. Plaintiffs' proposed remedy would thus *expand* the contents of the 4(d) Rule and have it apply to a broader set of activities without any finding from the Service that such an expansion is "necessary and advisable to provide for the conservation of such species." 16 U.S.C. § 1533(d). At bottom, Plaintiffs are asking this Court to impose an affirmative injunction which would expand the civil and criminal liability that the public may face. Plaintiffs have not made a showing that they are entitled to such an injunction.

Second, a court's decision to vacate an agency action is an equitable remedy.[7] *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995); *In re Clean Water Act Rulemaking*, 60 F.4th 583, 593, 94 (9th Cir. 2023) (describing vacatur as an exercise of equitable authority). Thus, vacatur should not be granted routinely but only in accordance with the traditional balancing of equitable considerations. The Plaintiffs have failed to present any argument on the traditional equitable factors and have therefore failed to carry their burden.

## CONCLUSION

For the foregoing reasons, the Plaintiffs' motion for summary judgment should be denied and Defendants' motion for summary judgment should be granted.

Dated: February 16, 2023        TODD KIM
                                Assistant Attorney General
                                U.S. Department of Justice
                                Environment & Natural Resources Division

---

[7] It is the position of the United States that "set aside" in Section 706 of the APA does not mean "vacate." See United States v. Texas, No. 22-58 (S. Ct.), Gov't Op. Br., 2022 WL 4278395, 40–44; Gov't Reply Br., 2022 WL 17170668, 16–20. The federal government acknowledges, however, that this Circuit's precedent on APA remedies controls at this stage of the proceedings.

S. JAY GOVINDAN, Section Chief
Wildlife & Marine Resources Section
NICOLE M. SMITH, Assistant Section Chief

LYDIA T. GRIMM                          /s/ Maggie Baker Smith
Attorney Advisor                        MAGGIE BAKER SMITH, Trial Attorney
Department of the Interior              (WA Bar No. 42658)
Office of the Solicitor                 Wildlife & Marine Resources Section
Pacific NW Region                       7600 Sand Point Way, NE
                                        Seattle, Washington 98115
                                        Tel: 202-598-3088/ Fax: 202-305-0275
                                        Email: Maggie.Smith@usdoj.gov

                                        *Attorneys for Federal Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon counsel of record using the CM/ECF system on February 16, 2023.

/s/      *Maggie Baker Smith*