IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and AUDUBON SOCIETY OF PORTLAND,[1] | Case No.: 3:23-cv-00150-AN |
| Plaintiffs,<br>v. | OPINION AND ORDER |
| DOUG BURGUM, in his official capacity as Secretary of the Interior,[2] PAUL SOUZA, in his official capacity as the Director of the U.S. Fish & Wildlife Service,[3] and U.S. FISH AND WILDLIFE SERVICE,<br><br>Defendants. | |

Plaintiffs Center for Biological Diversity (the "Center") and Audubon Society of Portland bring this action against defendants Doug Burgum, in his official capacity as Secretary of the Interior; Paul Souza, in his official capacity as Director of the U.S. Fish & Wildlife Service (the "Service"); and the Service. On October 19, 2023, plaintiffs filed a motion for summary judgment. On December 15, 2023, defendants filed a cross motion for summary judgment. On November 7, 2024, the Court heard oral argument from the parties as to both motions. For the reasons stated below, plaintiffs' motion is GRANTED, and defendants' motion is DENIED. The case is REMANDED to the Service to complete a new listing determination, to be issued within one year of the date of this Opinion and Order. The current listing determination shall remain in place pending the issuance of the new listing determination. The

---

[1] Though its name on this case's docket has remained unchanged, the Court notes that plaintiff Audubon Society of Portland is now called Bird Alliance of Oregon. *See Announcing Our New Name!*, Bird Alliance of Oregon (last accessed July 17, 2025), https://birdallianceoregon.org/about-us/name-change/.

[2] Pursuant to Federal Rule of Civil Procedure 25(d), Doug Burgum, acting Secretary of the Interior, is substituted for Debra Haaland.

[3] Pursuant to Rule 25(d), Paul Souza, acting Director of the Fish & Wildlife Service, is substituted for Martha Williams.

revised Endangered Species Act ("ESA") Section 4(d) rule is VACATED, and the 2013 Section 4(d) rule

issued as to the lark is REINSTATED pending the issuance of the Service's new listing determination.

## LEGAL STANDARD[4]

### A.      Standard of Review

An agency's compliance with the Endangered Species Act ("ESA") is reviewed under the

Administrative Procedures Act ("APA").  In APA cases, "the district court is reviewing a decision of an

administrative agency which is itself the finder of fact[,]" *Occidental Eng'g Co. v. Immigr. & Customs Enf't*,

753 F.2d 766, 770 (9th Cir. 1984), and "'the district judge sits as an appellate tribunal[,]'" *Herguan Univ. v.

Immigr. & Customs Enf't*, 258 F. Supp. 3d 1050, 1063 (N.D. Cal. 2017) (quoting *Rempfer v. Sharfstein*,

583 F.3d 860, 865 (D.C. Cir. 2009)).  When reviewing an agency's decision, the Court may set aside that

decision only if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law, . . . or unsupported by substantial evidence[.]"  5 U.S.C. §§ 706(2)(A), (E).  Agency decisions or

actions are

> "arbitrary and capricious if the agency has relied on factors which Congress has not
> intended it to consider, entirely failed to consider an important aspect of the problem,
> offered an explanation for its decision that runs counter to the evidence before the agency,
> or is so implausible that it could not be ascribed to a difference in in view or the product of
> agency expertise."

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State

Farm*").

Though the standard is a narrow one, courts must still "'engage in a substantial

inquiry[,] . . . a thorough, probing, in-depth review.'"  *Native Ecosystems Council v. U.S. Forest Serv.*, 418

F.3d 953, 960 (9th Cir. 2005) (alteration and ellipses in original) (quoting *Citizens to Preserve Overton*

---

[4] Though this is a motion for summary judgment, because this case involves a challenge to an agency's action, the
legal standard is governed by the Administrative Procedures Act ("APA") and related doctrines.  *See* 5 U.S.C.
§ 706(2); *see also Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 698 F. Supp. 3d 39, 57-58 (D.D.C. 2025)
("Although both parties move for summary judgment, the ordinary summary[]judgment standard does not apply. . . .
[Instead, the court] must ask 'whether the agency action is supported by the administrative record and otherwise
consistent with the APA standard of review.'" (quoting *Citizens for Resp. & Ethics in Wash. v. SEC*, 916 F. Supp. 2d
141, 145 (D.D.C. 2013)), *aff'd*, 146 F.4th 1144 (D.C. Cir. 2025).

*Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977)). Generally, agencies' analyses are entitled to deference, particularly when the analysis is undertaken "within [the agency's] area of competence." *Az. Cattle Growers' Ass'n v. Salazar*, 606 F.3d 1160, 1163 (9th Cir. 2010). However, no deference is necessary "when the agency's decision is without substantial basis in fact" or if there is no "rational connection between the facts found and the determinations made." *Id.* Ultimately, agencies' decisions must be upheld "'so long as the agencies have considered the relevant factors and articulated a rational connection between the factors found and the choices made.'" *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1206 (9th Cir. 2004) (quoting *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 953-54 (9th Cir. 2003)); *see State Farm*, 463 U.S. at 43 ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

**B.      Standard for Listing Species Under the ESA**

Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). Section 4 directs the Secretary to determine whether certain species are "endangered" or "threatened," and to publish lists of such species. *Id.* §§ 1533(a), (c). A species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range," and it is "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* §§ 1532(6), (20). A "species" includes subspecies and "any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." *Id.* § 1532(16).

In determining when to list a species, the Service must evaluate whether a species is endangered or threatened because of any of the following factors: "(A) the present or threatened destruction, modification, or curtailment of its habitat or range; (B) overutilization for commercial, recreational, scientific, or educational purposes; (C) disease or predation; (D) the inadequacy of existing regulatory

mechanisms; or (E) other natural or manmade factors affecting its continued existence." *Id.* §§ 1533(a)(1)(A)-(E). This determination must be made "solely on the basis of the best scientific and commercial data available to [the Secretary] after conducting a review of the status of the species and after taking into account those efforts, if any, . . . to protect such species[.]" *Id.* § 1533(b)(1)(A).

If the Service determines that listing is warranted, it must "promptly publish" a notice in the Federal Register that includes "the complete text of a proposed regulation to implement" the listing. *Id.* § 1533(b)(3)(B)(ii). The Service must act on a proposed rule within one year of the notice's publication. *Id.* § 1533(b)(6)(A). At that point, the Service must promulgate a final rule, withdraw the proposed rule, or extend the one-year period for consideration by not more than six months if there is "substantial disagreement regarding the sufficiency or accuracy of the available data relevant to the determination or revision concerned[.]" *Id.* §§ 1533(b)(6)(A), (B)(i)-(iii). After the listing, the Service must develop a recovery plan for the species to guide efforts for its conservation, including "objective, measurable criteria which, when met, would" provide for the delisting of the species. *Id.* § 1533(f)(1)(B)(ii). The Service must also designate "critical habitat" for each threatened and endangered species. *Id.* § 1533(a)(3)(A)(i).

A species listed as endangered or threatened is afforded legal protections under Sections 7 and 9 of the ESA. *See id.* §§ 1536(a)(2) (Section 7 protections), 1538(a)(1) (Section 9 protections). Section 7 protections apply to both endangered and threatened species and, if a federal agency determines that an action may affect a listed species, the agency must consult with the Service under this section. *Id.* § 1536(a). The Service then conducts a biological assessment to determine whether the action is likely to jeopardize the continued existence of the listed species. *Id.* §§ 1536(b)(3)(A), (c).

Section 9 prohibits the "take" of any endangered species of fish or wildlife without prior authorization. *Id.* § 1538(a)(1)(b)-(c). "Take" is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). Section 9 does not automatically prohibit take of threatened species, however, Section 4(d) authorizes the Service to extend Section 9 prohibitions and other protective measures to any threatened species as the Secretary deems "necessary and advisable to provide for the conservation of such species." *Id.* § 1533(d). To meet Section

4(d)'s requirements, the Service may issue a "species-specific rule" that "contain[s] all of the prohibitions and any additional exceptions that apply to that species."  50 C.F.R. §§ 17.31(a), (c).

## BACKGROUND

**A.     The Streaked Horned Lark**

The streaked horned lark ("lark") is a subspecies of horned lark that is endemic to the Pacific Northwest west of the Cascades.  AR00228; AR00231-32; AR00315.[5]  Presently, the lark can be found in only three regions: (1) the South Puget Lowlands in Washington, (2) the Pacific Coast and Lower Columbia River in Washington and Oregon, and (3) the Willamette Valley in Oregon.  AR00238; AR00316.  Larks are small, ground-dwelling songbirds that form mating pairs in the spring.  AR00315.  Nesting season begins in mid-April and ends in late August, with peaks in May and early June.  *Id.*

Historically, larks thrived in "relatively flat, open areas that were maintained by flooding, fire, and sediment transport dynamics."  *Id.*  However, the conditions that maintained these habitats have been interrupted by flood control, dams, and fire suppression.  *Id.*  Now, larks rely significantly on large, open areas created by anthropogenic disturbance, such as grass seed fields, recently planted Christmas tree farms, coastal dunes, fallow, airports, and active agricultural fields.  *Id.*; AR00234.  While these areas have benefitted larks as replacement habitats, use of these sites also exposes larks to disturbances which may kill or injure all life stages of the lark, particularly during breeding season.  AR00265.  Further, these replacement habitats are being converted to other uses that do not provide suitable habitats for larks, such as industrial and residential development, as well as different crop types.  AR00282.  Larks are also threatened by land management activities and their relative effects, such as "airport management activities and aircraft strikes, military training and activities, certain restoration actions, certain agricultural practices, and the placement of dredged materials."  AR00266.  Recreation and trainings at civilian airports are also stressors affecting larks' survival at the population level.  *Id.*

Lark breeding sites often have populations of less than ten breeding pairs.  *See* AR00239-

---

[5] All citations beginning with "AR" refer to the administrative record lodged in this case.  The administrative record is lodged at ECF [17] and [20].

43. The most recent rangewide population estimate for larks, based on the North American Breeding Bird Survey ("BBS") from 2005 to 2015, is approximately 1,170 to 1,610 individual birds. AR00247; AR00316. The BBS also indicates a 6.52% decline for larks between 2005 and 2015. AR00318. The United States Geological Survey manages the BBS and rated the data for larks as "yellow," which means it has deficiencies but has moderate precision and confidence. AR00267. In 2022, the minimum viable population ("MVP"), which estimates the number of individuals sufficient to have a ninety-nine percent probability of persisting over forty generations, set by the Service as a recovery objective for the lark is 5,725 individuals. AR00316. This number would allow the lark to be removed from the threatened/endangered list entirely. AR00065-66; AR07158.

On a region-by-region basis, the Service has set the MVP at 700 larks for the South Puget Lowlands, 525 larks for the Pacific Coast and Lower Columbia River, and 4,500 larks for the Willamette Valley. AR00070. In 2019, only 121-127 breeding pairs were surveyed in the South Puget Lowlands, 97 pairs in the Pacific Coast and Lower Columbia River, and 165 pairs in the Willamette Valley. AR00317. Two of the seven sites surveyed in the South Puget Lowlands had fewer than ten breeding pairs in 2019, and none of the Pacific Coast populations in 2019 were known to have more than ten breeding pairs. AR00239-41. Of the eighteen sites surveyed on the Lower Columbia River in 2019, only two sites had more than ten breeding pairs, fourteen had fewer than five breeding pairs, and two had no breeding pairs. AR00241-42. Of the nine sites surveyed in the Willamette Valley in 2019, five sites had fewer than ten breeding pairs. AR00243.

**B.    The Service's 2013 Listing of the Lark**

The Service first identified the lark as in need of listing under the ESA in 2001. 66 Fed. Reg. 54808, 54810-54812 (Oct. 30, 2001) (later codified in 50 C.F.R. pt. 17). In 2002, the Center and other conservation organizations submitted a formal listing petition to the Service. Petition to List Streaked Horned Lark (*Eremophila alpestris strigata*) as a Federally Endangered Species, Amazon Web Services (Dec.           10,           2002),           https://ecosphere-documents-production-public.s3.amazonaws.com/sams/public_docs/petition/646.pdf. In addition to identifying other threats, the

petition stressed that in the Willamette Valley, it was estimated that more than ninety-nine percent of the native grassland had been lost to agriculture and other human impacts. *Id.* at 11. The petition advocated that for the lark to persist on agricultural lands that displaced the lark's natural habitat, efforts needed to be made to lessen adverse effects during the active breeding season. *Id.* at 12.

Following the petition, the Service determined that the lark faced "imminent threats of a high magnitude" due to the "continued loss of suitable lark habitat, risks to the wintering populations," "plans for development," and other activities that are "imminent threats to the species." 71 Fed. Reg. 53756, 53761 (Sept. 12, 2006) (later codified in 50 C.F.R. pt. 17). The Service assigned the lark the highest possible listing priority, *see id.*, but took no further action to list the lark until after the Center brought suit against the Service for its failure to make ESA listing decisions about the lark and other species in a timely manner. Pls. Mot. Summ. J. ("Pls. Mot."), ECF [23], at 9-10 (all references to ECF pagination) (citing *In re Endangered Species Act Section 4 Deadline Litig.*, Misc. Action No. 10-377 (EGS), MDL Docket No. 2185 (D.D.C. 2010)); *see* Defs. Cross-Mot. Summ. J. & Resp. Opp'n Pls. Mot. ("Defs. Mot. & Resp."), ECF [26], at 7 n.4 (noting that "listing the streaked horned lark could not move forward [prior to 2013] because the Service was precluded from doing so by higher-priority listing actions" and because "[t]he Service could not move forward with listing the [l]ark until the Center and its co-plaintiff in" *In re Endangered Species Act Section 4 Deadline Litigation* "agreed to limit the quantity of deadline litigation to allow the Service to concentrate its efforts on the listing petitions.") (citing *In re Endangered Species Act Section 4 Deadline Litig.*, MDL No. 2185, 704 F.3d 972, 975 (D.C. Cir. 2013)).

In October 2012, the Service proposed listing the lark under the ESA as threatened, rather than endangered. AR00002. In October 2013, the Service published a final rule listing the lark as threatened (the "2013 Final Rule"). *See* AR00001-53. Concurrently, the Service published a 4(d) rule (the "2013 4(d) Rule")[6] that applied most of the Section 9 prohibitions to the lark, including prohibiting "take"

---

[6] A lengthier description of this type of rule is discussed below, but in short, a rule issued under Section 4(d) may extend prohibitions in Section 9 of the ESA, which applies to species designated as "endangered," to species designated as "threatened."

of the lark generally. AR00050-53. However, the Service did not extend the take prohibition to certain activities, including: (1) management activities at non-federal airports to minimize hazardous wildlife; (2) routine agricultural and ranching activities consistent with state laws on non-federal land in the Willamette Valley; and (3) routine removal or management of noxious weeds on non-federal lands. *Id.*

In 2018, the Center challenged the Service's 2013 Final Rule and 2013 4(d) Rule in this district. *See Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, No. 3:18-cv-00359-MO, Compl., ECF [1]. Following summary judgment briefing and oral argument, now-Senior District Judge Michael J. Mosman ruled that the Service acted arbitrarily and capriciously in its analysis of whether the lark was endangered in a significant portion of its range because the Service's listing decision was based on a "post-hoc rationalization" of a pre-ordained determination that the lark's South Puget Sound population was not endangered. Pls. Mot. Ex. A, at 44-45. As for the 2013 4(d) Rule, Judge Mosman agreed that the situation was unusual because industrial and agricultural activities create an inadvertent habitat for the species and declined to vacate the 2013 4(d) Rule because it was "sensible enough as an overall proposition" in light of the unusual situation. *Id.* at 45. Thus, the court remanded the 2013 Final Rule and 2013 4(d) Rule for further consideration. *Id.* at 45-46.

## C.    The Service's Decisions on Remand

### 1.    *Listing Determination on Remand*

On remand, the Service undertook several analyses that formed the basis of its updated decision to list the lark as threatened. First, the Service completed a Species Biological Report for the lark. AR06991-7035. The report assessed the lark's biology and stressors and evaluated its current status and viability. *See* AR06995. Second, the Service completed a Draft Recovery Plan, which was published for public comment on October 30, 2019. *See* AR00054-79; AR00088. The Draft Recovery Plan stated specific recovery goals and objectives that, when met, signal that ESA protections are no longer necessary. *See* AR00055, AR00059-62. In developing recovery plans, the ESA authorizes the Service to obtain assistance from "appropriate public and private agencies and institutions, and other qualified persons." 16 U.S.C. § 1533(f)(2). For the lark, the Service convened a group of species experts consisting of six

individuals.  AR00058.  The lark recovery objectives were in terms of "MVP," as previously described.  AR00065-66.

The Service then conducted a new Species Status Assessment ("SSA") in February 2021 (the "2021 SSA").  AR00080-165.  Under the SSA framework, the Service begins with a compilation of the best available information on the species, such as taxonomy, life history, and habitat, and its ecological needs at the individual, population, and species levels based on how environmental factors are understood to act on the species and its habitat.  AR06533.  Next, an SSA describes the current conditions of the species' habitat and demographics, and the probable explanations for past and ongoing changes in abundance and distribution within the species' environmental conditions and conservations efforts.  *Id*.  In an SSA, the Service uses the conservation biology principles of resiliency, redundancy, and representation (the "3R framework") as a lens to evaluate the current and future condition of the species.  *Id*.; AR00090.  Resiliency describes a species' ability to withstand stochastic (*i.e.*, random) disturbance events.  AR06535; AR00090.  Redundancy describes a species' ability to withstand catastrophic events.   AR06535; AR00090.  Representation describes a species' ability to adapt over time to long-term changes in the environment.  AR06535; AR00090.

For the lark, the Service created a matrix to evaluate the resiliency of local populations that included abundance, population trends, connectivity, habitat, and the presence of a beneficial disturbance regime.  AR00268-71.  The Service evaluated resiliency of the local populations within each regional population and evaluated the redundancy and representation on a rangewide level.  AR00268-71; AR00276-77.  Based on its analysis, the Service concluded that the lark has numerous, but mostly small (fewer than ten breeding pairs) populations that are well-distributed throughout the South Puget Lowlands, Pacific Coast/Columbia River, and Willamette Valley.  AR00278-79.  The Service determined there were positive trends in population, primarily at sites operated by the United States Department of Defense, which, as a result of the 2013 Final Rule, manages its properties to benefit larks.  AR00278.  That management includes conservation measures implemented due to Section 7 consultations between the Service and the Department of Defense, as well as the Army Corps of Engineers' management of deposits of dredged river material.

AR00278; AR00322.  The Service determined that other areas show stable or decreasing population trends and, although colonization of some new sites has occurred, particularly along the Columbia River, other areas of suitable habitat have not seen recolonization.  AR000278-80.  Thus, the Service concluded that the "rangewide distribution" of forty-two local populations "confers some measure of protection against catastrophic events."  AR00281.

The Service authored the 2021 SSA for the lark.  AR00081.  As part of that authoring, however, the Service also solicited review from five specialists, including scientists with expertise in ornithology and lark biology and habitat, and the Washington Department of Fish and Wildlife.  *Id.*  The 2021 SSA evaluated the lark's life-history needs, its historical and current distribution and status, the factors influencing its viability, and its current conditions; and made predictions for its future conditions.  *See* AR00086-87.  The 2021 SSA found that the lark faces myriad threats and that its population numbers are well below the Service's targets for a viable population.  AR00105-06.

On April 13, 2021, the Service issued a proposed rule for comment that maintained listing the lark as threatened, rather than endangered.  AR00166-87.  The Service further proposed expanding the 2013 4(d) Rule's exception for agricultural activities in the Willamette Valley to the entirety of the species' range.  AR00182-85.  The expert peer reviewers contracted by the Service, along with other commenters, objected to the Service's refusal to list the lark as an endangered species, as well as the expansion of the 2013 4(d) Rule.  *See* AR00190-205; AR00211-19.

The Service updated the SSA in March 2022 (the "2022 SSA"), AR00220-308, and on April 13, 2022, issued a final rule (the "2022 Final Rule") affirming the threatened listing of the lark and the revised 4(d) Rule, AR00309-38.  In the 2022 SSA, the Service provided what it said was "the best available scientific information" regarding the lark, as well as an assessment of the lark's current and future viability.  AR00228-29.  The Service found that "[t]he main factors influencing the future viability of the . . . lark include ongoing and sustained habitat loss, continued land management activities and related effects, recreation, and the synergistic effects of climate change and small population size."  AR00328.  Despite the ongoing influence of these stressors, the Service determined the lark to not be currently in danger of

extinction because the species retains multiple populations in high and moderate condition across all representative regions, these populations occur in a variety of habitat types, and no threat could plausibly change this under current conditions. AR00331. Additionally, the Service found that survey data of known populations show "relative stability for the last [seven] years" (since the 2013 Final Rule). AR00331. Looking to the future, the Service recognized the potential for decline as habitat loss continues and the species experiences the amplification of negative effects related to small population size and climate change. AR00331.

In reaching its listing decision, the Service evaluated the species' status throughout its range and considered whether the species had a different status in a significant portion of its range. AR00331-32. The Service found that the "lark is not currently in danger of extinction" throughout all of its range. AR00331. The Service evaluated the conditions of the lark across its range and concluded that there are no portions of the species' range where the species has a different status from its rangewide status because "there is no portion of the range where there is currently a concentration of threats relative to other areas in the range." AR00332. Thus, the Service concluded that no portion of the species' range provides a basis for determining that the species is in danger of extinction in a significant portion of its range. AR00332. Ultimately, the Service determined that the lark is not in danger of extinction now in any portion of its range, but that it "is likely to become in danger of extinction within the foreseeable future throughout all of its range." AR00331.

2.    *The 4(d) Rule on Remand*

Finally, the Service also reaffirmed its support for the revised 4(d) Rule's expansion of the exception for agricultural activities in all of the lark's range. *See* AR00333-34. The Service stated that the purpose of the revised 4(d) Rule was to "promote conservation of the . . . lark by encouraging management of the landscape in ways that meet the conservation needs of the species." AR00333. The Service believed that its decision not to extend the Section 9 take prohibition for incidental take for agricultural activities is important to "the continued survival and recovery" of the lark because the agricultural land base in the Willamette Valley is one of the largest areas of potential habitat for the lark, and the agricultural practices

11

themselves create and maintain habitat that mimics the lark's historical habitat. AR00334. In the Service's view, the continued farming of private agricultural lands in the Willamette Valley "is therefore crucial to maintaining the overall population" of larks in that area and aiding in the larks' recovery in Oregon—even if such practices occasionally harm or kill individual larks. AR00334.

Despite the risks from agricultural activities, the Service concluded that not extending the take prohibition to these activities would benefit the lark by creating an incentive to continue the practices that create habitat for the lark. AR00334-36. The Service determined that the evidence before it demonstrated that, in general, private landowners "may alter land management practices or restrict conservation activities to discourage attracting listed species to their lands" out of concern from being subjected to regulation associated with the ESA. AR00335. For the lark, which rely on "human-created habitat through ordinary agricultural management activities, this risk aversion would" harm the species' conservation. AR00335. The Service stated that the revised 4(d) Rule thus removes the negative incentive for private landowners to discontinue activities resulting in suitable habitat for larks and provides positive incentives for landowners to voluntarily report and conserve the species on their property. AR00335. The Service concluded that supporting landowners' ongoing activities that create or maintain lark habitat, while also encouraging voluntary conservation of the species on private lands, "is likely to result in more net positive conservation outcomes at the population level when compared to an approach that" would subject these activities to penalties under Section 9. AR00336.

On January 31, 2023, plaintiffs filed suit against defendants, challenging under the ESA and APA the 2022 Final Rule and the revised 4(d) Rule's failure to extend the Section 9 take prohibition to agricultural activities. Compl., ECF [1]. On October 19, 2023, plaintiffs filed a motion for summary judgment, arguing that "[d]efendants' determination to list the . . . lark . . . as a threatened rather than endangered species contravenes the best available science and is arbitrary and capricious, . . . and that the revised 4(d) Rule . . . does not provide for the conservation of the [l]ark and is arbitrary and capricious." Pls. Mot. 1-2.

On December 15, 2023, defendants filed a combined cross-motion for summary judgment

and response in opposition to plaintiffs' motion for summary judgment, arguing that plaintiffs "failed to demonstrate that the Service's [2022 Final Rule] and [revised] 4(d) [R]ule were 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or 'in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.'"  Defs. Mot. & Resp. 2 (quoting 5 U.S.C. § 706(2)(A), (C)).  On January 12, 2024, plaintiffs filed a combined response in opposition to defendants' motion and reply in support of their own motion.  Pls. Resp. Opp'n Defs. Mot. & Reply Supp. Mot. ("Pls. Resp. & Reply"), ECF [27].  On February 16, 2024, defendants filed a reply in support of their motion.  Defs. Reply Supp. Mot. ("Defs. Reply"), ECF [30].  The Court heard oral argument on November 7, 2024.  Mins. of Proceedings of November 7, 2024, ECF [32].

## DISCUSSION

Plaintiffs argue that (1) in the 2022 Final Rule, the Service made arbitrary findings as to the lark's status both throughout all of its range and in significant portions of its range; and (2) the revised 4(d) Rule, due to its failure to extend Section 9 take prohibitions to agricultural activities, fails to further the conservation of the lark.[7]  Pls. Mot. 21-22.  Plaintiffs' suit thus challenges both the 2022 Final Rule and the revised 4(d) Rule.  The Court addresses each argument in turn.

**A.**     **The Final Rule**

1.     *Threatened Status Throughout "All of the Larks' Range"*

Plaintiffs argue that the Service's listing determination regarding the lark's status throughout all of its range was arbitrary and capricious based on the Service's (1) failure to consider the negative genetic threat determination as impacted by the lark's small population size; and (2) errors in determining resiliency.  Pls. Mot. 24-34.  The Court addresses each argument in turn.

---

[7] Plaintiffs also make an affirmative standing argument, which defendants do not contest.  The Court agrees that plaintiffs' members have aesthetic, professional, recreational, or personal interests in observing the lark in its natural habitat, that a loss of the lark population would injure these interests, and such an injury would be fairly traceable to the Service's actions and redressable by an order of this Court.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  The Court further agrees that plaintiffs here have standing to sue on behalf of their members.  *See United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 553 (1996); *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1171 (9th Cir. 2002).

a.     Small Population Size

Plaintiffs argue that the Service failed to assess how the threats inherent to small population sizes are affecting the lark's *current* viability, which plaintiffs assert is the primary issue when determining whether the lark is "in danger of extinction" now, as opposed to becoming so in the foreseeable future. *Id.* at 24-26. Plaintiffs additionally argue that the Service erroneously asserted "that 'small population size does not influence populations on its own'" and "failed to incorporate the negative effects inherent to small populations into its analysis[.]" *Id.* at 26 (citing AR00330-31; AR00324; AR00311). Ultimately, plaintiffs argue that the listing determination is arbitrary and capricious because the Service's failure to consider the negative genetic and other effects associated with small population size amounts to a "fail[ure] to consider an important aspect of the problem[,]'" *id.* (quoting *State Farm*, 463 U.S. at 43), and reflects the Service's attempt to "'brush the small population size/low genetic diversity issue aside[,]'" *id.* (internal alteration omitted) (quoting *Defs. of Wildlife v. Jewell*, 176 F. Supp. 3d 975, 1006 (D. Mont. 2016)).

In turn, defendants argue that the record reflects the Service's lengthy consideration of whether the lark's small population size puts it at risk for extinction either now or in the foreseeable future. Defs. Mot. & Resp. 27-29, 32. Defendants further assert that: (1) disagreement about scientific conclusions is insufficient to overcome the reasoned judgment of the agency charged with implementing the ESA; (2) the Service addressed the small population issue, as well as other threats and the issue of the impact of small population size on other threats, in the 2022 SSA and the associated peer-review process; (3) the Service considered small population size when forming the 2022 Final Rule; (4) plaintiffs' citations are to the Service's own documents, which emphasizes the fact that the Service focused on those same documents in making its assessment about the lark's status; and (5) plaintiffs have not articulated what more the Service could have done. *Id.* at 32-35.

Upon careful consideration of the record, the Court finds that the 2022 Final Rule is arbitrary and capricious based on the Service's failure to consider the impact that small population size presently has on the lark.

To begin, there is a fair amount of inconsistency in the 2022 Final Rule's discussion of the

current effects of small population size on the lark. For example, the 2022 Final Rule lists "[t]the primary factors currently influencing the condition of streaked horned lark populations" as "the ongoing loss and conversion of suitable habitat, land management activities and related effects, and recreation." AR00320. In other words, the 2022 Final Rule does not identify small population size as a current factor affecting the lark. As another example, Table 4 of the 2022 Final Rule lists a summary of the factors influencing lark populations and the magnitude of these factors' effects but does not identify small population size as one such factor. AR00324. And yet, seemingly in tension with these assertions, the 2022 Final Rule also contains statements indicating that there are lark populations already experiencing small population effects. Indeed, the 2022 Final Rule contains a two-paragraph discussion which acknowledges the genetic effects that may affect small populations generally, such as "genetic drift, founder effects . . . , and genetic bottlenecks leading to increasingly lower genetic diversity, with consequent negative effects on adaptive capacity and reproductive success." AR00325. Further, it states that "small population effects" have already been observed in the range of the lark, including "low reproductive success, loss of genetic diversity, and male skewed sex-ratio," particularly in some local populations in the South Puget Lowlands and Lower Columbia River regions. *Id.* Finally, the studies cited for these assertions are from 2005, 2010, 2017, and 2019, suggesting that these factors are still being observed over time. *See Id.*

Despite its recognition of the issue of small population size, the 2022 Final Rule contains no substantive assessment for how these effects are presently affecting the lark. The 2022 Final Rule concludes that local populations with very low abundance that do not interbreed with other local populations "*will be* at more risk *in the future* due to small population effects." AR00325 (emphases added). However, the 2022 SSA indicates that the "male skewed sex-ratio" has been documented already at many sites with low populations, including the coastal sites, along the lower Columbia River, and some of the smaller populations in the South Puget Lowlands, and "is *currently* a concern range-wide." AR00263 (emphasis added). Furthermore, the 2022 SSA references studies from 2010 that indicated that lark populations in the South Puget Lowlands experienced "lower fecundity and nest success than other northwestern horned lark subspecies[,]" and experienced lower measures of reproductive success than other ground-nesting birds at

15

the same prairie sites. AR00263. Those studies indicated that the low reproductive success was likely not tied to poor habitat quality, because other ground-nesting bird species had much higher nest success rates in the same habitat, suggesting that inbreeding depression may play a role in the lark's decline in the South Puget Lowlands. AR00263-64. Inbreeding was also observed in the South Puget Lowlands as recently as 2020. AR00263-64. The 2022 SSA concluded that small populations effects "are not anticipated to influence or drive the viability of the species[,]" AR00263, but also stated that "[t]he combination of low genetic variability, small and rapidly declining local populations, high breeding site fidelity, and no observed migration into the South Puget Lowlands regional population suggests that in the future, if influences remain the same, the South Puget Lowlands regional population could eventually become extirpated," AR00264.

The 2022 Final Rule also discusses small population size in connection with climate change, however, this discussion is almost entirely predicated on the climate change aspect. *See* AR00324; AR00329. For example, the 2022 Final Rule discusses how climate change may affect each of the different regional ecosystems but does not meaningfully analyze small population size in connection with climate change. *See* AR00329.

Ultimately, the 2022 Final Rule concludes that "[t]he small size of [certain] local populations may amplify the effects of stressors influencing individuals, but small population size does not influence populations on its own." AR00330. But this statement appears to be in direct tension with the Service's earlier publications, and even other portions of the 2022 Final Rule itself, which each describe the direct effects that may occur from small population sizes—even when considered with other facts such as quality of habitat. *See* AR00263 (2022 SSA, noting that larks in the South Puget Lowlands experience lower nesting success due to inbreeding depression, despite having suitable habitat); *see also* AR00325 (2022 Final Rule, stating that "populations that are small, isolated by habitat loss or fragmentation, or impacted by other factors are more vulnerable to extirpation . . . and to genetic effects that plague small populations . . . [,] leading to increasingly lower genetic diversity, with consequent negative effects on adaptive capacity and reproductive success"); *and see* AR00065 (Draft Recovery Plan, noting that

16

"[c]urrent threats to the lark are mainly those associated with small population, and can be alleviated with a larger self-sustaining rangewide population that is less susceptible to environmental and demographic stochasticity"). Thus, it is difficult to see how the 2022 Final Rule's statement that a small population size "cannot influence populations on its own" can be reconciled with the Service's own prior statement that small population size can lead to genetic effects affecting a species' adaptive capacity and reproductive success. AR00325 (internal citation omitted).

In the "all of its range" section, the 2022 Final Rule acknowledges that, in the future, negative effects from factors such as loss of preferred habitat, changes in land use, and other human activities will likely be amplified "due to the synergistic effects related to small population size and the increased effects of climate change." AR00330-31. However, it does not address how those factors are *presently* affected by small population size. Indeed, the 2022 Final Rule acknowledges that "the current abundance of local populations along the Pacific Coast is lower than other areas," AR00331, but then provides no assessment for how the size of those populations are currently affecting their viability.

In the "significant portion of the range" section, the 2022 Final Rule lists "cumulative effects associated with climate change and small population size" as an "influenc[ing] factor[]" that the Service considered but only determined may affect the lark's "*future* viability[.]" AR00331-32. It acknowledges, again, that the Pacific Coast populations are "low compared to other areas," but nonetheless concludes that "it has been low for many years" and that there is "no apparent declining trend in this regional population based on survey data." AR00332. It states that populations in the Willamette River and on islands in the Columbia River could be exposed to stochastic events that could "kill individuals, destroy limited habitat and food availability, or skew sex ratios," but nonetheless concludes that available information does not indicate these events are currently a threat that decreases the resiliency of the lark populations in these regions. *Id*. Yet, the 2022 Final Rule does not address whether there are *current* small population effects in these regions affecting the viability of the lark. It does provide that "[t]he available information does not indicate that the effects of climate change, such as sea level rise, are currently decreasing the resiliency of the [lark] populations." AR00332. However, given its prior discussion

regarding how small population effects have been (and are currently) observed in the South Puget Lowlands and lower Columbia River regions, it is noteworthy that the 2022 Final Rule does not discuss the impact of effects of climate change specifically when determining whether these regions are facing a concentrated threat relative to other regions, and especially on the basis of small population size.

The Court recognizes the Service's point that loss of habitat is the primary driver of the lark's status, and that small population size is, in many cases, exacerbated by the issue of loss of habitat. Defs. Reply 16-17. But this does not explain why the 2022 Final Rule does not substantively address the current effects of small population size that the lark faces. As noted, the Service had studies available from multiple years that all indicated that genetic diversity issues remain a current, observable problem in many of the lark's ranges. Many of the lark's populations are small enough to risk exposure to these effects: twenty-four populations in the South Puget Lowlands and Columbia River/Pacific Coast regions have less than ten breeding pairs, and seven populations in Willamette Valley have less than fifteen breeding pairs. The Service's arguments regarding loss of habitat do not explain the 2022 Final Rule's failure to substantively address these issues.

Finally, the Court finds that the Service's conclusion that small population size is a "synergistic factor" that can have no influence "on its own" is not rational. AR00330; *see* Defs. Mot. & Resp. 34-35. The 2013 Final Rule specifically addressed small population size in relation to genetic diversity and low reproductive success as a factor that posed a threat to the lark and discussed potential successes from a 2011 project intended to increase genetic diversity in the South Puget Lowlands. *See* AR00039. However, the 2022 Final Rule makes no mention of this project, its resulting effects, or how it may have impacted the change in classification or the role that small populations play in the lark's status. The 2013 Final Rule had deemed the small populations a threat even despite the then-apparent success of the 2011 project. AR00039 ("[W]e conclude that the loss of genetic diversity, the current number of small and isolated populations . . . and the subspecies' low reproductive success are likely to combine to result in continued population declines . . . and thus pose a threat to the subspecies."). The Court finds that the Service's consideration of this issue was not rational and is not entitled to deference because the Service

failed to explain why small population size is appropriately deemed a "synergistic factor" with climate change, despite it being considered a standalone threat in the 2013 Final Rule and despite the existence of evidence that small population effects are still presently being observed.

In sum, by failing to consider the impact that small population size presently has on the lark population, the Service failed to consider an important aspect of the problem and offered explanations that are contrary to the evidence that was before it. For these reasons, the Court finds that the 2022 Final Rule was arbitrary and capricious and is subject to remand on this issue.

b.    Resiliency

Plaintiffs assert that in determining resiliency, the Service (1) used arbitrary and unsupported population numbers and skewed or selectively presented the available data regarding population trends, including by ignoring relevant data such as the 2005-2015 BBS data; (2) arbitrarily assumed that movement between populations is impactful in assessing the lark's resiliency; and (3) relied on selective data that provides no rational connection between the facts found and the choice made. Pls. Mot. 26-34.

i.    *Population Numbers and Trends*

Plaintiffs argue that the record reflects that few, if any, of the lark's remaining small populations are truly resilient, and that the Service's labels of "high" or "moderate" condition have no basis in the best available science. Pls. Mot. 27. In support of these arguments, plaintiffs assert that (1) the Service used numbers that were arbitrary and unsupported by the record and proffered categorizations inconsistent with surveyed populations; (2) an assessment by the Service's expert peer reviewer showed that the only surveyed site with evidence of local populations greater than 100 birds is the population at the Corvallis Municipal Airport which is the "exception that proves the rule"; and (3) the same peer reviewer found that any purported anecdotal population increases noted by the Service are likely due not to increased populations but rather to increased survey effort over time, and that the Service effectively disregarded the BBS data that indicated a "large and statistically significant annual decline" in the Willamette Valley. *Id.* at 27-30.

In turn, defendants argue that the Service's use of a matrix to assess each breeding site's resiliency was holistic and based on the best available scientific data, that it supported its conclusions with rational explanations using its special expertise, and that its conclusions are entitled to deference over plaintiffs' analyses. Defs. Mot. & Resp. 35-36. Defendants further argue that plaintiffs focus on the "abundance" factor, but that abundance is only one aspect of resiliency, and the Service reasonably assessed abundance by relying on numbers that came from the Draft Recovery Plan and in response to comments received during the peer review process. *Id.* at 36-37. Defendants assert that the Service did not ignore the BBS data in its resiliency analysis, and that plaintiffs misrepresent the record by citing to a literature review prepared for a group developing recovery objectives for use in the Draft Recovery Plan and which is not on-point or revealing to the issues before the Court. *Id.* at 38-40; Defs. Reply 12-14.

As an initial matter, the Court is not persuaded by plaintiffs' argument that the breeding pairs metric, in terms of the chosen numbers, is arbitrary. On this point, plaintiffs cite to Liebezeit's comment on the draft SSA which states that the draft SSA does not "'say where these numbers came from nor describe the rationale for selecting them.'" Pls. Mot. 27-28 (quoting AR08034). However, the 2022 SSA clarifies that the breeding pairs ranges were determined based on the Draft Recovery Plan. *See* AR00270; Defs. Mot. & Resp. 37. Thus, the Service addressed the issues raised by this comment.

Similarly, the Court is not persuaded by plaintiffs' argument regarding the Service's consideration, or purported lack thereof, of the BBS. Plaintiffs focus primarily on the BBS to argue that the Service ignored the fact that the lark population was found to be declining in the Willamette Valley. *See* Pls. Resp. & Reply 17. However, the 2022 Final Rule acknowledges the BBS and its limitations— namely being that it only includes data up to 2015. *See* AR00318. With regard to the Willamette Valley specifically, the 2022 Final Rule notes that ten local populations appear "to have increased" the number of breeding pairs, and explicitly acknowledges that the additional surveys that the Service used to assess population trends for this region "may represent a small portion of the total number of streaked horned larks in the Willamette Valley due to lack of access on private lands, and there is no information to infer the condition of these potential populations." AR00328. Put simply, the 2022 Final Rule is clear that it only

infers a positive growth trend for those populations in the Willamette Valley that the Service has adequate survey information about; it does not extrapolate that conclusion to the region as a whole. Additionally, there is no evidence that the 2022 Final Rule wholly omits the BBS data. As such, the Court cannot say that the Service's assessment of this factor in its analysis of resiliency was arbitrary or capricious.

As to plaintiffs' argument that it was arbitrary for the Service to use the breeding pairs metric from the Draft Recovery Plan to assess the resiliency of the individual sites, this argument is well-taken. The Draft Recovery Plan states that for each recovery region, the Streaked Horned Lark Recovery Team Species Specialist Group[8] "applied their best professional judgment based on their research and experience to establish *regional* population goals that would meet the objectives of resiliency, redundancy, and representation." AR00066 (emphasis added). In other words, the population metrics that the recovery plan considered for each local site was based on establishing resiliency for the regional population as a whole. The Draft Recovery Plan also notes that "*regional* populations that are represented at multiple sites have a greater chance of being buffered from the negative effects of environmental variation, reduced chance of being simultaneously eliminated by a single catastrophic event, and stand a better chance of maintaining historic levels of genetic diversity and gene flow." AR00062 (emphasis added). As such, the Draft Recovery Plan seems to contemplate that, even if the breeding pair metrics and several other goals were met, the local population at a given site could be wiped out from a single catastrophic event, though the regional population might nonetheless survive. This is not the same as asserting that a local population is resilient merely because it meets the breeding pairs metric. As such, the Court finds the 2022 Final Rule to be arbitrary and capricious based on the Service's decision to use the breeding pairs metric from the Draft Recovery Plan to assess the resiliency of the individual sites.

Defendants' argument that Draft Recovery Plan also contemplates the existence of "matrix" sites, which, unlike "core sites," "would not have specific goals in terms of breeding pairs," *see* Defs. Reply

---

[8] In relevant part, this group published meta-analyses of MVPs for vertebrates, including birds, and then, "[i]nformed by these meta-analyses, . . . assembled several times to set regional and rangewide population targets for the lark." AR00066.

8 (citing AR00070-71), does not alter the Court's conclusion. To begin, as defendants acknowledge, these matrix sites are not managed specifically to advance the recovery of the lark in the way that core sites are. *See id.*; AR00070-71. Further, as noted, the Draft Recovery Plan explicitly acknowledges that its metrics are based on creating a resilient *regional* population. *See* AR00069. The Draft Recovery Plan does not state that a *local* population, standing alone, would be considered resilient based on those metrics. Simply put, the 2022 Final Rule contains no explanation as to why these breeding metrics were part of the assessment of *local* populations' resiliency, when it appears that these metrics were determined in the Draft Recovery Plan based on the resiliency of the *regional* population.

       The Court is cognizant that there are multiple factors to be considered in the resiliency assessment and, to be clear, defendants' argument that this analysis is a holistic assessment is not ill-taken. Other factors also play a role in a population's ability to withstand stochastic events, and it makes sense to include such other factors in the assessment. For example, a population could have a high population, but if its population's growth is declining and its habitat is not suitable, the population is unlikely to persist. However, even if the assessment is holistic, the 2022 Final Rule provides no explanation for why the Service provided each factor "equal weight." AR000326 ("Each of the five parameters were given equal weight."). In this way, the Service fails to contend with the fact that population size can be a determinative factor given how small many of the local lark populations are. As plaintiffs point out, it is difficult to see the rationality of marking a population with fewer than ten breeding pairs as "highly" resilient when that population's size alone means it could be entirely wiped out by a single stochastic event—regardless of if the population lives in a suitable habitat or experiences connectivity. Pls. Resp. & Reply 12-13. There can be no doubt that a wiped-out population gains no benefit from those other parameters.

       For these reasons, the Court finds that the 2022 Final Rule is arbitrary and capricious based on the Service's chosen resiliency parameters around population numbers and trends, particularly regarding the weight given to population size in assessing resiliency and the decision to use the breeding pairs metric from the Draft Recovery Plan to assess the resiliency of the individual sites.

ii.    *Connectivity*

As to the issue of connectivity, plaintiffs argue that there is no basis in the record for generally assuming "'movement between local populations/regions'" because, as the 2022 SSA notes, larks "'exhibit high nest site fidelity.'"  Pls. Mot. 31 (quoting AR00325; AR00234).  Plaintiffs point out that the Service noted elsewhere within the 2022 Final Rule that although larks "'can move between sites, and there are a few instances of detections at previously unoccupied locations, . . . recolonization appears *very low* and difficult to predict.'"  *Id.* (omission in original) (quoting AR00331).  Plaintiffs argue that without "specific information in the record regarding recolonization of sites, [the connectivity] factor cannot contribute to the" assessment of the lark's resiliency.  *Id.* at 31-32 (citing AR08036).  Thus, plaintiffs assert that the Service's assumption of movement between populations, despite this assumption's tension with the Service's own other findings, was arbitrary and capricious.  *Id.* at 32.

In turn, defendants argue that the Service did not "generally assume" movement between local and regional populations; instead, its resiliency matrix assigned one point if the population had "[m]ovement between local populations/regions" and no points if there was no such movement.  Defs. Mot. & Resp. 40 (quoting AR00325).  Defendants argue that the record thus shows that the Service evaluated whether connectivity existed for each local population based on the evidence before it.  *Id.*  Finally, defendants point out that the Service recognized that larks have a "low incidence of movement between local populations, and fewer incidences of movement between regions," and thus found connectivity only when "information was available from survey data."  *Id.* at 40-41.

The Court does not find 2022 Final Rule to be arbitrary and capricious on the issue of connectivity.  There is no evidence that the Service generally assumed movement between local and regional populations simply because the resiliency matrix assigns one point if connectivity is observed, and zero if no connectivity is observed.  The 2022 Final Rule explicitly acknowledged that larks have "low incidence of movement" between local and regional populations and only found connectivity when supported by survey data.  AR00328.  As such, the Court declines to find that the Service's assessment of connectivity in its analysis of resiliency was arbitrary and capricious.

    *iii.*   *Suitable Habitat & Beneficial Disturbance*

  Plaintiffs argue that the Service's reliance on factors like sufficient suitable habitat and beneficial disturbance regimes to maintain suitable habitat cannot be squared with its overall conclusion that "'[t]he primary driver of the status of [the lark] has been the scarcity of large, open spaces with very early seral stage plant communities with low-statured vegetation and substantive amounts of bare or sparsely vegetated ground.'" Pls. Mot. 32 (first alteration in original) (quoting AR00330). Plaintiffs assert that the Service's assessment of the lark's status in the Willamette Valley focuses on a small unrepresentative sample of sites that ignores the majority—nearly seventy percent—of the Valley, and that the 2022 Final Rule itself partially acknowledged this selective bias by admitting that "the limited surveys of accessible sites may not accurately reflect the trend in the whole region." *Id.* at 32-33 (emphasis omitted) (quoting AR00318). Ultimately, plaintiffs argue that the Service has arbitrarily relied on a few isolated populations that, based on the best available science, do not reflect the lark's status in the majority of its range, and that there is no rational connection between the facts found (that the lark has barely increased in a few areas with intensive management) and the choices made (listing the lark as threatened because it is not endangered throughout its entire range where it faces ongoing habitat loss and fragmentation). *Id.* at 33.

  Defendants argue that the Service properly evaluated the available habitat quality in its resiliency analysis "[b]ecause habitat loss is the main driver of the lark's status[.]" Defs. Mot. & Resp. 41. Defendants deny that the Service determined that the species, as a whole, had "resiliency due to sufficient habitat," because resiliency is assessed at the local population level and the Service's analysis looked at the habitat quality at individual breeding sites. *Id.* Defendants assert that it was not inappropriate for the Service to consider the available survey data for local populations, even though it was not representative of the entire Valley, because "the ESA does not require the Service to ignore imperfect data." *Id.* Defendants also note that the Service acknowledged these imperfections by stating that "'the limited surveys of accessible sites may not accurately reflect the trend in the whole region.'" *Id.* at 41-42 & n.11 (quoting AR00318).

  The Court also does not find the listing determination to be arbitrary and capricious based

on the Service's consideration of suitable habitat and beneficial disturbance in its analysis of resiliency. Plaintiffs focus primarily on the Willamette Valley to argue that the Service arbitrarily considered the populations to have suitable habitats based on limited survey results that do not reach the populations most impacted by habitat changes. However, as defendants point out, this is an appropriate factor to consider in the resiliency analysis based on the evidence in the record. The Service used the survey data to assess the local populations in the Willamette Valley that it had data on without extrapolating those results to other local populations not surveyed. The Service also acknowledged the limits of its analysis and explicitly made no findings about the stability of local populations on private lands in the Willamette Valley. Indeed, the Service repeatedly acknowledged that crop conversion, among other factors, could negatively impact the availability of suitable habitat for local populations on private lands, but declined to make an affirmative conclusion for those populations due to lack of data. For all these reasons, the Court declines to find that the Service's assessment of suitable habitat and beneficial disturbance was arbitrary and capricious.

        2.     *Threatened Status In "A Significant Portion of the Larks' Range"*

Plaintiffs argue that the Service's conclusion that "'there is no portion of the range where there is currently a concentration of threats relative to other areas in the range'" is cursory and contradicted by the record, "which clearly shows threats concentrated in portions" of the lark's range. Pls. Mot. 35 (emphasis omitted) (quoting AR00332). As described below, plaintiffs identify what they deem to be concentrated threats in the Willamette Valley, South Puget Lowlands, Pacific Coast, and Lower Columbia River regions.

        a.     Willamette Valley

As to the Willamette Valley, plaintiffs argue that "the Service identified agricultural conversion and urbanization as serious threats in" this region, which is also where most of the lark's remaining population survives. *Id.* Plaintiffs argue that the lark currently relies primarily on grass seed fields in this region, but that "'grass seed farming is in rapid decline[,]'" as the 2022 Final Rule acknowledges. *Id.* (quoting AR00321). In lieu of grass seed, growers have switched to other crops that the Service has acknowledged "'do not have the low-statured vegetation and bare ground preferred by the

[l]ark.'"  *Id.* (quoting AR00321).  Plaintiffs additionally argue that the Willamette Valley faces a concentrated threat of development that the 2022 Final Rule acknowledged when it noted that "'[a]bout [ninety-six] percent of the Willamette Valley is privately owned, and it is both the fastest growing area in Oregon and the most densely populated.'"  *Id.* at 36 (quoting AR00252).  Plaintiffs assert that the Service failed to consider these factors in its analysis and ignored Ninth Circuit precedent requiring it to "'at least explain [its] conclusion that the area in which the species can no longer live is not a significant portion of its range.'"  *Id.* (quoting *Defs. of Wildlife v. Norton*, 258 F.3d 1136, 1145-46 (2001)).

In turn, defendants argue that the Service reasonably determined that the lark was not endangered in a significant portion of its range.  Defs. Mot. & Resp. 42.  Defendants assert that the Service determined that each region has at least eight redundant local populations, there are some signs of increase in specific local populations, and surveys show relative stability for those populations that can be monitored.  *Id.* at 43.  Although threats to the lark have been present and consistent for many years, the Service determined that, in the foreseeable future, the continued loss of preferred habitat and changes in management regimes could lead to a decline in the resiliency of local populations.  *Id.*  When looking at the lark's status throughout a significant portion of its range, the Service "considered whether the threats to [larks] are concentrated in any portion of the species' range such that the threats currently affect enough individuals in an area to influence the resiliency of a population."  *Id.* (citing AR00331).  The Service found that although "the influence of factors threatening the lark varied somewhat across the range," all regions populated by the lark are experiencing factors that are likely to lead to the lark being endangered in the foreseeable future.  *Id.* (citing AR00331).  Thus, the Service concluded that no regions are experiencing these factors in a manner that would create a *current* danger of extinction.  *Id.*

Defendants further note that the Service's decision about the lark's status in the Willamette Valley explained that the Service considered the "'conversion of suitable habitat into unsuitable habitat through changes in land use' and 'changes in agricultural practices from crops that mimic preferred habitats to crops that diminish habitat suitability.'"  *Id.* at 44 (internal alteration omitted) (quoting AR00331-32).  The Service determined that this factor is a driver of the threatened listing because it puts the lark at risk of

extinction in the foreseeable future, but "there is no evidence that the larks of the Willamette Valley are at a higher risk of extinction than the species as a whole[.]" *Id.* (citing AR00331; *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, No. 21-cv-791-TJK, 2023 WL 6388936, at *20 (D.D.C. Sept. 30, 2023)). Thus, defendants argue the decision was not arbitrary and capricious. *Id.* (citing *Ctr. for Biological Diversity*, 2023 WL 6388936, at *20).

Defendants additionally argue that the Service did consider the conversion of suitable habitat into unsuitable habitat when undertaking its significant portion of the range analysis because "[h]abitat loss is the primary driver of the lark's threatened status." *Id.* at 45 (citing AR00320; AR00330-31). Defendants note, however, that "habitat loss is a threat that faces the species throughout its range, not just in the Willamette Valley." *Id.* Even though the causes of habitat loss may differ across the range, defendants argue that these differences do not alter the risk of extinction. *Id.* Finally, defendants also note that the evidence plaintiffs point to in arguing that the Service's conclusion is "'contradicted by the record'" is the 2022 Final Rule itself, which included an "extensive threats analysis"—albeit not in the significant portion of its range section. *Id.* (quoting Pls. Mot. 35-36). Defendants argue that the Service need not repeat this analysis when it previously explained those precise issues, and that "'[t]he absence of such a specific discussion does not necessarily require the agency's action to be overturned,' because a court 'will uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned.'" *Id.* (quoting *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1078 (9th Cir. 2010)).

The Court does not find the listing determination to be arbitrary and capricious based on the Service's analysis of the impact of agricultural conversion, urbanization, and development in its significant portion analysis. As an initial matter, despite plaintiffs' assertions to the contrary, the 2022 Final Rule states that it did consider these factors but found that there were no portions of the lark's range where there was a concentration of threats relative to other areas. *See* AR00321; AR00332. It is true that the 2022 Final Rule discusses the potential impacts from climate change that the lark may experience in the Willamette Valley but does not discuss the direct effects of habitat conversion that the lark is currently experiencing in this region. *See* AR00324. Nonetheless, defendants' argument that the lark is experiencing

this factor rangewide is supported by evidence in the record. For example, the 2022 Final Rule contains an in-depth discussion of how crop conversion and industrialization are affecting multiple lark ranges. AR00315; AR00321. Specifically, the 2022 Final Rule states:

> "Across the range, the conversion of streaked horned lark habitat into agricultural, industrial, residential, or urban development will continue to influence current and future streaked horned lark local or regional populations to some degree *throughout the range of the species*, although the Pacific Coast is less affected than other areas."

AR00321 (emphases added). This discussion also contains evidence indicating that the Willamette Valley population's exposure to this threat is not necessarily greater than that experienced by other regions. AR00321. For example, the 2022 Final Rule notes that in that industrial development along the Columbia River has "reduc[ed] habitat availability for larks" in that region and that prairie habitat conversion via removal of native vegetation and excavation in the South Puget Lowlands for residential developments has impacted habitat availability in that region. AR00321.

To be clear, the Service's discussion of these issues is not included in the "significant portion" analysis. Nonetheless, as defendants point out, the discussion need not necessarily be included in this section provided that prior discussions of these issues can be reasonably discerned to apply equally to the significant portion analysis. *See* Defs. Mot. & Resp. 45 (citing *River Runners for Wilderness*, 593 F.3d at 1078). Here, there is a rational connection to be reasonably discerned between the 2022 Final Rule's discussion on these points and the Service's conclusion that the Willamette Valley population is not experiencing a concentration of threats greater than that experienced by other regions. For this reason, the Court declines to find that the 2022 Final Rule was arbitrary and capricious based on this issue.

b.    Other Regions

Plaintiffs argue that the Service "commit[ted] the same error [as to] the other regional populations that are facing threats different in kind and degree from other populations." Pls. Mot. 37. In sum, plaintiffs argue that the omission of any analysis regarding whether the lark is indeed in danger of extinction in the South Puget Lowlands, Pacific Coast, or Lower Columbia River, and whether those regions are significant such that the lark is in danger of extinction in a significant portion of its range, "'is itself a

sufficient basis for remanding this case to the Service to consider the question.'" *Id.* at 38 (cleaned up) (quoting *Norton*, 258 F.3d at 1146).

As to the South Puget Lowlands, plaintiffs argue that the "[2022] SSA found that very small population size presents a particular threat in [this region]." *Id.* at 37. Plaintiffs further argue that the Service found that the lark's low reproductive success could not be attributed to poor habitat because "'other bird species have much higher nest success rates in the same habitat suggesting that inbreeding depression may be playing a role in the decline of [l]arks in the South Puget [L]owlands.'" *Id.* (cleaned up) (quoting AR00263). Further "'analysis indicated a declining female population trend'" in the South Puget Sound. *Id.* (quoting AR00240). Thus, the SSA ultimately stated that "'[t]he combination of low genetic variability, small and rapidly declining local populations, high breeding site fidelity, and no observed migration into the South Puget Lowlands regional population suggests that in the future, if influences remain the same, the South Puget Lowlands regional population could eventually become extirpated.'" *Id.* (quoting AR00264). Despite these recognitions, plaintiffs argue that at no point in the significant portion of its range analysis did the Service explain why the unique, concentrated threats facing the South Puget Lowlands population do not satisfy the significant portion of its range standard. *Id.* at 38.

Plaintiffs also assert that the 2022 SSA found that small population size presents a particular threat in the Pacific Coast and Lower Columbia River regions. *Id.* at 37. Like as to the South Puget Lowlands, plaintiffs assert that the "'[l]ocal populations in the Pacific Coast and Lower Columbia River region[s] are particularly susceptible to recreation impacts.'" *Id.* at 38 (first alteration in original) (quoting AR00285). Yet, the Service likewise did not explain why the unique, concentrated threats facing these populations do not satisfy the significant portion of its range standard. *Id.* Plaintiffs thus argue that the Service's omission of any analysis regarding whether the lark is in danger of extinction in the Pacific Coast and Lower Columbia River regions, and whether those regions are significant enough such that the lark is in danger of extinction in a significant portion of its range, is again sufficient basis for remanding this case. *Id.* (citing *Norton*, 258 F.3d at 1146).

In support of their arguments, plaintiffs point to *Center for Biological Diversity v. United*

*States Fish and Wildlife Service*, 488 F. Supp. 3d 1219, 1232 (M.D. Fla. 2020). *Id.* In that case, the relevant SSA had recognized that the species at issue was facing far graver threats from climate change and associated sea-level rise in certain portions of the species' range compared with other portions. *Id.* The court held that the threat "'warranted more explanation than the [] simple statement that there were no concentrated threats[,]'" and ordered the Service on remand to "'explain why threats are uniform across the range notwithstanding non-uniform rates of inundation[.]'" *Id.* at 38-39 (quoting *Ctr. for Biological Diversity*, 488 F. Supp. 3d at 1232). Plaintiffs ultimately argue that the Service's conclusions in this case suffer the same fatal flaw as in that case: the listing determination, the SSA, and the agency's peer reviews "all leave no doubt that various threats are more severe in certain portions of the [l]ark's range than others." *Id.* at 39. Despite this, the 2022 Final Rule found that "'there is no portion of the range where there is currently a concentration of threats relative to other areas in the range[.]'" *Id.* (quoting AR00332). Thus, plaintiffs argue, "the Service engaged in a cursory significant portion of its range analysis" that failed to consider the significance of individualized regions for purposes of an endangered listing. *Id.*

In turn, defendants argue that plaintiffs' arguments only prove the Service's point: each portion of the species' range faces threats, and no portion of the species' range has a different status from its rangewide status. Defs. Mot. & Resp. 46. In defendants' view, "[p]laintiffs simply disagree with the Service regarding what [the lark's] status should be." *Id.* Defendants assert this is insufficient because Ninth Circuit law makes clear that "'[w]here evidence is susceptible of more than one rational interpretation, [a court] uphold[s] the agency's finding if a reasonable mind might accept it as adequate to support a conclusion.'" *Id.* (alterations in original) (quoting *Ctr. for Biological Diversity v. Zinke*, 900 F.3d 1053, 1068 (9th Cir. 2018)).

Defendants again dispute plaintiffs' contention that the Service did not consider small population size as a particular threat on the basis that such a threat was discussed, extensively, elsewhere. *Id.* On this point, defendants note that plaintiffs quote the 2022 SSA, which stated that the South Puget Lowlands populations suffered risks that "'suggest[] that *in the future*, if influence remain the same, the South Puget Lowlands regional population could *eventually* become extirpated.'" *Id.* (emphases in original)

(quoting Pls. Mot. 37). Defendants argue this is precisely why the lark was listed as threatened—because it *could* become endangered *in the foreseeable future*—and demonstrates "why the South Puget Lowlands population is representative of the lark's status as a whole." *Id.* (citing AR00332). Defendants also point out that plaintiffs rely on the 2013 Final Rule in their discussion of the South Puget Sound population, but that the Service addressed the 2013 Final Rule's "'suggest[ion] that the South Puget Sound population could become extirpated in the near future'" in the 2022 SSA, in which the Service explained that "'[w]hen the lark was listed as threatened in 2013, an analysis predicted a rapid decline in the Washington regional populations, including breeding sites on the South Puget Lowlands, the Pacific Coast and Lower Columbia River regions[.]" *Id.* at 47 (alterations in original) (quoting Pls. Mot. 37-38; AR00268). Defendants assert that "[t]his rapid decline has not materialized[,]" and on the contrary, "some local populations have stabilized or increased," even if the numbers specific to the South Puget Lowlands may be declining. *Id.* (citing AR00239-40; AR00245). Defendants further note that a *potentially* declining population does not equate to an immediate risk of extinction. *Id.* Finally, specifically as to the Pacific Coast, defendants point out that the Service acknowledged that the size was relatively small compared to other local populations but ultimately observed "'no apparent declining trend in this regional population based on survey data between 2013 and 2019[.]" *Id.* (quoting AR00332). In essence, defendants assert that the Service reviewed the evidence for each region and concluded that small population size could contribute to extinction risk in the foreseeable future, but that none of the regions are presently facing a concentration of this threat such that they are presently in danger of extinction. *Id.*

i.    *South Puget Lowlands*

The Court finds the 2022 Final Rule to be arbitrary and capricious based on the Service's failure to discuss the genetic effects currently impacting the lark in the South Puget Lowlands. The 2022 SSA provides a relatively extensive analysis of the threats of inbreeding and low reproductive success to the lark in the South Puget Lowlands, but the 2022 Final Rule contains little discussion of this issue. It appears the closest the Service comes to addressing the issue is an acknowledgment that some effects are being felt and an indication that "any local population of larks" with low abundance does not interbreed

"will be at more risk *in the future*[.]" AR00325 (emphasis added). The 2022 Final Rule therefore does not address how the genetic effects are *currently* affecting the South Puget Lowlands, nor does it assert that this threat is felt rangewide or currently being observed rangewide. In sum, by failing to include any discussion of the severity of the genetic effects currently impacting the lark in the South Puget Lowlands, the Service failed to address an important aspect of the problem in its significant portion analysis.

Defendants assert that the 2022 Final Rule does address the declining female population and point to the Service's citation to a study that finds declining female population trends at two local sites and a stable female population and growing male population trend at five local sites in the South Puget Lowlands. Defs. Reply 19 (citing AR00318; AR01817). To be sure, the study defendants point to is relevant to the analysis. Nonetheless, the 2022 Final Rule itself does not substantively discuss the genetic threats the South Puget Lowlands is facing, let alone whether it constitutes a concentrated harm for this region. As such, while there is discussion in the 2022 SSA, and the cited studies provide useful context, the 2022 Final Rule does not itself discuss why the genetic issues the South Puget Lowlands is facing are or are not a concentrated threat that might warrant a different listing status. Defendants' arguments thus do not alter the Court's conclusion on this issue.

### ii.     *Pacific Coast & Lower Columbia River*

The Court does not, however, find the listing determination to be arbitrary and capricious based on the Service's discussion of threats facing larks in the Pacific Coast or Lower Columbia River regions. Plaintiffs argue at length that defendants did not address the specific threats facing these regions, but this argument is belied by the record. The 2022 Final Rule discussed the impact of the Pacific Coast region's small population, invasive beach grass, sea-level rise, and increased coastal erosion, as well as the impact of small population and certain land management activities on the Lower Columbia River; and then explained why these factors do not change the lark's status. AR00325; AR00328-29. Again, it is true that not all these factors are discussed within the "significant portion" section of the Service's analysis. Nonetheless, they are discussed within the 2022 Final Rule and can be reasonably traced to the Service's ultimate conclusions.

As further example, the 2022 Final Rule contains a discussion of current stressors influencing the lark's conditions. AR00320. In this discussion, the Service included a comprehensive analysis of the impact of beachgrass and noted that this beachgrass has reduced available nesting habitat and that the low abundance of the local populations in the Pacific Coast region can be attributed to the beachgrass. *Id.* The 2022 Final Rule also discussed how the beachgrass will continue to influence local populations only if they are not subject to management, such as the habitat restoration work conducted on Leadbetter Point. *Id.* The restoration work at that site reduced the beachgrass to increase the suitable habitat from approximately eighty-four acres to 121 acres. *Id.* That location gained an estimated five-eighths new territories following the restoration work. *Id.* As another example, the 2022 Final Rule repeatedly acknowledged the small lark populations on the Pacific Coast but emphasized that this region has, historically, never had large populations, indicating that current low populations is not necessarily connected to any outside factors or indicative of this factor being a substantial threat to this region. AR00332. For these reasons, it does not appear that the Service has failed to address the threats facing larks in the Pacific Coast or Lower Columbia River regions, and the Court finds that the 2022 Final Rule is not arbitrary and capricious based on the Service's conclusion that the Pacific Coast and Lower Columbia River regions are not facing a concentration of threats.

**B.    The Revised 4(d) Rule**

Plaintiffs argue that the revised 4(d) Rule is arbitrary and capricious because (1) its "wholesale exemption of 'routine agricultural practices' in the Willamette Valley since 2013, and now across the [l]ark's range," does not provide for the conservation of the lark where it foregoes the ESA's safeguards entirely, rather than trying to limit the harms of agricultural practices that have been recognized to intensify during the larks' breeding season; (2) the Service's own evidence shows that the harms associated with agricultural practices are significant; (3) the Service's rationale underlying the agricultural exemption is unsupported by the record; (4) the evidence shows that since the 2013 4(d) Rule's implementation, the loss of habitat that it was designed to avert has persisted; and (5) the Service's assertion that either the 2013 or revised 4(d) Rule incentivizes landowners to voluntarily report and serve larks is unsupported by the record.

Pls. Mot. 39-44.

In turn, defendants argue that the revised 4(d) Rule, and particularly the determination not to extend Section 9 take prohibitions to routine agricultural activities, are critical to the lark's conservation. Defs. Mot. & Resp. 48. Defendants argue that the revised 4(d) Rule encourages continued land disturbance which the lark relies on, and that because most of the agricultural land base in the Willamette Valley is privately held, conservation of larks is a significant challenge where the same land management activities that can harm or kill individual larks are also necessary to create and maintain the habitat characteristics that the lark requires as a species. *Id.* at 50. Under such circumstances, defendants argue, Section 9's prohibitions can work against the best interest of the lark by discouraging landowners from engaging in activities that are beneficial to the species and creating a perception that its presence creates a legal or economic liability. *Id.* at 51. This is particularly so because Section 9 provides no requirement that landowners "*continue* beneficial activities[,]" *i.e.*, landowners would be free to alter land management practices to discourage attracting larks to their land without infringing on Section 9. *Id.* (emphasis added). Thus, defendants argue that the revised 4(d) Rule is rationally related to minimizing the negative incentives for landowners, while encouraging the continuation of land management practices that are beneficial to the lark. *Id.*

Defendants further argue that plaintiffs' contention that the revised 4(d) Rule fails to provide for the conservation of the lark is meritless because the Service has fully and repeatedly acknowledged that land management activities can harm individual larks and destroy nests. *Id.* Nonetheless, defendants characterize the question not as whether these activities can harm larks, but whether extending the Section 9 take prohibition to make grass seed harvest in late June (when the first nesting attempt typically happens) a potential violation of the ESA would benefit the conservation of the species. *Id.* at 51-52 (citing AR00312). The Service concluded it would not because exposing landowners to Section 9 liability for harvesting grass seed would disincentivize grass seed farming and create an incentive to discourage the presence of larks. *Id.* at 52. Defendants thus characterize plaintiffs' arguments as a difference of opinion over the best way to incentivize private landowners and therefore contend that

the Service's judgment is entitled to deference. *Id.* at 52-53.

Defendants also dispute plaintiffs' implication that the Service was required to extend Section 9's take prohibitions to routine agricultural activities based on the lack of evidence showing that the 2013 4(d) Rule has prevented conversion of cropland suitable to the lark. *Id.* at 52; Defs. Reply 21 (citing *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014)). Defendants argue that plaintiffs have not identified any available and relevant information that the Service did not already consider, which alone is fatal to plaintiffs' claim. Defs. Mot. & Resp. 52. Defendants contend that there are numerous "incentives for landowners to convert grass seed farms to habitats less hospitable to larks[,]" such as "the availability of higher value crops and a drop in demand for grass seed." *Id.* According to defendants, "[t]he purpose of [both the 2013 and revised 4(d) Rules] was to conserve the lark by avoiding adding an *additional* incentive for [converting] habitat[s] favorable to the lark[,]" *i.e.*, "exposure to Section 9 liability." *Id.* at 52-53; *see* Defs. Reply 21 (citing AR00334-35). Defendants acknowledge that "[w]hether adding Section 9 liability would have accelerated the trend of conversion is not empirically knowable," but argue that "the Service's conclusion that such liability would play a role was explained in the record and supported by the agency's experience and scientific literature." Defs. Mot. & Resp. 53.

The Court addresses the revised 4(d) Rule in two parts. First, the Court considers whether the revised 4(d) Rule's continuation of the 2013 4(d) Rule's exception for agricultural practices in the Willamette Valley is arbitrary and capricious. Second, the Court considers whether the revised 4(d) Rule's extension of this exception to regions other than the Willamette Valley is arbitrary and capricious.

As to the first question, the Court does not find that the revised 4(d) Rule's continued exception to the take prohibition for agricultural activities in the Willamette Valley is arbitrary and capricious. To begin, as a general matter, the Service does not appear to have downplayed the harms or risks associated with permitting agricultural practices. In its discussion of the revised 4(d) Rule within the 2022 Final Rule, the Service repeatedly acknowledges the risks associated with permitting these activities, particularly in relation to management activities during the lark's nesting season. AR00312-15; AR00334-36. Despite plaintiffs' assertion that the Service misrepresents the nesting time period, the studies the

Service cites indicate that peak breeding season appears to be from May to early June, and the nesting that occurs in late June or early July is often a second nesting attempt that appears to have fewer incidences of breeding attempts (although there is still a higher number of breeding attempts during this period compared to other months). *Compare* Pls. Mot. 40-41 (citing AR00312-13, AR00335), *with* AR02052 (study reflecting observation of six nests that originated between April and early June, and four nests that originated in early July), *and* AR02607 (study indicating that approximately sixteen percent of nests occurred in late May/early June, the peak, whereas approximately twelve percent occurred in late June, a second, smaller peak). Thus, while it may be more accurate in some regard to describe the nesting season as having two peaks, it is not inaccurate or contrary to the evidence to describe the lark's peak nesting season as being in late May and early June.

The issue of whether the revised 4(d) Rule actually accomplishes the incentives and goals set forth by the Service is a closer call. On the one hand, plaintiffs set forth strong arguments that the exception for agricultural activities is not limited to practices that benefit the lark and that there is minimal evidence of how the 2013 4(d) Rule has benefitted the lark over the last ten years. On the other hand, defendants set forth strong arguments that there are multiple factors influencing the decline of suitable habitat in the Willamette Valley, not all of which (*e.g.*, market economics, crop rotation) the Service can influence, and that it is impossible to know how much crop conversion would have been impacted if the take prohibition hadn't excepted agricultural practices. Ultimately, it appears that this question is one with more than one rational conclusion which could be reached. In such circumstances, the Service's conclusion is entitled to deference, and plaintiffs' arguments must fail. *See Zinke*, 900 F.3d at 1068 (quoting *San Suis & Delta-Mendota Water Auth.*, 747 F.3d at 601) ("Where 'evidence is susceptible of more than one rational interpretation,' we uphold the agency's finding if a 'reasonable mind might accept [it] as adequate to support a conclusion.'").

For the same reason, plaintiffs' argument related to the scope of the exception—*i.e.*, that the Service should have limited the exception for agricultural activities based on crop type rather than activity—also fails. The Service explained its reasoning on this point, noting that various farming activities,

36

not just grass seed farming, can create habitats beneficial to larks. *See* AR00315. As defendants point out, although "grass seed fields are particularly beneficial, other types of farming also benefit the lark[] and cannot always be reasonably predicted based on crop type." Defs. Reply 22 (citing AR00315; AR00234). Ultimately, it is not unreasonable to believe that trying to craft an exception that encompasses the full scope of potentially beneficial activities could render the rule unnecessarily complicated and, therefore, less useful. Thus, there appears to be more than one rational conclusion to be reached on this issue, and the Service's decision must be given deference.

While it is true that the exception does not change the status quo to actively protect the lark (such as by prohibiting agricultural activities during breeding season), it also does not change the status quo in a way that may inadvertently harm the lark (such as by encouraging landowners to convert crops to avoid potential Section 9 liability). Further, although plaintiffs assert that the Service's assertions regarding the incentivization of landowners are "generic," these statements are supported by evidence collected in several studies, all of which indicate that landowners are likely to convert land to avoid attracting protected species, particularly where the species is not well-known. *See* AR00335. Though these studies are not specific to the lark, plaintiffs have not identified any evidence in the record that would indicate landowners would be more receptive to having larks on their property.[9] For all these reasons, the Court does not find that the revised 4(d) Rule's continued exception for agricultural activities in the Willamette Valley is arbitrary and capricious.

The Court does, however, find the Service's expansion of the revised 4(d) Rule to all of the lark's range to be arbitrary and capricious. The 2022 Final Rule appears to only reference the expansion one time, stating that "[a]lthough [the Service is] unaware of any current breeding populations of streaked horned larks on agricultural lands in Washington, use of these habitats by streaked horned larks would aid

---

[9] In fact, plaintiffs point out evidence that may suggest the contrary. Plaintiffs note that the Service "spent multiple years and $175,000 trying to engage the owners of working farmlands in voluntary conservation" but that ultimately, the efforts "could not get a single landowner to come forward to voluntarily report and conserve [l]arks." Pls. Mot. 37 (citing AR00194; AR00948). This appears to indicate, at best, private landowners' disinterest with attracting larks to their land.

in recovery of the subspecies in Washington as in Oregon[.]"  AR00335.  In essence, it appears that there is no evidence supporting the expansion of the exception beyond a general claim that it will benefit larks' conservation.  Indeed, as recognized by the 2022 Final Rule, there appears to be no evidence that there are larks utilizing these habitats in Washington or regions outside of the Willamette Valley.  Combined with the existence of evidence that larks have "high nest site fidelity" (meaning they do not frequently leave their chosen population sites), AR00234, it is difficult to understand the rationality behind the expansion of the exception.  As such, the Court finds that the revised 4(d) Rule's expansion of the exception for agricultural activities beyond the Willamette Valley is arbitrary and capricious and subject to remand.

C.    **Remedies**

Having found that both the 2022 Final Rule and revised 4(d) Rule are subject to remand, the Court must now determine the appropriate remedy to be issued.  Plaintiffs request that the Court (1) remand the Service's decision not to list the lark as endangered, but leave the threatened listing in place pending a new listing determination from the Service on remand; (2) order the Service to issue a new listing determination for the lark within one year of the date of this Opinion and Order; and (3) vacate the 4(d) Rule's exception of take caused by agricultural practices, which plaintiffs assert is appropriate here "'to prevent the harms flowing' from the agency's unlawful action."  Pls. Mot. 40 (quoting *Neighbors of the Mogollon Rim, Inc. v. U.S. Forest Serv.*, No. 22-15259, 2023 WL 3267846 (9th Cir. May 5, 2023)).  Defendants agree that remand without vacatur is appropriate as to the listing determination but argue that the Court should not order a specific remand period.  Defs. Mot. & Resp. 53-54.  Instead, defendants assert that the Court should allow the parties to submit additional briefing to assess the work that will be required by the Service based on the Court's findings.  *Id.*  Defendants also argue that if the Service determines that promulgation of a new rule is needed, one year is "likely [] too short" a timeframe for the Service to issue such a rule because the Service will need to update the scientific information, propose and publish the rule for public comment, assess the public comments, and then submit a final rule for publication.  *Id.* at 44.  Finally, defendants assert that the revised 4(d) Rule should also be remanded without vacatur.  *Id.*

As to the remand period, the Court is cognizant that it generally "should not dictate to an

administrative agency 'the methods, procedures, and time dimension' of the remand" absent "'substantial justification.'" *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 839 F. Supp. 2d 1117, 1129 (D. Or. 2011) (quoting *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976) (per curiam)). Nonetheless, "[d]istrict courts have 'broad latitude in fashioning equitable relief when necessary to remedy an established wrong,'" *id.* (quoting *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 936 (9th Cir. 2008)), and district courts' discretion in this area includes the "discretion to impose a deadline for remand proceedings[,]" *id.* Here, there is substantial justification for setting a deadline for remand proceedings: such action is in accord with the nature of the ESA, which mandates that "timeliness in the listing process is essential." *Ctr. for Biological Diversity v. Norton*, 254 F.3d 833, 839 (9th Cir. 2001). Courts also recognize the practical reality that "an open-ended remand without vacat[ur] . . . is, in effect, an indefinite stay of the effectiveness of the court's decision and agencies naturally treat it as such." *Nat. Res. Def. Council v. EPA*, 489 F.3d 1250, 1264 (D.C. Cir. 2007) (citation omitted) (Randolph, J., concurring); *see Eme Homer City Gen., L.P v. EPA*, 795 F.3d 118, 132 (D.C. Cir. 2015) ("[R]emand without vacatur creates a risk that an agency may drag its feet and keep in place an unlawful agency rule."). As such, no later than one year[10] from the date of this Opinion and Order, the Service shall issue a new listing determination for the lark that is consistent with the findings set forth herein.

    As to vacatur of the revised 4(d) Rule, the Court finds vacatur to be appropriate as to the revised 4(d) Rule due to its arbitrary expansion of the exception for agricultural activities beyond the Willamette Valley. When considering vacatur of an agency's decision, courts generally consider "'the seriousness of the order's deficiencies . . . and the disruptive consequences of an interim change that may itself be changed.'" *Nat'l Org. of Veterans' Advocs. v. Sec'y of Veterans Affairs*, 260 F.3d 1365, 1380 (Fed. Cir. 2001) (omission in original) (quoting *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1492 (D.C. Cir.

---

[10] As plaintiffs point out, the Service is generally required to conclude the listing process, when starting from scratch, within two years, Pls. Mot. 45 (citing 16 U.S.C. § 1533(b)(3)(A)-(B), (b)(6)(A)), and the ESA itself contemplates the issuance of a final rule only ninety days after the publication of a proposed rule, *see* 16 U.S.C. § 1533(b)(5). Where, as here, the SSA is recently updated and the Service holds much pertinent information already, the Court finds one year to be sufficient. *See* AR00228 (indicating the Service's "intent [] for th[e] SSA report to be easily updated").

1995)).  Here, the Court need not leave the revised 4(d) Rule in place where there is no indication that it provides protection for the lark or that there will be any disruptive consequences of vacatur, particularly where the 2013 4(d) Rule may be reinstated.  "Normally, the effect of invaliding an agency action is to reinstate the agency action or rule previously in effect." *Nat'l Wildlife Fed'n*, 839 F. Supp. at 1129 (citing *Paulsen v. Daniels*, 413 F.3d 999, 1008 (9th Cir. 2005)).  Here, that means the 2013 4(d) Rule is reinstated.

For all these reasons, the Court remands the Service's decision not to list the lark as endangered, but leaves the threatened listing in place pending a new listing determination from the Service on remand; orders the Service to issue a new listing determination for the lark within one year of the date of this Opinion and Order; vacates the revised 4(d) Rule; and reinstates the 2013 4(d) Rule.

## CONCLUSION

For the reasons stated herein, plaintiffs' motion is GRANTED, and defendants' motion is DENIED.  The case is REMANDED to the Service to complete a new listing determination, to be issued within one year of the date of this Opinion and Order.  The current listing determination shall remain in place pending the issuance of the new listing determination.  The revised 4(d) Rule is VACATED, and the 2013 Section 4(d) rule issued as to the lark is REINSTATED pending the issuance of the Service's new listing determination.

IT IS SO ORDERED.

DATED this 29th day of September, 2025.

Adrienne Nelson
United States District Judge